**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
David Saldamando
Alexandra E. Forgione
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**KAHN SWICK & FOTI, LLC**
Kim E. Miller
J. Ryan Lopatka
250 Park Ave., 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
kim.miller@ksfcounsel.com
j.lopatka@ksfcounsel.com

*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE ZETA GLOBAL HOLDINGS CORPORATION SECURITIES LITIGATION | No. 1:24-cv-8961-DEH <br><br> CLASS ACTION <br><br> JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................. 2

II.     JURISDICTION AND VENUE .............................................................................. 8

III.    PARTIES ................................................................................................................... 9

        A.    Lead Plaintiffs ............................................................................................... 9

        B.    Defendants .................................................................................................... 9

        C.    Former Employees With Relevant Knowledge And Information ....................... 12

IV.     OVERVIEW OF THE FRAUD ............................................................................... 13

        A.    Zeta's Value Was Tied To Its Proprietary And Exclusive "Opted-In" User
              Data Set ........................................................................................................ 13

        B.    Between 2007 And 2021, Zeta Grew Through Strategic Acquisitions That
              Enlarged Its Purported "Opted-In" User Data Set To Include Nearly 90%
              Of The U.S. Adult Population ......................................................................... 16

        C.    Zeta Went Public In 2021, Capitalizing On Its Deployment Of Its "Opt-In"
              Consent Framework, A New Focus Of The Industry ........................................ 18

              1.    Zeta Embraces Heightened "Opt-In" User Consent Requirements .......... 18

              2.    Zeta Launches Its IPO, Touting Its "Opted-In" Data As The
                    "Philosophical" Foundation Of The Company ....................................... 23

              3.    Post-IPO, Zeta Continues Acquiring Companies For User Data,
                    Claiming Additional Opted-In Data ....................................................... 25

        D.    Beginning In Early 2024, Zeta's Stock Price Increased Exponentially As
              Defendants Make a Series of Statements That Linked the Company's
              Success To Its First Party "Opted-In" User Data ............................................ 28

        E.    On November 13, 2024, Culper Research Publishes A Report Indicating
              That Zeta's User Data Was Improperly Collected From "Consent Farms" ......... 33

        F.    Amidst The Culper Report Revelations, Defendants Continued To Tout
              Their Opted-In Data Set And Also Denied That They Acquired Data From
              "Consent Farms" ........................................................................................... 38

        G.    Zeta Admits That More Than Half Of Its 240+ Million U.S. Individuals'
              User Data Was Never "Opted-in" At All ......................................................... 41

H.  Lead Plaintiffs' Investigation Confirms And Expands On Defendants' Deceptive Statements And Conduct ................................................ 50

    1.  Lead Plaintiffs' Data Science Expert Conducted His Own Independent Investigation Into Zeta's Data Collection Practices ............ 50

    2.  The Data Collected From Disqus, Zeta's Main Source of Consumer Data, Was Not "Opted-In" During The Class Period ............. 66

    3.  Former Employees Explain That Zeta Improperly Managed User Data—Including The Consent Of Its Users—And Was Intentionally Opaque With Customers About Its Opt-In Practices .......... 69

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ................................................................................. 73

A.  Q4 2023 Earnings Conference Call (February 27, 2024) ...................................... 73

B.  FY 2023 Form 10-K (February 28, 2024) ........................................................... 75

C.  Morgan Stanley Technology, Media & Telecom Conference (March 4, 2024) ............................................................................................................... 76

D.  Q2 2024 Earnings Conference Call (July 31, 2024) ............................................ 78

E.  Fox Business Interview (October 25, 2024) ........................................................ 79

F.  Company Press Release (November 13, 2024) .................................................... 80

G.  Zeta Update On Company In Response To Recent Price Movements (November 14, 2024) ........................................................................................ 81

H.  Zeta's Form 8-K (November 14, 2024) ............................................................... 82

I.  Zeta's Rebuttal Presentation (November 20, 2024) ............................................. 82

J.  William Blair Analyst Conference Call (November 20, 2024) ........................... 83

K.  CNBC Interview (November 27, 2024) ............................................................... 86

L.  Zeta Data Summit (December 9, 2024) ............................................................... 86

M.  Interview With Anthony Pompliano (December 12, 2024) .................................. 88

VI.  OVERVIEW OF SCIENTER ALLEGATIONS .............................................................. 89

A.  Defendant Steinberg Circumvented Section 16 Of The Exchange Act And Zeta's Own Insider Trading Compliance Policy In Order To Obscure,

Expedite, And Maximize Extraordinary And Unusual Profits During The Class Period ................................................................................ 89

1.  Steinberg's Scheme Circumvented Section 16 Reporting Requirements .................................................................. 91

2.  Steinberg's Scheme Circumvented The SEC's Mandatory 90-Day Cooling-Off Period For Officers And Directors ................................... 100

3.  Steinberg's Scheme Circumvented The "Blackout Periods" Imposed By Zeta's Insider Trading Compliance Policy ........................ 102

4.  Steinberg's Scheme Circumvented Section 16(b)'s Rule Against "Short-Swing" Profits, Allowing Him To Covertly Lock-In Expedited Huge Profits Of Over $25 Million During The Class Period ............................................................................. 105

B.  Zeta Closely Monitored Its Own Data Collection Practices In Response To The FTC's Lawsuit Against Fluent .................................... 108

C.  Zeta Claimed To Record And Document Each And Every "Opt-in" That Came In, Strongly Supporting An Inference of Scienter ................................... 110

D.  The Individual Defendants' Data-Focused Positions In The Company And Repeated Assertions Regarding Zeta's "Opted-In Data Set" Supports A Strong Inference Of Scienter ................................................ 112

E.  Following The Culper Report, Defendants Admitted Zeta Had Misled The Market And That It Had Not Been "Transparent" With Investors, Supporting A Strong Inference Of Scienter .................................... 116

F.  Zeta's First Party Opted-In Data—Its "Secret Sauce"—Was Core To The Company's Business, Such That Defendants Knew How Zeta Obtained Its Data ............................................................................. 120

G.  Analysts' Frequent Interest In And Questions About Zeta's Opt-In Consent Framework Meant That Defendants Were Informed ........................... 123

H.  Former Employees Corroborate Defendants' Reckless Disregard For The Acquisition And Handling Of Consent From Its Users ...................... 126

I.  Defendants' SOX Certifications Are Further Indicia Of Scienter ...................... 128

VII.  DEFENDANTS' SCHEME TO DEFRAUD THE MARKET ....................................... 129

VIII.  LOSS CAUSATION ........................................................................ 134

IX.  PRESUMPTION OF RELIANCE .......................................................... 140

X.      CLASS ACTION ALLEGATIONS ...................................................................142

XI.     THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE ...............................................................................144

XII.    CONTROL PERSON ALLEGATIONS......................................................................145

XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT...........................................147

COUNT I ......................................................................................................................147

COUNT II .....................................................................................................................149

COUNT III....................................................................................................................151

XIV.    PRAYER FOR RELIEF ...............................................................................154

XV.     JURY DEMAND ........................................................................................155

Court-appointed Lead Plaintiffs Allegheny County Employees' Retirement System ("Allegheny") and Amir Konigsberg ("Konigsberg," and together with Allegheny, "Lead Plaintiffs"), by and through their undersigned counsel ("Lead Counsel"), bring this federal securities class action on behalf of themselves and a class consisting of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Zeta Global Holdings Corp. ("Zeta" or the "Company") during the period from February 27, 2024 through March 10, 2025, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class"). Lead Plaintiffs assert claims for violations of the Securities Exchange Act of 1934 (the "Exchange Act") against: Zeta; the Company's Chief Executive Officer ("CEO"), David A. Steinberg ("Steinberg"); the Company's Chief Financial Officer ("CFO"), Christopher Greiner ("Greiner"); Company's Chief Data Officer ("CDO"), Neej Gore ("Gore"); and the Company's Senior Vice President ("SVP"), Privacy and Chief Privacy Officer ("CPO"), Benjamin Hayes ("Hayes") (collectively, "Defendants," and without Zeta, the "Individual Defendants").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on the ongoing investigation of Lead Counsel. This investigation includes review and analysis of, among other things: (i) public filings made by the Company with the Securities and Exchange Commission ("SEC"); (ii) transcripts of the Company's conference calls with analysts and investors; (iii) the Company's presentations, press releases, and other public statements issued by Defendants; (iv) research reports issued by securities and financial analysts; (v) news and media reports and other publicly available information concerning the Company and Defendants; (vi) economic analyses of the movement and pricing of the Company's publicly traded securities; (vii) consultation with experts, including a data science expert; and (viii) interviews of

former employees of the Company (referred to as "FE-__"). Lead Counsel's investigation into the factual allegations continues, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.    Nearly a decade ago, *The Economist* wrote: "The world's most valuable resource is no longer oil, but data."[1] That sentiment, once rather shocking, is now common knowledge, as some of the most profitable companies in the world are the largest custodians and purveyors of personal data.

2.    But as data became big business, privacy and security issues led to questions and concerns regarding how companies cultivated their use of individual's personal data. This, in turn, led to a number of systemic changes in how such companies conduct their business—chief among them, Apple's 2020 adoption of a mandatory "opt-in" consent as a prerequisite to "app" providers operating on its platform. Additionally, state legislatures across the United States and various countries throughout the world have enacted laws to address these privacy concerns, creating a complicated web of regulations governing the collection and use of data. As a result, not all data has the same value anymore; the methods of procurement—and, specifically, the permissions received when gathering data—help determine its worth in the market.

3.    This is where Zeta boasted its value proposition, and also where Defendants perpetrated their fraud. Zeta is just one of many marketing and advertising companies that ingests large quantities of individual user data, which is then synthesized and sold to clients for

---

[1] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last accessed on May 12, 2025).

advertising, targeting and tracking purposes. Defendants distinguished Zeta from the rest of the market by emphasizing that Zeta had obtained the highest level of consent for the collection of the user data it was ingesting—*i.e.*, "**opt-in**" consent.

4.      This, according to Defendants, set them apart. When asked by an analyst prior to the start of the Class Period about the regulatory scrutiny being applied to the data advertising industry, Zeta's CFO, Defendant Greiner, stated: "what's unique about our model is that we're philosophically, and the foundation of our data, is all built on permissioned data; ***data that's been opted-in*** . . . ***and that's really the central part of our business model***." When later questioned about the evolving regulatory environment in mid-2023, Defendant Greiner again emphasized that although regulations had "evolved over time," "the ***single thread in all of that that's important is it's opt-in. Privacy-first opt-in. From the very beginning of Zeta's data cloud, it's been built on that premise of opt-in***."

5.      Over the course of the Class Period, Defendants continued to bang that drum, consistently and repeatedly claiming that Zeta's "***data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally*** with an average of more than 2,500 attributes per individual"; that "***[t]he 240 million Americans in our data cloud have opted-in to be there***"; and that "***[w]e have 240 million opted-in Americans in our data cloud that we're seeing*** across 5.2 million publisher platforms on a first-party basis."

6.      In this highly regulated industry, Zeta's first party "opted-in" data set provided assurance to Zeta's customers and investors that, even in the face of increasing regulatory scrutiny, Zeta's data was safe. That Zeta purportedly acquired its first party user data through "opted-in" consent meant that Zeta's practices, unlike other companies, exceeded minimum data privacy law requirements.

7.     The investment community locked in on Zeta's "opted-in" consent-driven value proposition. In July 2024, Truist Securities wrote that the number one "Investment Highlight" for Zeta, and a "Key Part" of the "Zeta Story" was the Company's "competitive moat with one of the ***largest opted-in consumer data*** sets in the world powering Zeta's data cloud," repeating and quoting Defendants' misstatements that Zeta's opted-in data set "***encompass[ed] over 240 million opted-in individuals in the US and 535 million globally***." In October 2024, analysts at KeyBanc decreed that Zeta's first party opted-in dataset of over 240 million users was the Company's "*secret sauce*."

8.     But the real secret was that Defendants had been lying about the ingredients. Defendants would later admit that in reality, more than half of the 240 million U.S. individuals in its database had not provided "opted-in" consent, and then abandoned the "opted-in" language altogether. As it turns out, data had been collected from individuals who had not opted-in—and, in some cases, those users had provided no consent whatsoever. When the truth was revealed through a series of partial disclosures, Zeta's stock price plummeted, even as Defendants attempted to maintain the fiction (and Zeta's stock price) with additional misrepresentations about Zeta's data collection practices.

9.     Zeta's true state of affairs first began to emerge on November 13, 2024, when research investment firm, Culper Research, issued a report (the "Culper Report") detailing how "conversations with former employees, a September 2023 class action lawsuit, [and] our own experiences alongside numerous online complaints corroborate our views regarding the deceptive way that Zeta gathers 'opted-in' data." The Culper Report detailed how Zeta operated "consent farms," *i.e.*, websites which obtained user data from individuals through misleading and fraudulent methods. The Culper Report found that "Zeta has quietly spun up its own network of consent

4

farms," and listed 40 "**sham websites** that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses, baited by job applications, stimulus money, or other rewards that **simply do not exist**."

10.    Zeta's share value plummeted 37% in reaction to the Culper Report. Zeta quickly published a response to the Culper Report in order to halt its rapidly falling stock price, calling the Culper Report analysis "misleading" and "riddled with misrepresentations, speculative conjecture, and categorically false statements." Critically, Zeta denied the Culper Report's assertions about Zeta's opted-in data, claiming that "Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners," and "is confident in its data collection practices, policies and processes to ensure compliance with applicable laws." A week later, Zeta issued another vehement rejection of the Culper Report, stating unequivocally, "**Zeta does not operate 'consent farms.'**"

11.    But these denials were simply untrue, as confirmed by not only Defendants' later admissions, but also by Lead Counsel's own expert's corroboration of the Culper Report findings. Specifically, Lead Plaintiffs conducted an independent investigation with the assistance of a data science expert who validated and substantiated many of the findings in the Culper Report concerning the nature of Zeta's "consent farm" operations. As discussed below, Lead Plaintiffs' data science expert: (1) validated the findings of the Culper Report related to Zeta's use of consent farming for obtaining user data; (2) discovered that many of the consent farm operation websites named in the Culper Report have since been deleted and scrubbed (or the associated privacy policies were changed); (3) found that Zeta has improperly obtained data from websites (including from fake job posting platforms) through the use of "leaky forms," a tactic whereby Zeta-affiliated websites obtain user data even when users have had no opportunity to actually give opt-in consent to the collection of such data; and (4) found that **Zeta is still, to this day, using consent farms to**

*acquire user data*. Lead Plaintiffs' data science expert also confirmed that data collected from Zeta's most prominent source of user data—the Disqus commenting platform that represented 33% of the user data in Zeta's data cloud at the start of the Class Period—was not collected under a true "opt-in" framework of consent, as had been represented by Defendants.

12.    After Defendants had forcefully denied the Culper Report, Zeta offered a series of admissions that confirmed and corroborated it.

13.    On the morning of December 9, 2024, the Company hosted the "Zeta Data Summit," during which Defendant Gore conceded Zeta's data set did ***not***, in fact, include "240 million opted-in individuals in the U.S.," ***but instead only included 110 million opted-in individuals***. As explained by Ari Waldman, a professor of law at the University of California, Irvine: "Calling your data set the largest 'opted-in' data set and then admitting that less than half the people in that data set actually opted in is a straight up lie."

14.    Then, when Zeta filed its annual Form 10-K with the SEC on February 26, 2025, Defendants quietly corrected their Class Period misstatements by removing all references to Zeta's "opted-in" data set.

15.    Two weeks later, on March 10, 2025, in an article highlighting this "correction," *The Capitol Forum* pointed out that "Zeta's 2024 annual filing walked back Defendants' claims and references to consumers opting in to data sharing," which raised serious "questions over how the company sources and promotes its data set." Critically, the article included a comment from a Zeta spokesperson who conceded that the Company issued the correction "to provide shareholders with clear and accurate disclosures." Zeta even admitted that removal of the phrase "opted-in" in reference to its data set "ensures our terminology aligns with the nature of permissions across our data assets to prevent misinterpretations." In other words, Zeta conceded Defendants' Class Period

representations about its "opted-in" users was neither clear nor accurate, but simultaneously attempted to lay the onus of those representations at the feet of the Company's investors, who somehow "misinterpreted" the Company's crystal-clear prior claim to have "opted-in" consent to share the data of 90% of the U.S. adult population.

16.      Zeta's stock price declined precipitously after each of these admissions revealed the truth, ultimately closing at $14.03 per share on March 10, 2025, down nearly 62% from its Class Period closing high of $36.74.

17.      Defendants' false and misleading statements of material fact, which caused the losses of Lead Plaintiffs and the Class, were made with scienter.  Defendant Steinberg, as Zeta's founder and CEO, was the key architect of the Company's opted-in data set and repeatedly spoke with knowledge about Zeta's data collection policies and the specific opt-in practices that he instituted. Similarly, Defendants Greiner, Gore, and Hayes also made repeated and informed assertions regarding Zeta's opted-in data set—with the latter two individuals responsible for Zeta's data collection and privacy compliance as Chief Data Officer and Chief Privacy Officer, respectively. Moreover, Defendants claimed to **record, document, and validate every "opt-in" that the Company received**, and, following the revelations of the Culper Report, Defendants *admitted* they were not "transparent with the investment community." The Individuals Defendants' deep understanding of and active involvement in Zeta's data collection practices demonstrates their knowledge of the falsity of Defendants' repeated claim that it obtained opted-in consent from millions of individuals.

18.      Moreover, Defendant Steinberg was **specifically** and **personally** motivated to artificially inflate Zeta's stock price. Throughout the Class Period, Defendant Steinberg perpetrated a scheme to defraud Lead Plaintiffs and the Class by systematically misrepresenting

the nature of Zeta's "opted-in" consent for Zeta's valuable user data in an effort to maintain or drive up the share price, all while surreptitiously selling massive quantities of Zeta common stock via a complex web of LLCs and trusts. All told, during the Class Period, Steinberg sold some *13,371,398 shares* of Zeta common stock for total profits of *$270 million*—an extraordinary amount and materially distinct from Steinberg's past trading practices.

19.    Accordingly, Lead Plaintiffs bring this action to hold Defendants responsible for their fraud and the resulting significant losses suffered by investors.

## II.    JURISDICTION AND VENUE

20.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

21.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

23.    Zeta conducts substantial business in this District, with its corporate headquarters located in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including the preparation and dissemination to the public of materially false and misleading information, occurred in this District. The Company's common stock trades on the New York Stock Exchange ("NYSE"), a national stock exchange located in this District.

24.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.    PARTIES

#### A.    Lead Plaintiffs

25.    Lead Plaintiff Allegheny is a single-employer, defined benefit, contributory retirement benefit plan covering substantially all employees of the County of Allegheny, Pennsylvania. As of March 2025, Allegheny manages approximately $930 million in assets on behalf of approximately 12,100 participants, including members of the Allegheny County's police and fire departments. As set forth in the attached Exhibit A, Allegheny purchased Zeta common stock during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

26.    Lead Plaintiff Konigsberg, a founder, executive, and strategic advisor in the technology sector with a focus on AI-driven businesses and products, has years of experience investing in capital markets. As set forth in the attached Exhibit B, Mr. Konigsberg purchased Zeta common stock in domestic transactions during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

#### B.    Defendants

27.    Defendant Zeta is a marketing technology company incorporated under the laws of Delaware. Zeta operates a cloud-based platform for marketers to identify and target potential consumers across a wide range of digital channels, including email, social media, web, chat, connected TV, and video. Zeta was founded in 2007 by Defendant Steinberg and former Apple CEO John Sculley, who remains as a member of the Board of Directors. The Company was first known as XL Marketing, changing its name to Zeta Interactive in 2014, and then to Zeta Global in 2016. Zeta is headquartered in New York, New York, with offices around the world. The Company went public on June 10, 2021, and trades on the NYSE under the ticker symbol "ZETA." According to the Company's Form 10-K for the fiscal year ("FY") ended December 31, 2024

("2024 Form 10-K"), as of February 14, 2025, the total number of outstanding shares of Zeta's Class A common stock was 237,722,456.

28.    Defendant Steinberg is and was the Company's co-founder and served as Zeta's Board Chairman and Chief Executive Officer at all relevant times. Steinberg is a serial entrepreneur who founded and served as CEO for several companies in the wireless communications industry before Zeta. Throughout the Class Period, Steinberg gave prepared remarks and answered questions at each of the Company's earnings conference calls, signed Zeta's quarterly and annual financial reports and Sarbanes-Oxley Act ("SOX") certifications attached thereto, and gave various interviews to analysts and the media.

29.    Defendant Greiner is and was the Company's Chief Financial Officer at all relevant times. Prior to joining Zeta, Greiner was the CFO for several technology-based companies in various fields. Throughout the Class Period, Greiner gave prepared remarks and answered questions at each of the Company's earnings conference calls and signed Zeta's quarterly and annual financial reports and SOX certifications attached thereto.

30.    Defendant Gore is and was the Company's Chief Data Officer at all relevant times. Gore's other positions at Zeta included the President of Data Cloud Division from January 2019 to December 2020, the SVP and Head of the Data Cloud Division from January 2018 to December 2018, and SVP of Business Operations from July 2017 to January 2018. According to his biography on Zeta's website, Gore "is responsible for the Zeta global data and analytics strategy, creating growth for brands by transforming data into actionable business insights, developing Zeta's identity graph and driving further innovation within the Opportunity Explorer platform." During the Class Period, Gore made materially false and misleading statements in an investor

conference call with William Blair to defend the Company's data collection practices in the wake of the Culper Report.

31.     Defendant Hayes is and was the Company's SVP, Privacy and Chief Privacy Officer at all relevant times. During the Class Period, Hayes made materially false and misleading statements at the Zeta Data Summit and an investor conference call with William Blair to defend Zeta's data practices in the wake of the Culper Report.

32.     The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from investors, and that the positive representations were materially false and/or misleading when made. The Individual Defendants are liable for the false statements pleaded herein.

33.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

C.    **Former Employees With Relevant Knowledge And Information**

34.    FE-1 was employed by Zeta from May 2022 until February 2024, as a Data Scientist, in Zeta's Prague, Czech Republic location. During his[2] time of employment at Zeta, FE-1's responsibilities included working with clients in developing projects, including building out marketing and advertising models for Zeta's clients. FE-1 reported to the Data Scientist Manager (located in Prague), who reported to SVP, Data Science & Analytics, Pavan Korada (located in the United States).

35.    FE-2 was employed by Zeta from before the Class Period until January 2024, as a Marketing Campaign Manager (May 2021 to Sept. 2022), Senior Campaign Manager (Oct. 2022 to March 2023), and Mobile Operations (SMS/MMS) Manager (March 2023 to Jan. 2024). In his most recent role, FE-2 advised that he analyzed clients' data layout and was responsible for maintaining and onboarding clients' mobile (SMS/MMS) programs.

36.    FE-3 was employed by Zeta from August 2019 to June 2023, as a Vice President of Client Services. During his tenure, he was responsible for selling Zeta's consumer marketing services to retail, travel and hospitality, and publishing clients. FE-3 detailed that he specifically sold Zeta's email marketing support to clients, and that most of his clients were retail customers. FE-3 reported to Senior Vice President of Customer Success, Yara Lutz.

37.    FE-4 was formerly employed by Zeta as Associate Account Director from April 2021 to January 2023. FE-4's responsibilities included being the point of contact for three large customers as Associate Account Director and managing client projects and filtering different requirements and requests for those projects to the appropriate internal Zeta support teams. In his

---

[2] In order to protect confidentiality, masculine ("he/him") pronouns will be used to describe the former employees of Zeta throughout this Complaint, irrespective of those former employees' actual gender and/or identity.

final reporting structure, FE-4 reported to Zeta's Vice President of Client Relations (or Client Services).

38.    FE-5 was formerly employed by Zeta as Vice President of Business Development from December 2021 to August 2023. According to FE-5, his responsibilities included selling Zeta's business to enterprise-sized clients, and described his role as a Vice President of enterprise sales. He advised that he reported to a number of people throughout his tenure but most recently reported to the Vice President of Client Development, Ben Eason, and to a Senior Vice President before that.

39.    FE-6 was employed with Zeta as a Senior Account Manager from June 2024 to November 2024. During his tenure, FE-6 was responsible for launching and managing advertising and marketing campaigns. He reported to the Director of Account Management.

## IV.    OVERVIEW OF THE FRAUD

### A.    Zeta's Value Was Tied To Its Proprietary And Exclusive "Opted-In" User Data Set

40.    Maintaining control over one's personal data is often considered a cornerstone of privacy. Data about individual users is at the heart of many online marketing models and guides firms, including Zeta's customers, in targeting users with marketing actions like promotions or advertising. Such approaches, however, often raise privacy concerns, drawing increased attention from regulators and individual users alike.

41.    According to Zeta's SEC filings, Zeta's flagship product is it's Zeta Marketing Platform ("ZMP"), which is a "single platform designed to enable enterprises to acquire, grow and retain consumer relationships more efficiently and effectively than alternative solutions available in the market." According to Zeta, the ZMP analyzes billions of structured and unstructured data points to predict individual consumers' intent by leveraging machine learning algorithms and the

"***industry's largest opted-in data set***." Zeta's business is premised on the collection of this "***opted-in***" user data from various sources, ingesting it into Zeta's proprietary ZMP and "data cloud," amalgamating and churning it through various machine learning algorithms, and then utilizing that data to be leveraged for Zeta's clients for their specific advertising and targeting purposes. In layman's terms, Zeta uses a series of websites to collect consumer data—contact information (names, emails, addresses, etc.), shopping preferences, browsing history, etc.—then organizes and sells that data to companies who use it primarily for marketing purposes.

42.    The infographic below illustrates the workflow of Zeta's revenue-generating platforms. Zeta breaks out its revenues by "Direct platform" and "Integrated platform" revenues. Direct platform revenue is recognized when a customer generates revenue entirely through Zeta's ZMP as a direct channel, compared to when Zeta generates revenue by leveraging its platform interactions with third parties. Roughly 75% of Zeta's revenues were Direct platform revenues during the Class Period.[3]



---

[3] The infographic is derived from KeyBanc's October 21, 2024 analyst report. "CRM" refers to Customer Relationship Management and "CDP" refers to Consumer Data Platform.

43.    Prior to and throughout the Class Period, Defendants claimed that Zeta owned and utilized billions of data points based on user data from 240 million "opted-in" U.S. individuals—nearly 90% of the entire U.S adult population—and that this was the first "pillar" of the Company's ZMP. Analysts identified this data set as the Company's core value proposition to investors. On October 21, 2024, for example, analysts at KeyBanc wrote in their report initiating coverage that: "Zeta uses algorithms for data matching with company proprietary data against its own opt-in data set on over 200 million U.S. adults; yes, that's most of the U.S. adult population, hence its '**secret sauce**.'"

44.    KeyBanc further noted, the Company's "data set here is truly foundational to the rest of the value [of the Company]" and Zeta's "core differentiator." KeyBanc also noted that a consumer's "identity plus intent is such a key" to Zeta's value because Zeta's algorithms match a customer's intended targets to Zeta's opted-in customer data:

> Zeta Data provides a unique container tag to identify consumers within the data set against attributes (location, behavior, purchases) and internal customer first-party data to generate a "score" of intent to purchase. Once matched in the CDP, customers can leverage its internal information about a consumer (purchase history, brand engagement) with external purchasing signals allowing high intent-to-purchase tagged consumers to be "activated" (execute a marketing campaign against them) across multiple channels.

45.    Notably, the market placed great importance on the emphasized "opted-in" nature of Zeta's data set because this meant that Zeta's data set not only *met* regulatory requirements concerning data privacy but also ***exceeded*** them. As explained by Zeta in the Company's Registration Statement filed in connection with Zeta's June 2021 IPO, "we have implemented a framework to record and apply consumer consents that meet or exceed legal requirements in the U.S. and the EU," referring to Zeta's "opted-in" consent framework. The market understood that the key to Zeta's value proposition was its ability to "significantly reduce[] reliance on third-party

cookies due to the opt-in nature of the data set, in this increased day and age of privacy regulations."[4]

**B.    Between 2007 And 2021, Zeta Grew Through Strategic Acquisitions That Enlarged Its Purported "Opted-In" User Data Set To Include Nearly 90% Of The U.S. Adult Population**

46.    Zeta's business model depended upon the acquisition of other businesses and online user platforms to obtain, integrate, and then monetize those companies' valuable consumer user data. Defendant Steinberg explained this corporate strategy during the March 4, 2024 Morgan Stanley Technology, Media & Telecom Conference, where he stated that for the past "15 years," Zeta obtained monetizable consumer data through the purchase of "a series of networks," including the Disqus commenting platform, job board publishers such as Apptness, and the ArcaMax newsletter publisher. Zeta purchased these platforms as tools to gain access to private consumer data and not for the purported services being offered on them. According to Steinberg:

> We bought a series of tools that support publishers on a first-party technology basis, a series of networks. . . . ***And quite frankly, we didn't buy them for their core business strategies. We bought them because we liked the data generation and we were able to combine them***. You put that together with one of the largest DSPs[5] where we're literally ingesting every ad impression bid on everywhere, every moment of every day, and we're able to synthesize all of this down to a deterministic individual.[6]

47.    By the start of the Class Period, Zeta had closed at least nine significant acquisitions. Perhaps most impactful of these deals was the Company's 2017 acquisition of Disqus,

---

[4] Jackson Ader, et al., *ZETA: Extended Platform Extends the Run for Zeta; Initiating at Overweight*, KEYBANC CAP. MKTS., Oct. 21, 2024.

[5] A DSP refers to a "Demand-Side Platform," which is a type of software platform that allows a third-party advertiser or marketer to buy and manage advertisements through an automated process. Zeta currently offers a DSP to its clients to manage and organize its advertising campaigns.

[6] Morgan Stanley Technology, Media & Telecom Conference, March 4, 2024.

the popular comment hosting service embedded in many third-party websites, which now claims to be the web's largest conversation platform, touting 225 million commenter profiles and 50 million comments per month across millions of different websites.[7]

48.    *Forbes* reported that the Disqus acquisition was valued at $90 million, Zeta's largest acquisition leading up to the start of the Class Period.[8] At the time of Zeta's acquisition of Disqus, Defendant Steinberg stated that: "Marketers typically have to make trade-offs between reaching engaged audiences on social platforms with massive reach and using tools that give them control and access to granular targeting capabilities. [] Disqus strengthens Zeta's ability to offer the best of both worlds with the scale, visibility and performance marketers have been asking for."[9]

49.    Defendants directly tied Zeta's acquisition of Disqus to the Company's robust "opted in" data set. For example, in a section titled "Opted-In Data" in the Company's IPO Registration Statement filed with the SEC on June 7, 2021, Defendants explained that Zeta had "implemented a framework to record and apply consumer consents that meet or exceed legal requirements in the U.S. and the EU. We capture much of our opted-in data through our publisher network, which includes our commenting platform, Disqus."

50.    Following Disqus, Zeta's other strategic acquisitions increased the Company's revenues. In 2019, Zeta acquired Unsubcentral, Sizmek, PlaceIQ, and IgnitionOne, primarily for their valuable data assets. These acquisitions contributed to a significant increase in Zeta's

---

[7] *Publishers and Readers Love DISQUS*, Disqus, http://about.disqus.com/publishers-love-disqus (last accessed on May 12, 2025).

[8] *See* Robert Hof, *Zeta Global Makes Its Biggest Buy Yet: Social Discussion Platform Disqus*, Forbes (Dec. 5, 2017), https://www.forbes.com/sites/roberthof/2017/12/05/zeta-global-makes-its-biggest-buy-yet-social-discussion-platform-disqus/ (last accessed on May 9, 2025).

[9] *Id.*

revenue, which reached $368.1 million in 2020 (a 20% increase over its 2019 revenues), and positioned the Company to go public in June 2021.

### C.   Zeta Went Public In 2021, Capitalizing On Its Deployment Of Its "Opt-In" Consent Framework, A New Focus Of The Industry

#### 1.   Zeta Embraces Heightened "Opt-In" User Consent Requirements

51.     In the leadup to Zeta's IPO in June 2021, the online marketing and advertising industry became extremely focused on the need to secure "opt-in" consent from consumers before targeting those consumers with advertisements for products and services. The most prominent example of this heightened focus was encapsulated in Apple's adoption of a mandatory "opt-in" consent as a prerequisite to app providers operating on its system. This declaration roiled the advertising and marketing industry and propelled Zeta—which already touted its first party "opted-in" data set—as a leader in this new online marketing regime.

52.     In June 2020, Apple announced that its forthcoming iOS 14 software system for its Apple devices would require that all apps receive affirmative "opt-in" user consent to track Apple users across platforms. Prior to this announcement, the methodology by which advertisers tracked Apple users through the advertising and marketing ecosystem was via Apple's IDFA, or Identifier for Advertisers (akin to a social security number for a particular iPhone or Apple device). Under this new "opt-in" framework, advertisers wishing to obtain consumer data or track Apple users through IDFA would now need to program into their apps a specific "opt-in" consent feature which gave Apple users a choice to participate or not.

53.     Critically, Apple's iOS 14 "opt-in" framework mandated that apps needed to secure consumers' purely optional consent to tracking through a clear and explicit request. As tweeted by Apple CEO Tim Cook in unveiling the opt-in framework: "We believe users should have the choice over the data that is being collected about them and how it's used." Cook explained that

apps such as Facebook "can continue to track users across apps and websites as before," but now they would only be able to do so if "they ask for your permission first." In his tweet, Cook provided an example of the mandated "opt-in" consent prompt that would appear for all apps that sought to collect data from Apple users:



54.    As articles commenting on this Apple iOS 14 opt-in change explained: "Opt-in is a very different arrangement from opt-out. For clarity, it is important to flesh-out the terms. Opt-in is an arrangement in which an individual must take some ***affirmative action*** in order to 'opt favorably' regarding the choice they are given. Opt-out is an arrangement in which an individual 'opts favorably' unless they take an affirmative action to indicate that they do not."[10]

---

[10] *Will Anyone Ever Opt-In?*, CLARIP, https://www.clarip.com/data-privacy/will-anyone-ever-opt-in/ (last accessed on May 9, 2025).

55.     Indeed, an "opt-out" framework of consent is one where the service **assumes** the user's consent by virtue of using the service—including through the company's terms of service and/or privacy policy—and the user must take certain affirmative action after their consent is already presumed to request removal from tracking or advertising. An example of such an "opt-out" framework is where a user, following presumed consent, must then navigate to a company's embedded privacy policy (after having already signed up for the service) and clicks on a "Do Not Track" or "Do Not Share" link to effectuate that action.[11] During this time (and during the Class Period), California data privacy laws, including the California Consumer Privacy Act ("CCPA"), mandated an "opt-out" framework of consent, meaning that a company complied with the CCPA by simply inputting a notice in a sign-up page that says the user agrees to the company's terms of service and/or privacy policy by signing up.[12]

56.     Thus, Apple's shift to an **opt-in** policy—with its corresponding explicit consent prompt seen above—was a significant move towards informed consent in the industry, as it signaled that Apple was going above and beyond the baseline requirements of data privacy laws. As commented by industry reports at the time, "[t]aking a **maximalist** privacy stand, Apple will require iPhone apps to obtain explicit user opt-in before tracking or sharing of user data across apps and websites starting in 2021. This new requirement tightens mobile privacy requirements **beyond** the strictures of the California Consumer Privacy Act."[13]

---

[11] *See* Omer Imran Malik, *Opt In vs Opt Out Consent: What's the Difference?*, SECURITI (Aug. 13, 2023), https://securiti.ai/blog/opt-in-vs-opt-out/ (last accessed on May 9, 2025).

[12] *See CCPA Opt-Out: The Total Compliance* Guide, SECURE PRIVACY, https://secureprivacy.ai/blog/ccpa-opt-out-requirements-guide (last accessed on May 9, 2025).

[13] Matt Fleischer-Black, *Apple Overhauls Privacy for iPhone Apps, but Will It Enforce ItsPolicies?*, CYBERSECURITY L. REP. (Sept. 23, 2020), https://www.cslawreport.com/7605081/apple-overhauls-privacy-for-iphone-apps-but-will-it-enforce-its-policies.thtml (last accessed on May 9, 2025) (emphasis added).

57.     The news of Apple's switch from an opt-out to an opt-in consent framework sent shockwaves through the marketing and advertising data world. Online news publication *The Conversation* published an article on September 15, 2020 titled, "*Apple is starting a war over privacy with iOS 14 – publishers are naive if they think it will back down*," which explained the industry response to Apple's "opt-in" requirement, noting that it "caused a major backlash from companies that rely on this data to make money, most notably Facebook." The article noted that "Facebook warned the opt-in could halve publishers' revenues on its advertising platform" and that "[t]he owner of UK news site Mail Online, DMG Media, threated to delete its app from the App Store."[14] Similarly, *CNBC* reported on December 15, 2020 in an article titled "*Apple's seismic change to the mobile ad industry is drawing near, and it's rocking the ecosystem*," that "[t]he fact that users will need to opt-in to sharing their IDFA to have apps track them will likely mean low opt-in rates. As a result, advertisers would have much less of that definitive data to work with."[15]

58.     Apple's iOS 14 and associated opt-in consent framework went into effect in April 2021. Analysts covering the data advertising industry noted that Apple's move to opt-in consent was in response to the ongoing global regulatory scrutiny applied to the data advertising industry, with analysts from Bernstein Research reporting in its November 11, 2021 analyst report that Apple's change to an opt-in framework was "a game changer for the industry," noting that "[b]y making [Apple's] IDFA ***opt-in***, the number of users that share their IDFA number with advertisers

---

[14] Ana Isabel Domingos Canhoto, *Apple is starting a war over privacy with iOS 14 – publishers are naïve if they think it will back down*, THE CONVERSATION (Sept. 15, 2020), https://theconversation.com/apple-is-starting-a-war-over-privacy-with-ios-14-publishers-are-naive-if-they-think-it-will-back-down-146227 (last accessed on May 9, 2025).

[15] Megan Graham, *Apple's seismic change to the mobile ad industry is drawing near, and it's rocking the ecosystem*, CNBC (Dec. 15, 2020), https://www.cnbc.com/2020/12/15/apples-seismic-change-to-the-mobile-ad-industry-draws-near.html (last visited on May 9, 2025).

has dropped from 75-80% to just ~20%. This is a big disruption to the existing iOS advertising models that are heavily reliant on tracking and attribution metrics."[16]

59.     Amidst this turmoil, however, Zeta projected confidence in its value and growth potential, claiming that its user data already satisfied the heightened "opt-in" consent demands. Indeed, Defendant Steinberg explained how Zeta's already-embedded "opted-in" first party data set positioned Zeta to be insulated from the effects of Apple's switch to opt-in—and that others were just catching up. In the Company's Q2 2021 Earnings Call and in response to analyst concerns regarding Apple's IDFA opt-in change, Defendant Steinberg stated: "with the elimination of the IDFA, I think you're going to continue to see, even without the sunsetting of third-party cookies, I think you're going to continue to see sites focused more and more on that sort of opted in, which is just bringing it more to people's attention." And the next day, in the Oppenheimer Technology, Internet & Communications Conference, Steinberg stated: "There is no question that the elimination of the IDFA for Apple is affecting companies that are heavily focused on marketing in the mobile ecosystem. . . . [but] *it's not going to affect us*."

60.     Notably, in Zeta's online privacy policy at the time (and during the Class Period), Zeta represented that its fully identifiable personal data in the Zeta data cloud "is collected when an individual consents to have their data used for marketing purposes."[17] And according to the Company, "this permission is generally provided at a website or landing page where an individual provides an email address and *checks a box authorizing their data to be used* for marketing purposes, transferred to third parties, and augmented with other data obtained from other

---

[16] Emphasis in original.

[17] *Privacy Policy*, ZETA GLOBAL, https://zetaglobal.com/privacy-policy/ (archived as of April 2021, last updated May 1, 2020). Notably, the relevant and quoted language in Zeta's privacy policy remained substantially the same during the Class Period (last updated in December 2023) as it was during April 2021, *i.e.*, around the time of Apple's IDFA opt-in change.

sources."[18] Moreover, in its privacy policy, the Company touted that it complied with the Self-Regulatory Principles for Online Behavioral Advertising as managed by the Digital Advertising Alliance ("DAA"). The DAA defines consent as "an individual's action in response to a ***clear, meaningful and prominent notice*** regarding the collection and use of data for Online Behavioral Advertising purposes."[19] In other words, prior to and throughout the Class Period, Zeta claimed that its framework of consent for user data collection was actively opt-in (and not opt-out), requiring users to "check[] a box" consenting to data collection after being given "clear, meaningful and prominent notice."

### 2. Zeta Launches Its IPO, Touting Its "Opted-In" Data As The "Philosophical" Foundation Of The Company

61.    Amidst all these changes in the data advertising and marketing industry, and as Apple's new opt-in IDFA framework launched in April 2021, Zeta announced in May 2021 that the Company would initiate its IPO and capitalize on its first party[20] "opted-in" data set.

62.    On June 10, 2021, Zeta went public touting its own "permissioned," first party, "***opted-in***" data as the "***philosophical***[]" foundation for the Company's business model. Zeta's common stock shares were priced at $10 per share, and the IPO was valued at approximately $1.9 billion.

63.    In an interview with *Yahoo Finance* on the day of the IPO—and in connection with the market's interest in how Zeta was acquiring consumer data in the highly-scrutinized

---

[18] *Id.*

[19] *Self Regulatory Principles for Online Behavioral Advertising* (July 2009), https://digitaladvertisingalliance.org/sites/aboutads/files/DAA_files/seven-principles-07-01-09.pdf at 10.

[20] First party data is data collected directly from interactions with customers and audiences on Zeta's own sites. First party data is considered more valuable than data collected from other, non-proprietary sources.

environment—Defendant Greiner was asked how Zeta "plans to navigate amid this atmosphere when there's so much backlash around companies, platforms, applications, collecting personal data that can be used for digital advertisers and for marketing efforts. How is Zeta Global going to navigate against that crackdown that we are seeing?" Greiner responded:

> In the setting of privacy and personalization, what's unique about Zeta is — even if you zoom out and look at the evolving regulatory landscape from GDPR[21] all the way through CCPA and even this week's announcements[22] — *what's unique about our model is that we're philosophically, and the foundation of our data, is all built on permissioned data; data that's been opted-in*.

64.    Zeta's offering documents further emphasized its "opted-in" data as one of the Company's core features. In the first few pages of the Company's Registration Statement, the Company touted its "proprietary data" powered by the "220M+ Opted-In US Individuals."

65.    Following the IPO, the market understood Zeta's "opted-in" data set was a key differentiator in the industry. For example, in July 2021, Bank of America published an analyst report covering Zeta's IPO and initiating coverage of Zeta, wherein it stated: "We believe Zeta Global's proprietary customer data set is the key differentiator. . . . *because a good portion of Zeta's customer data is 1P and generated through an opt-in process*, it stands to be better positioned that competitive data sets that are more reliant on third-party cookies." And according to a "[l]arge business services company" (a client of Zeta) that Bank of America interviewed, that client stated: "We looked at other participants in the space and we thought Zeta Global's customer data platform had the potential to be better positioned if third party cookies were phased out. *This is because Zeta Global uses an opt-in 1P cookie, which makes its data set different*."

---

[21] GDPR is Europe's landmark regulatory regime and set of laws concerning data collection and data privacy.

[22] Greiner appears to be referring to Apple's June 7, 2021 announcement that Apple would introduce even more features to help users control how third parties use their data, for example, by hiding information such as IP addresses, locations, and whether users had opened or read emails.

66.     Similarly, on July 6, 2021, Roth Capital Partners published an analyst report initiating coverage of Zeta following the IPO, whereby Roth Capital Partners issued a "Buy" rating. Therein, Roth Capital Partners stated: "In our view, the regulatory and legal backdrop is likely going to change to make it harder to utilize the 'cookie' method of consumer tracking (installing code on consumer systems and sharing or selling the data across marketers). If correct, this ***should favor opt-in data collection systems like the one Zeta has built*** and operated for many years."

67.     Thereafter, in September 2021, Zeta told investors in a presentation that "our data is durable" and emphasized that despite "an evolving data privacy environment," the Company's "proprietary identity data set and revenue have increased." In that September presentation, Zeta boasted of "515M+" "Global Zeta Opted-In Individuals" that were "known individuals with full name and full postal with 1+ email address."

### 3.     Post-IPO, Zeta Continues Acquiring Companies For User Data, Claiming Additional Opted-In Data

68.     Following its IPO, Zeta continued its advantageous strategy of acquiring companies for valuable user data. On October 4, 2021, Zeta announced the acquisition of the "technology platform and data" from Apptness, a digital technology company with proprietary audience engagement technology. Zeta stated that the acquisition "accelerates several of the growth drivers laid out as part of Zeta's IPO," including (1) "Strengthen[ing] the Data Cloud," (2) "Revenue Efficiencies," (3) "Growth Sales Capacity," and (4) "Expand[ing] Publisher Capabilities."

69.     Zeta paid $48.7 million for Apptness, the majority of which was for the value of the user data being transferred and absorbed into Zeta's ZMP, as indicated by the $31.7 million of

the total purchase price being attributed to "goodwill."[23] Goodwill is an accounting term that represents the premium a company pays for the acquired business, over and above the fair value of all the assets acquired. The measurement of goodwill in this context can demonstrate what the value of the acquired user data was to Zeta.  Here, goodwill represented roughly **65%** of the purchase price—meaning that the majority of the value of the Apptness acquisition laid in Zeta's acquisition of Apptness's user data.

70.    After the Apptness acquisition, on March 21, 2022, Zeta reported that it had acquired ArcaMax, a web and email syndication news publisher that "includes a larger permissioned data set derived from millions of subscribers." As further indicated in Zeta's 2022 Form 10-K, "the Company paid a premium to acquire ArcaMax assets, which is represented as Goodwill in the above purchase price allocation." Zeta's purchase price of ArcaMax was approximately $27 million, of which goodwill accounted for $18.6 million. As such, goodwill represented roughly **69%** of the purchase price—meaning that, again, the majority of the value of the ArcaMax acquisition was attributable to ArcaMax's user data.

71.    Notably, Zeta paid a combined $76 million for the Apptness and ArcaMax businesses, nearly as much as the $90 million that Zeta paid for Disqus, *i.e.*, Zeta's single largest source of individual user data. Zeta paid this much because—as admitted by Defendant Steinberg in Zeta's earnings calls—the "data that is generated [from Apptness] is an ***incredibly valuable new data set to our data cloud***"[24] and Zeta was "enhancing our data cloud with the recent acquisitions of Apptness and ArcaMax, which added ***millions*** of new permission-based consumer data and

---

[23] *See* Zeta Glob. Holdings Corp., Annual Report (Form 10-K) (Feb. 15, 2022) at 83.

[24] Zeta's Q3 2021 Earnings Conference Call.

behavioral signals for marketers to engage with high-value audiences."[25] Indeed, as Steinberg explained when discussing growing Zeta's data cloud: "You look at ArcaMax . . . [y]ou look at Apptness. ***We're driving millions of opted-in consumers through those platforms***."[26]

72.     The acquisition of other companies' data sets added significant value to Zeta far outside of the value generated by those companies' websites. For example, Zeta's former Senior Director of Corporate Finance and Financial Planning and Analysis ("FP&A") confirmed the value of Zeta's acquisitions during an interview conducted on September 25, 2024, which was published on the Alphasense website platform on October 9, 2024. This former employee, whose name was not revealed but who represented himself to be a chartered accountant with over 30 years of experience working in corporate finance, investment banking, transaction advisory services, and FP&A, joined Zeta in August 2020. Throughout his tenure, he helped with the Company's IPO, led financial planning and performance analysis, and was a member of the team that developed new business verticals and tracked Zeta's operational performance.

73.     During the interview, this former employee noted that the ArcaMax acquisition helped Zeta "to strengthen the data cloud, so to reach out to the huge mass and then it has helped Zeta to develop [its] overall data ecosystem, to get more data and then to access different potential clients or customers…" He also explained that the Apptness data acquisition also "help[ed] Zeta make its data cloud better." This former employee described "the use of the first-party data" as a "benefit that would accrue to Zeta through both" the Apptness and ArcaMax acquisitions.

74.     FE-1, a former Zeta Data Scientist who built out marketing and advertising models for Zeta's clients, reported that the value of the acquisitions and businesses that Zeta acquired—

---

[25] Zeta's Q1 2022 Earnings Conference Call.

[26] *Id.*

including Apptness and ArcaMax—was derived from the individual user data from those acquisitions. He described such user data that Zeta received as valuable to the Company, as it was data that was then processed and utilized for Zeta's clients.

**D.    Beginning In Early 2024, Zeta's Stock Price Increased Exponentially As Defendants Make a Series of Statements That Linked the Company's Success To Its First Party "Opted-In" User Data**

75.    Following these acquisitions, Zeta's stock price increased exponentially as Defendants made a series of false and misleading statements touting Zeta's "opted-in" data set (as detailed *infra* Section V). As shown from the graph below measuring Zeta's closing share price from January 2, 2024 (the first trading day of the year) to November 11, 2024 (the Class Period high), Zeta's share price and corresponding market capitalization grew by an approximate factor of four, trading at a Class Period closing high of $36.74 per share:



76.     By the start of the Class Period, the market understood that there was a fundamental relationship between the quality of a Company's data set—including whether user data was obtained through a true, consensual, opted-in process—and the Company's legitimate engagement with users and revenues. Indeed, changes made by Gmail and Yahoo, including, *inter alia*, easier unsubscribe options for users, kept the discussion surrounding "opt-in" consent prevalent in the market in 2024.

77.     On January 30, 2024, William Blair published an analyst report explaining the recent changes by Gmail and Yahoo "will have some impact on the practice of email marketers, primarily those that send emails to consumers and, to a lesser extent, to businesses. The companies in our coverage we believe could see some impact include Braze, Klaviyo, and ***Zeta Global***, all of whom primarily serve B2C [i.e., business to consumer] brands." As explained in the William Blair analyst report, "[i]f we zoom out and look at the spirit of these changes, they are clearly trying to make the emails received by consumers more relevant, ***more solicited/opted in,*** and less noisy." And based upon William Blair's "conversations with investors regarding the potential impact of these changes," "[t]he bear case argues that many of the email lists used by these vendors are filled with ***low quality email addresses that have been obtained without opt-in***. And since the email portion of these models are largely monetized based on the size of their customers' email lists or the number of emails they send, the bear argument is that this will be a headwind to revenue growth as more people unsubscribe from marketing emails."

78.     Furthermore, as noted above, Zeta's statements during the Class Period and earlier made clear that Zeta's data collection practices not only met the minimum regulatory requirements, but exceeded them. In mid-2023, just a few months before the Class Period, Defendant Greiner responded to an analyst question about how Zeta "control[led for] privacy regulations in your

platform?" by stating, "that regulatory environment has evolved over time from GDPR[27] to CCPA to even CPRA that's most recently announced, *the single thread in all of that that's important is it's opt-in. Privacy-first opt-in. From the very beginning of Zeta's data cloud, it's been built on that premise of opt-in*."

79.     The Class Period begins on February 27, 2024. On that date, Zeta hosted its Q4 2023 Earnings Conference Call, in which Defendant Steinberg stated that Zeta was a "*in a very unique position where we can take assets that we already own, which is the 240 million-plus opted-in individuals*, which we can take back to this Zeta ID number, which we can identify in the mobile economy. So it gives us an advantage that nobody else in the mobile ecosystem has outside of the walled gardens." The next day, on February 28, 2024, Zeta published its Form 10-K for fiscal year ended December 31, 2023, wherein Zeta stated that: "*[o]ur data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally* with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference."

80.     Securities analysts covering Zeta relied on these statements during the Class Period in issuing their positive commentary about Zeta. For example, on February 28, 2024, Needham & Company published an analyst report finding that: "the [C]ompany's Zeta Marketing Platform analyzes billions of structured and unstructured data points to predict consumer intent by

---

[27] GDPR came into effect in May 2018. During the Class Period, GDPR was (and currently is) Europe's landmark regulatory regime concerning data privacy and data collection. GDPR states that "[c]onsent cannot be implied and must always be given through an opt-in," and defines "opt-in" as "*a declaration or an active motion*, so that there is no misunderstanding that the data subject has consented to the particular processing." Importantly, GDPR mandates that such opt-in "[c]onsent must be freely given, specific, informed and unambiguous," and that this "consent must be bound to one or several specified purposes which must then be sufficiently explained." GDPR further states that: "[i]n order to obtain freely given consent, it must be given on a voluntary basis. The element 'free' implies a real choice by the data subject."

leveraging sophisticated machine learning algorithms and the ***industry's opted-in data set*** for omnichannel marketing; and the Consumer Data Platform ingests, analyzes, and distills disparate data points to generate a single view of a consumer, encompassing identity, profile characteristics, behaviors, and purchase intent." As a result, Needham & Company issued a "Buy" rating with a price target of $13 per share, while Zeta's stock was trading at around $10.76 per share at the time.

81.    Defendants continued to make statements touting Zeta's massive "opted-in" data set of 240 million U.S. individuals during the Class Period. On March 4, 2024, Defendant Steinberg participated in the Morgan Stanley Technology, Media & Telecom Conference in which he again reiterated that: "***We have 240 million opted-in Americans in our data cloud that we're seeing across 5.2 million publisher platforms on a first-party basis***." Defendant Steinberg further stated in the same conference, without equivocation, that: "***The 240 million Americans in our data cloud have opted-in to be there***"—further representing to the market that the type of opt-in consent obtained by consumers wasn't just consent to use a service owned by Zeta (*e.g.*, Disqus), but was instead an affirmative opt-in to specifically be in Zeta's *data cloud*. These assurances were repeated again in Zeta's Q2 2024 Earnings Conference Call on July 31, 2024, when Defendant Steinberg stated: "Realizing the full potential of Gen AI requires propriety data. Over the last 15 years, we have invested and innovated to assemble one of the largest proprietary ***opted-in data clouds***."

82.    The market thus continued to rely on Zeta's touted "opt-in" data set during the Class Period. Indeed, on July 15, 2024, Truist Securities published an analyst report commenting on Zeta's ongoing significant growth, and finding as its first "Investment Highlight" that: "Zeta's proprietary database represents one of the ***largest opted-in consumer data*** sets in the world, combining proprietary data, publicly available data, and data gathered through Zeta's partner

ecosystem to create a comprehensive identity graph of over ***240 million opted-in individuals in the US and over 525 million opted-in individuals worldwide***." Notably, Truist Securities found that because these data assets were a "key part" of Zeta's story, they "could be impacted amid heighted data privacy or intensified regulatory backdrop," and that "[w]e believe with the focus on consumer data, data privacy, regulations and industry standards related to data collection and privacy will need to be monitored closely over time as it relates to Zeta's business." Nonetheless, Truist Securities stated that "[w]e believe Zeta represents a potential disruptive force," and issued a "Buy" rating with a price target of $23 a share (while Zeta was trading at around $17.66 a share at the time).

83.     On July 31, 2024, following Zeta's Q2 2024 Earnings results and misstatements therein, Truist Securities issued another analyst report reiterating a "Buy" rating for Zeta stock with an increased price target of $30 per share, finding that: "Reflecting what we believe is right place right time with ***differentiated proprietary opted-in data cloud***, AI & martech solutions, ***Zeta is well outgrowing its market***."

84.     On October 21, 2024, analysts at KeyBanc initiated coverage, and concluded that Zeta's "secret sauce" was rooted in its opt-in data set of most of the entire U.S. population:

> Zeta uses algorithms for data matching with company proprietary data against its own opt-in data set on over 200 million U.S. adults; yes, that's most of the U.S. adult population, hence its '***secret sauce***.'. . . The ***240+M opted in consumers with a Zeta ID that, unlike cookies or IDFA or bulk email rules, are completely in the hands of Zeta***.  As the marketing world continues to tighten its grip around third-party data sharing arrangements, Zeta should continue to benefit and already has. Management has made it clear that the success the Company has seen with agency holding companies (those firms which control marketing and advertising spend for dozens of brands under one house) can draw a direct line from those third-party data headwinds that Zeta hasn't had to weather.

85.     Thereafter, Zeta continued its false and misleading narrative that its data set of over 90% of the U.S. adult population (and hundreds of millions of additional people across the globe)

was acquired through proper opt-in user consent. Once again, on October 25, 2024, Defendant Steinberg went on Fox Business television and stated that "**over 240 million Americans have opted-in to our data cloud**."

E.       **On November 13, 2024, Culper Research Publishes A Report Indicating That Zeta's User Data Was Improperly Collected From "Consent Farms"**

86.     On November 13, 2024, at approximately 1:28 pm Eastern Standard Time, Culper Research issued a report (the "Culper Report") detailing how "conversations with former employees, a September 2023 class action lawsuit, [and] our own experiences alongside numerous online complaints corroborate our views regarding the deceptive way that Zeta gathers 'opted-in' data," and finding that "Zeta has quietly spun up its own network of **consent farms**[,] i.e., sham websites that hoodwink millions of consumers each month into handing their data over to Zeta under false pretenses, baited by job applications, stimulus money, or other rewards that simply do not exist."

87.     The Culper Report raised significant issues concerning the composition, the value proposition, and potential liability of Zeta's claimed "opted-in" data set due to: (1) these "consent farms" obtaining user data from a consumer without providing a corresponding exchange of value for a legitimate service; and (2) without obtaining explicit and informed consent from individuals for the collection of their user data to be a part of Zeta's data cloud. Culper's researchers "uncovered at least 40 websites run by Apptness and Arcamax – with names such as higherincomejobs.com, onlygreatjobs.com, stimmoney.com, and unclaimedmoneyinfo.com – that bait visitors into disclosing data to Zeta under the promise of job applications, stimulus checks, or other rewards that don't actually exist." The Culper Report's findings raised serious concerns regarding Zeta's supposed procurement of opted-in consent from nearly 90% of the U.S. adult

population because opt-in consent could not be delivered through sham websites offering nothing of value.

88.    The market responded swiftly to the revelations contained within the Culper Report and Zeta stock value plummeted from a daily high of $28.51 per share on November 13, 2024, to close at $17.76 per share—reflecting a massive decline of 37.07% on unusually high trading volume of over 45.4 million shares.

89.    To stem the losses from the Culper Report's revelations, Zeta quickly published a press release response later that same day, after the close of trading, in which the Company falsely characterized the Culper Report as "misleading," and "riddled with misrepresentations, speculative conjecture, and categorically false statements." Zeta's press release denied that it "operate[d] so-called 'consent farms,'" and brushed aside the Culper Report's concerns about Zeta's opt-in data, explaining that "Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners," and "is confident in its data collection practices, policies and processes to ensure compliance with applicable laws."

90.    By falsely denying the veracity of the Culper Report, Zeta successfully maintained artificial inflation in its stock price, and the next morning, Zeta's stock even rebounded to open at $19.12 per share, up 7.66% from the prior day's close.

91.    Analysts following Zeta directly attributed the November 13, 2024 stock decline to the revelations within the Culper Report, but indicated Zeta's subsequent denials, at the very least, created uncertainty as to the Culper Report's veracity.

92.    For example, RBC Capital Markets released a report on November 13, 2024, entitled "Zeta Global Holdings Corp. – Thoughts on recent short report and stock reaction," that attributed the day's stock price decline to the revelations of the Culper Report, including that "Zeta

has built a network of consent farms."[28] However, the RBC analyst then cited Zeta's press release that "disputed key parts of the report," including that "[t]he company is confident in its data collection, noting that they are not operating 'consent farms.'"[29] RBC's opinion was that: "After reading the short report, management's response and speaking with management, we feel that the stock reaction is significantly overdone."[30] In other words, while RBC attributed Zeta's stock decline to the revelations in the Culper Report, RBC believed Zeta's false denials of the report, and set a price target of $43.00.[31]

93.    Needham analysts also published a report the next day, on November 14, 2024, with similar conclusions about the Culper Report and Zeta's denials.[32] Needham's report acknowledged that "[s]hares of Zeta [] traded off sharply yesterday following the publishing of a short report," and that "[g]iven the magnitude of the sell-off, ZETA management published a response to the allegations, denying the use of consent farms [and] clarifying the overstatement of revenue and data contributions of Apptness & ArcaMax…."[33] Like RBC, Needham concluded that "[g]iven these points of clarification in the response, we believe the sell-off in shares to be overdone and remain buyers on the weakness," and also set a price target of $43.00.[34]

---

[28] Matthew Swanson, et al., *Thoughts on recent short report and stock reaction*, RBC CAP. MKTS., Nov. 13, 2024 at 1.

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] Ryan MacDonald, *Zeta Response Points to Short Report Inaccuracies & Clean FY23 Audit*, NEEDHAM & CO., LLC, Nov. 14, 2024 at 1.

[33] *Id.*

[34] *Id.*

94.    Canaccord Genuity issued a report on November 14, 2024, which credited the Culper Report as "well constructed and deeply researched," but then noted "in rebuttal to claims of operating 'consent farms,' Zeta denies this and maintains that its data collection and practices comply with applicable laws and undergo multiple levels of audit and oversight, being review by both partners and clients, and that Zeta further reviews its partners [sic] opt-in/opt-out data collection practices…."[35] Canaccord acknowledged that "we're kind of stuck taking management at their word," answering the self-imposed question, "So where does that leave us?" with, "[t]he honest answer is that we don't know, which we realize isn't comforting to investors, but it's hard to look at what's come out and not have questions."[36] In the end, Canaccord "thought about stepping to the sidelines and just waiting to see how this plays out, but that seemed like giving too much credit to a report that (a) management is vehemently denying, and (b) was clearly written with an agenda (and that's not discrediting it, it's simply stating a fact)."[37]

95.    Notably, amidst the Culper Report revelations, and due to Zeta's rebuttal and Class Period statements, analysts continued to rely on Defendants' false and misleading assurances regarding the opt-in nature of consent for data collected from hundreds of millions of individuals. On November 14, 2024, D.A. Davidson published an analyst report recommending a "Buy" rating with a $42 price target, finding that "[t]he key takeaways from our conversation with management yesterday are that ZETA has compliant processes in place to *collect exclusive opt-in information*,"

---

[35] David Hynes, Jr., et al., *Round Two: here we are again, another short report, this time with a bit more meat on the bone*, CANACCORD GENUITY LLC, Nov. 14, 2024 at 1.

[36] *Id*. at 1-2.

[37] *Id*. at 2.

and finding that "ZETA's real-time deterministic data is sourced from its proprietary digital assets and web properties that are ***exclusively opt-in and well ahead of regulatory requirements***."[38]

96.     Morgan Stanley published a research note the next day, on November 15, 2024, which, like the others, attributed Zeta's stock drop to the Culper Report: "ZETA shares are down ~40% in reaction to a short seller report published Wednesday," but acknowledged "Mgmt provided a subsequent defense."[39] Morgan Stanley identified two points in the Culper Report, number one being the issues surrounding "Zeta's data collection practices."[40] Specifically, while Zeta's "management expressed confidence in the legality of these practices and their ongoing compliance with data security/privacy standards," Morgan Stanley wrote that management did ***not*** address some of the issues that went to the "quality of Zeta's data assets."[41] As a result, Morgan Stanley "continue[d] to see yellow flags," and expressed that: "We are not yet comfortable with 1) the nature of the data aggregation tactics, and 2) the quality of the data assets, in particular the need to acquire more data to remain relevant."[42]

97.     Canaccord issued a follow-up note on November 19, 2024, stating that having "spoken with a lot of investors, as well as management on numerous occasions….we're undoubtedly feeling better about the Zeta story."[43] Canaccord acknowledged that "[i]n our conversations with investors, there's been much more focus on the data collection side of things,"

---

[38] Clark Wright, *Attacking The Core Of The Value Proposition*, D.A. DAVIDSON & CO., Nov. 14, 2024.

[39] Elizabeth Porter, et al., *Initial Reaction To Short Report – Not Yet Stepping In*, MORGAN STANLEY, Nov. 15, 2024 at 1.

[40] *Id*.

[41] *Id*. at 2.

[42] *Id*. at 2-3.

[43] David Hynes, Jr., et al., *Time is the wisest counselor of all; cooler heads prevailing as information flow improves*, CANNACORD GENUITY LLC, Nov. 19, 2024 at 1.

and one of the principal things that made Canaccord "more comfortable with the idea that Zeta was operating on solid footing," was that Zeta's data came from individuals that "opted in" to provide their data: "One of the most important things to understand about Zeta's opt-in data collection practices is that, (a) they are opt-in, which means that consumers check a box that consents to their information being collected, and (b) there is a transfer of value to that consumer in exchange for their consent."[44]

98.     The contemporaneous analyst reports confirm the Culper Report partially revealed the truth regarding Zeta's data set, because while Zeta's stock price declined on November 13, 2024, Zeta's strongly-worded denials of the Culper Report prevented the market from fully digesting the truth, which in turn maintained Zeta's stock price at an artificially inflated level.

**F.      Amidst The Culper Report Revelations, Defendants Continued To Tout Their Opted-In Data Set And Also Denied That They Acquired Data From "Consent Farms"**

99.     Notwithstanding the findings of the Culper Report, Defendants continued to make false and misleading statements by: (1) continuing to tout their "opted-in" data set; and (2) denying that Zeta operated or collected user data from "consent farms," asserting that users received actual value in exchange for their data.

100.     Indeed, following Zeta's November 13, 2024 press release, Defendants sought to further minimize the impact of the Culper Report by adamantly insisting that Zeta promised a value exchange for *every* user, without exception. On November 14, 2024, during a webinar titled "Zeta: Update on Company in Response to Recent Price Movements," Defendant Steinberg stated: "***In a hundred percent of the cases where we collect a consumer's data, there's a value exchange***."

---

[44] *Id*. at 1-2.

101.    Defendants also attempted to rehabilitate the Company in the aftermath of the Culper Report by issuing a more forceful and detailed response on November 20, 2024, when Zeta published a press release entitled, "Zeta Global Corrects False and Misleading Claims About Its Business," along with a 15-page presentation entitled "Setting the Record Straight," which Zeta said "debunks," "dissects and corrects" the Culper Report.[45]

102.    Notably, not once in this 15-page presentation did Zeta deny that the 40 websites Culper Research identified actually transmitted user data to Zeta. Instead, Zeta doubled-down and claimed the websites were legitimate, stating that: "Apptness job sites only display ads from paying advertisers – real employers – who are looking to hire." As to the ArcaMax websites, Zeta stated that: "ArcaMax offers conventional newsletters to which consumers subscribe on topics such as news digest, entertainment and comics." In the "Setting the Record Straight" presentation, Zeta further falsely stated that it "gathers data lawfully [and] *does not operate 'consent farms,'* often defined as sites that deceptively acquire personal information from people, often with the promises of jobs or contest prizes."

103.    Tellingly, after reading Zeta's "detailed rebuttal," Morgan Stanley issued an analyst report on November 21, 2024, begging for more detail regarding the collection and value of Zeta's data, noting that "not all data points are created equal . . . ."[46] Moreover, Morgan Stanley did not feel that Zeta had adequately explained away the Culper Report's comparisons to the fraudulent data collection practices of Zeta's competitor Fluent, a company that had recently been targeted

---

[45] Press Release, Zeta Glob. Corp., Setting the Record Straight on Zeta's Data Collection and Accounting Processes (Nov. 20, 2024), https://zetaglobal.com/resource-center/zeta-short-seller-report-response/.

[46] Elizabeth Porter, et al., *Short Report Noise Continues: The Rebuttal*, Morgan Stanley, Nov. 21, 2024 at 1-2.

with a Federal Trade Commission ("FTC") enforcement action relating to its practice of fraudulently enticing consumers to consent to having their data used for marketing purposes.

104.    Specifically, on July 17, 2023, the FTC charged Fluent for operating what the FTC called a "massive 'consent farm' enterprise, using deceptive ads and websites to induce nearly one million consumers a day to provide their personal information. . . ."[47] Morgan Stanley noted that:

> [T]he [Culper] short report specifically features screen shots of Zeta's alleged data collection practices, which appear quite similar to those of Fluent, a company which faced regulatory action. The rebuttal does acknowledge these screen shots, referring to them as "false", *though stops short of providing incremental context*, which could have potentially increased investor (and our) confidence in how the seller engineered these images. While Zeta does opine on differences between their practices and those of Fluent, *we have unanswered questions*. We look forward to gaining further insight into these outstanding questions at the company's announced Data Summit on December 9th.[48]

105.    After Zeta's publication of its "Setting the Record Straight" presentation, on November 20, 2024—and in direct response to the Culper Report—Zeta organized an investor conference call with William Blair to defend the Company's data collection practices. In this conference, Defendants continued to assert that their data set of 240 million U.S. individuals was fully "opted-in."  Specifically, Defendant Gore stated, without equivocation, that: "***The one thing I want to make really clear is that we have 240 million people in our graph that are opted-in*** for tracking and monitoring for digital marketing, display ads, CTV ads, calculation of intent."

106.    At this investor conference, Defendants also continued to assert that Zeta did not collect user data from consent farms, because there was a true exchange of value between a consumer and the service in exchange for the consumer's individual user data.  According to Defendant Hayes: "To put this in the clearest terms, ***we do not operate any sites that trick or***

---

[47] Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief, *United States v. Fluent, LLC, et al.*, No. 9:23-cv-81045 (S.D. Fla. July 17, 2023), ECF No. 1

[48] *Id.* at 2.

*mislead consumers into giving us their data*, which is what those companies [*i.e.*, Fluent] were accused by the FTC of having done." And Defendant Gore similarly stated in the same conference: "there's a third type of publisher in the world, a performance marketing publisher, ***where there's an explicit exchange between a consumer opting for some kind of service. And in that process, they're willing to opt-in to a service and provide their data as well. Apptness falls into that category***."

107.    Just seven days later, on November 27, 2024, Defendant Steinberg went on CNBC to further respond to the Culper Report and rehabilitate Zeta's stock price. CNBC's host asked Defendant Steinberg directly about the Culper Report, pressing him on "what should investors know?" and asking Steinberg whether Zeta was operating "consent farms." Steinberg responded and assured investors of the legitimacy of Zeta's user data, stating that:

> ***No. We never do consent farms***. Our organization is one of the most powerful as it relates to our data. We have spent hundreds of millions of dollars over the years in acquiring companies that create first party, ***opted-in data, where we partner with the consumer***. ***The consumers are always getting a value exchange***; ***whether they are getting a newsletter, or able to comment on a site, or share different content to their social graph***. ***A consent farm is when somebody is running misleading ads to get somebody to sign-up for something that they have no intention of giving them. We never do that and we have never done that***.

### G.    Zeta Admits That More Than Half Of Its 240+ Million U.S. Individuals' User Data Was Never "Opted-in" At All

108.    On the morning of December 9, 2024, the Company hosted the "Zeta Data Summit," an in-person and virtual conference, which Zeta billed as designed "to explore the transformative power of the Zeta Data Cloud, responsible data practices, and AI-driven personalization."[49] But once the Summit started, Zeta made clear that the purpose of the

---

[49] *Unlocking the Future of Marketing: Highlights from the Zeta Data Summit*, ZETA GLOB. CORP. (Dec. 10, 2024), https://zetaglobal.com/resource-center/highlights-zeta-data-summit-2024/.

presentation was to further assuage investors regarding the persistent questions surrounding the Company's data collection practices and legal compliance in the wake of the Culper Report.[50] The PowerPoint accompanying Zeta's presentation characterized the Company as being in a "Crisis" "Since 'The Report' Landed'" on November 13, 2024, and outlined all the steps the Company had been taking to gain momentum, including providing "Greater Data Transparency," and "Clarify[ing] the Truth."[51]

109.    During this presentation, Defendant Gore conceded that Zeta did ***not***, in fact, have "240 million opted-in individuals in the U.S.," as Defendants had consistently misrepresented to the market both before and throughout the Class Period. In fact, Gore admitted that there were ***only 110 million opted-in individuals*** in Zeta's data set. Specifically, Gore stated:

> Now, one thing I'm going to call out before we continue is that digital and email permission are different. The 245 million people that we see across the US, we have digital permission on. This is permission akin to what you'd find with a walled garden. Our code and our integration with publishers gives us access to actually monitor these individuals across the open web, and we do so across our graph. There is a subset of the population, ***about 110 million that we actually have opt-in*** email permission for. These are people that we would send acquisition email to, but it's a subset of the 245 million that we have in the overall graph. And again, across both of these vectors, we comply with federal, state and self-regulatory programs.

110.    This was the first time Zeta disclosed that their oft-touted "240 million" individuals in the U.S. referred only to users who gave mere "digital permission" for "online tracking," and had not, in fact, "***opted-in***." Moreover, this was the first time Zeta stated that they only "actually have opt-in email permission for" 110 million individuals.

111.    As later explained by Ari Waldman, a professor of law at the University of California, Irvine in an email published in part by *The Capitol Forum*:

---

[50] *Zeta Data Summit*, Zeta Glob. Corp. (Dec. 9, 2024), https://s202.q4cdn.com/623583957/files/doc_events/2024/Dec/09/Zeta-Data-Summit-12-9-2024.pdf (last accessed on May 12, 2025).

[51] *Id*. at pp. 9, 11-14.

Calling your data set the largest "opted-in" data set and then admitting that less than half the people in that data set actually opted in is a ***straight up lie*** *...* ***there is no definition of 'opt in' where the latter group*** *[referring to "users who just clicked agree to a third party's terms of service without another option"]* ***are considered opted in for the purposes of laws like the CCPA***.[52]

112.    During the December 9, 2024 Data Summit, Defendant Gore also disclosed to investors the type of data that the Company received from its opted-in individuals. In order to create its data set, the Company collected three types of data from users: identity data, signal data, and identifier data. As explained by Gore:

There are three kinds of data that Zeta brings into our ecosystem. The first is identity data. This is highly durable and persistent, and it's really the representation of a person using offline PII, it being joined to digital PII or digital identifiers. The second is identifiers. How would we reach someone if we wanted to across different channels? And third is signal data, which is refreshing regularly. This is data in motion, things that change very frequently and data at rest. Profile attributes that do not change very frequently. And we use that to infer interest, intent and other attributes about a person.

113.    Importantly, according to Gore, "[t]o be a really good data cloud, you need to have all three things happening persistently and being refreshed persistently... it's a very powerful combination."[53]

114.    However, in the December 9, 2024 Data Summit presentation, the Company disclosed that it received ***only*** identity data from opted-in individuals, and not the valuable signal or identifier data. Thus, not only did Defendants disclose for the first time that a significantly smaller number of people had opted-in to share their data, but the Company also disclosed that it was receiving *less* information from those that had opted-in as compared to those that had not.

---

[52] *Zeta Global: Company Removes References to 'Opted-In' Data in 10-K Filing, Experts Question Data Collection Claims*, THE CAPITOL FORUM (Mar. 7, 2025), https://thecapitolforum.com/zeta-global-company-removes-references-to-opted-in-data-in-10-k-filing/ (last accesses on May 12, 2025).

[53] Morgan Stanley Technology, Media & Telecom Conference – Fireside Chat, March 3, 2025.

115.    After having fervently denied the veracity of the Culper Report, these partial revelatory disclosures confirmed and corroborated Culper Research's suspicions that Zeta's "opted-in" customer data set was not all the same, per Defendants' prior representations, and that Zeta operated consent farms. As Morgan Stanley previously noted following the Culper Report, investors were concerned over "the quality of Zeta's data assets" because "not all data points are created equal," based on how and what data was obtained and for what purpose.[54] Moreover, full email opt-in permission is much less likely than mere digital permission to invite regulatory scrutiny and cause reputational harm, which was also a major concern for investors following the publication of the Culper Report, as explained in Canaccord Genuity's November 14, 2024 research note. The Canaccord research note also noted that while the analysts hoped "that Zeta is doing business the 'right' way," it was "clear that investor confidence is shaken."

116.    Although Defendants continued to mislead the market regarding Zeta's data set, the market reacted negatively to these new partial disclosures in the December 9, 2024 Data Summit presentation. Zeta shares declined from an open of $26.10 per share in the morning of December 9, 2024, to close at $22.97 per share the same day on unusually high trading volume—reflecting a 12% decline in a single day.

117.    Notably, Defendants in the December 9, 2024 Data Summit continued to mislead the market in an effort to prop up the falling share price, notwithstanding the partial correction and revelation of truth that day. Specifically, Defendant Steinberg doubled-down on the claim that Zeta did not operate consent farms, stating that: "I think one of the things I've really talked about openly over the last few weeks is, there are ***companies that have created data sign up ecosystems where***

---

[54] Elizabeth Porter, et al., *Short Report Noise Continues: The Rebuttal*, Morgan Stanley, Nov. 21, 2024 at 2.

*they would make promises to a consumer that were not true. Zeta has never done that. Anybody who has ever come to apply or join the Zeta Data Cloud is getting a value proposition in return*," and asserting that: "*it's something that we've focused on for many years*." Similarly, Defendant Hayes stated that: "*first, anyone who comes to one of our owned and operated properties, there is a value exchange there. They're getting something for any data that they provide, and that is straightforward and we believe fair*."

118.    Thereafter, on December 12, 2024, Defendant Steinberg went on-air with Anthony Pompliano, a widely subscribed and viewed investor podcaster who publishes his interviews on YouTube. In this interview, Defendant Steinberg again made another false and misleading misrepresentation in an effort to maintain or artificially inflate the Company's share price, reiterating that: "*In the United States, 245 million people have opted in to be in our data cloud.* Now, what [Culper Research was] accusing us of is getting people to sign up without a value proposition on the other side. *And in a hundred percent of the cases, if people opt into our data cloud, they're getting a value exchange*, they're able to get a newsletter or they're able to use a technological product that we built or a company we bought that provides them with the service."

119.    Seven days later, on December 19, 2024, William Blair published an analyst report with an "Outperform" rating for Zeta stock in reliance on Defendants' misrepresentations. Therein, the analyst stated: "First, Zeta emphasized that its approach to data privacy is an important part of its pitch to customers and a reason it has been successful in landing large customers in highly regulated industries like healthcare and financial services. Second, the company highlighted the breadth of its *opted-in data sources as a moat that would make it difficult for a competitor to replicate its offering*." The market thus understood, as it did during and throughout the Class Period, that Zeta's much asserted opted-in data set was: (1) an "important part of its pitch to

customers;" (2) was a "reason it had been successful in landing large customers in highly regulated industries;" and (3) was a differentiator that would make it "difficult" for other competitors in the advertising industry to compete and "replicate."

120.    Following Defendant Steinberg's final misrepresentation on December 12, 2024, just a few weeks later, on February 26, 2025, Zeta filed its Form 10-K for FY ended December 31, 2023 (the 2024 Form 10-K), in which Defendants corrected their Class Period misstatements by quietly removing all references to "opt-in" with respect to the Company's data. Notably, in every Form 10-K that Zeta has filed with the SEC since the Company went public in 2021 through its 2023 Form 10-K, the Company has touted that it owned "the industry's largest *opted-in data set* for omnichannel marketing." However, in Zeta's 2024 Form 10-K, Defendants removed this language.

121.    Moreover, the Company no longer touted its "opted-in" data set as one of its ZMP's four pillars. Whereas Zeta's prior 2023 Form 10-K stated that the ZMP was "built on the following four pillars: 1. *Opted-in* Data Set . . . Our data set contains more than 240 million *opted-in* individuals in the U.S. and more than 535 million *opted-in* individuals globally," Zeta's 2024 Form 10-K removed those "opted-in" references, now indicating that the ZMP was "built on the following four pillars: 1. Zeta's Data Set . . . Our data set, which contains more than 245 million individuals in the U.S. and more than 535 million individuals globally. . . ." Notably, this was in *direct contradiction* to what Defendant Steinberg said just weeks earlier during the Anthony Pompliano podcast and throughout the Class Period. The removal of the "opt-in" language from Zeta's annual reports is demonstrated in the below comparison of the Company's 2023 Form 10-K and its 2024 Form 10-K:

[continued on next page]

**Zeta's 2023 Form 10-K**

The ZMP is built on the following four pillars:

1. **Opted-in Data Set**

Our data set is an amalgamation of our private proprietary data, publicly available data and data provided by our partner ecosystem.

Our data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally with an average of more than 2,500 attributes per individual, which may be demographic, psychographic, transactional, or indicative of preference. On average, we ingest more than one trillion content consumption signals per month on a global basis and synthesize this information into hundreds of intent-based audiences, which can then be used to create marketing programs. All this data is managed through a proprietary database structure that has patented flexibility, speed and scalability.

**Zeta's 2024 Form 10-K**

The ZMP is built on the following four pillars:

1. **Zeta's Data Set**

Our data set, which contains more than 245 million individuals in the U.S. and more than 535 million individuals globally, is a comprehensive mix of proprietary, partner, and publicly available data, now strengthened by LiveIntent's authenticated identity graph, providing enhanced first-party resolution. This data set includes an average of more than 2,500 attributes per individual, which may be demographic, psychographic, transactional, or indicative of preference.
On average, we ingest more than one trillion content consumption signals per month on a global basis and synthesize this information into hundreds of intent-based audiences, which can then be used to create marketing programs. All this data is managed through a proprietary database structure that has patented flexibility, speed and scalability.

122.    Additionally, the Company also removed its reference to "opted-in data" in its risk disclosures. In its 2023 Form 10-K, Zeta told investors that "our business and the effectiveness of our platform depends on our ability to collect and used online data" and explained that "the principal way that we collect individual *opted-in data* is directly from the consumers when they register or interact with our platform (such as the DISQUS commenting system), or with partners' services." However, in its 2024 Form 10-K, Zeta removed the "opted-in" language from this disclosure.

123.    By removing the "opted-in" language from its 2024 Form 10-K, Defendants signaled to the market that the individuals it received data from had (1) not affirmatively agreed to share their data through "opt-in" consent and (2) had not received a transfer of value in exchange for their informed consent, given Defendants' prior statements equating opted-in data to such

47

exchange of value. Further, Zeta's correction of its 2024 Form 10-K shortly after the publication of the Culper Report affirmed the legitimacy of the Culper Report's claims that the Company was utilizing consent farms and misrepresenting its data collection practices. This disclosure removed additional artificial inflation caused by Defendants' Class Period misrepresentations. Although analyst consensus was that Zeta's financial results beat market expectations, as a result of the dissipated artificial inflation, Zeta shares declined from an open of $20.48 per share in the morning of February 26, 2025, to close at $17.77 per share the same day on unusually high trading volume. The stock continued to decline on February 27, 2025, to close at $16.65 per share, again on unusually high trading volume.

124.    Thereafter, on March 10, 2025, *The Capitol Forum* promoted via X (f/k/a Twitter) an article titled "*Zeta Global: Company Removes References to 'Opted-In' Data in 10-K Filings Experts Question Data Collection Claims*."[55] The article recognized that "Zeta's 2024 annual filing walked back these claims and references to consumers opting in to data sharing," which raises "questions over how the company sources and promotes its data set, a *Capitol Forum* investigation has found." The article quoted Clarence Okoh, Senior Associate at the Georgetown Law Center on Privacy and Technology, who stated: "The removal of the 'opt-in' language is concerning, and I think it invites additional questions on whether this reflects a larger shift in the organization's data governance practices." *The Capitol Forum* also included a quote from Alan Butler, Executive Director and President of the Electronic Privacy Information Center, who said: "Any company that's doing business with this company, that's thinking about their own compliance, their own potential liability or exposure, is going to want to understand the source and

---

[55] *See generally, The Capitol Forum*, X.COM (Mar. 10, 2025) https://x.com/Capitol_Forum/status/1899104607197958303 (last accessed Apr. 18, 2025). The article is dated March 7, 2025, when it was not publicly available but rather only privately available to Capitol Forum subscribers.

provenance of this data," because, "[t]here is absolutely a difference between data that is subject to an actual affirmative express consent indication process versus data that's not, under many laws, and so that's going to be very relevant to companies that are considering whether they can use this service."

125.    *The Capital Forum* also found that "[w]ith Zeta now claiming that 245 million U.S. consumers have provided them 'Permission to Online Tracking by Agreeing to Publisher Terms of Service'—as opposed to opt-in consent—the company runs the risk of violating state laws that mandate affirmative express consent to process certain types of sensitive data, according to some privacy experts."

126.    Importantly, the article included a comment from a Zeta spokesperson, who revealed that the language change in the 2024 Form 10-K was by no means a minor stylistic change, but rather a correction "to provide shareholders with clear and accurate disclosures," and that "[t]his update ensures our terminology aligns with the nature of permissions across our data assets to **prevent misinterpretations**." In other words, Zeta conceded that its Class Period representations regarding "opt-in" users were *not* clear or accurate and *were* subject to misinterpretation.

127.    That same day, on March 10, 2025, Zeta published a press release on its website entitled, "Zeta Global Statement on Data Terminology Updates," which reiterated verbatim these same concessions made to *The Capitol Forum* regarding its data set statements. Zeta's admission that the removal of the "opt-in" language from its 2024 Form 10-K was done "as part of our ongoing efforts to provide shareholders with clear and accurate disclosures" and to "prevent misinterpretations" revealed to investors that the Company's previous statements about its opted-in data set were inaccurate. This final corrective disclosure from Defendants fully cemented to the

market that the individuals it received data from had (1) not affirmatively consented to share their data through "opt-in" consent and (2) had not received a transfer of value in exchange for their informed consent, given Defendants' prior statements equating opted-in data to such exchange of value.

128.   On this information, along with other details uncovered in *The Capital Forum* investigation related to Zeta's data collection practices and potential regulatory exposure, additional artificial inflation was removed from Zeta's stock, and its value declined from the previous day's closing price of $15.82 per share, to close at $14.03 per share on March 10, 2025, on unusually high trading volume of 9,987,500 shares.

129.   These disclosures removed the inflation caused by Defendants' materially false and misleading misrepresentations and omissions, and accordingly resulted in significant investor losses for which Lead Plaintiffs seek recovery.

**H.   Lead Plaintiffs' Investigation Confirms And Expands On Defendants' Deceptive Statements And Conduct**

**1.   Lead Plaintiffs' Data Science Expert Conducted His Own Independent Investigation Into Zeta's Data Collection Practices**

130.   Lead Plaintiffs have conducted an independent investigation with the assistance of a data science expert to not only validate and substantiate the findings of the Culper Report, but also further explore the nature of Zeta's "consent farm" operations and data collection practices. As discussed in this Section, Lead Plaintiffs' data science expert: (1) validated certain findings of the Culper Report related to Zeta's use of consent farming for obtaining user data; (2) discovered that many of the consent farm operation websites named in the Culper Report have since been deleted and scrubbed (or the associated privacy policy was changed); (3) found that Zeta has improperly obtained data from websites (including from fake job posting platforms) through the

use of "leaky forms," as further explained below; and (4) **found that Zeta is still, to this day, using consent farms to acquire user data**.

131.    Lead Plaintiffs' data science expert has a PhD in Information Management and Systems, and has over 25 years of experience as a research scientist and technologist, with expertise on user experience research and user behavior concerning technology, security, and privacy. This expert has worked with Fortune 100 firms to develop privacy and security solutions. He has also given testimony on his research in front of Congress and the FTC and served as a consulting and testifying expert for the California Department of Justice.

132.    Lead Plaintiffs' expert conducted research to assess the validity of the allegations in the Culper Report. Specifically, Lead Plaintiffs' expert analyzed the 40 websites that the Culper Report listed as "websites run by Apptness and Arcamax ... that bait visitors into disclosing data to Zeta under the promise of job applications, stimulus checks, or other rewards that don't actually exist."[56] Notably, as stated *supra* at ¶102, Zeta's official November 20, 2024 rebuttal response to the Culper Report **did not deny** that the 40 websites identified in the Culper Report transmitted individual user data to Zeta. Furthermore, as at least one analyst noted, Zeta's rebuttal response did not provide "incremental context" concerning these 40 websites which could have "increased investor . . . confidence in how [Culper Research] engineered these [screenshot] images" (regarding those 40 websites). *Supra* at ¶104. As a result, the market was left with "unanswered questions" following Zeta's official response to the Culper Report.

---

[56] *See Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam*, CULPER RSCH. (Nov. 13, 2024), https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/0819f0d2-64be-46af-8977-6762c6dae944/Culper_ZETA_11-13-24.pdf?ver=1743770140965 at 3, 10 (listing the table of the 40 websites).

133.    Lead Plaintiffs' data science expert, through his investigation and analysis, uncovered additional information and details concerning Zeta's data collection practices through these 40 websites, including Zeta's use of consent farms. By using "Semrush,"[57] the expert found that from March 2024 to November 2024 (*i.e.*, during the Class Period), the 40 websites identified by Culper Research received ***161.3 million visits*** and ***82.9 million unique users***—indicating the massive scale of collection of data from individuals. From October 2023 to October 2024 (a one-year baseline), the same sites received 262.1 million visits and 141.7 million unique users. These numbers exceed the Culper Report's cited figures of 158.7 million visits and 85.9 million unique users. According to Lead Plaintiffs' expert, however, given that some sites (like apptrck.com) alone account for over 130 million visits during this span, Culper Research's reported totals appear realistic and are likely conservative depending on the inclusion criteria and methodology used for the estimates.

a.    **Lead Plaintiffs' Data Science Expert Validated the Findings of the Culper Report**

134.    Lead Plaintiffs' expert focused on the 40 websites' periods of activity and current status. To determine the lifespan of each domain, the expert examined multiple signals including current HTTP responsiveness, earliest, and most recent snapshots in the Internet Archive, ICANN domain registration, and update records, visibility with Semrush, and last update timestamps found in terms of conditions and privacy policies.

135.    Lead Plaintiffs' expert found that only 18 of the 40 websites listed in the Culper Report as consent farms are still active. Lead Plaintiffs' expert assessed the data collection

---

[57] According to the expert, Semrush is a digital marketing analytics firm that sources online traffic estimates. Lead Plaintiffs' data science expert calculated the traffic to the 40 websites identified in the Culper Report by using Semrush data to estimate total visits and unique users during the Class Period.

mechanisms and transparency of these 18 active websites. The results showed that 14 of these websites rely on a ***passive*** consent mechanism—indicating that these websites do not and did not operate under a true "opt-in" framework of consent during the Class Period.[58]

136.    Moreover, certain consent farm websites identified in the Culper Report were ***also independently flagged as consent farms*** by Lead Plaintiffs' own expert. According to Lead Plaintiffs' expert, the FTC considers consent farms to be "sites that use deceptive and manipulative 'dark patterns' to induce consumers to provide their personal information, obscuring hard-to-find and inadequate disclosures about how the information would be used"[59]—and thus, data obtained from such sites could not be obtained under a true "opt-in" framework of consent as such data was acquired through a misleading or fraudulent manner. As just one example, the Culper Report found that a consent farm website by the name of *unclaimedmoneyinfo.com* "dangles the prospect of 'unclaimed money' to its visitors, only to collect users' data." As shown from the screenshot reproduced below from the Culper Report, Culper Research found that *unclaimedmoneyinfo.com* is a Zeta affiliated-website due to its Apptness registration with the Mississippi Secretary of State:

[continued on next page]

---

[58] The 14 websites that rely on a passive consent mechanism are: *higherincomejobs.com*, *onlygreatjobs.com*, *stimmoney.com*, *freshcareerfinder.com*, *topjobofferstoday.com*, *jobzoodle.com*, *mybestjobmatch.com*, *localcareerz.com*, *americanjobfinder.com*, *yourmorningtea.com*, *americanresourcehub.com*, *welcomeconfirmation.com*, *getworkfromhomejobs.com*, and *registerednursingcareers.com*.

[59] Press Release, Fed. Trade Comm'n, California-based Lead Generator Agrees to Settlement Banning It from Making or Assisting Others in Making Telemarketing Calls, Including Robocals (Jan. 2, 2024), https://www.ftc.gov/news-events/news/press-releases/2024/01/california-based-lead-generator-agrees-settlement-banning-it-making-or-assisting-others-making.



137.    Lead Plaintiffs' expert has corroborated and confirmed through his own independent investigation that the above consent farm website was active during the Class Period and was indeed a "consent farm" under the FTC standard and definition—as such site used "deceptive and manipulative" practices to obtain user data without proper informed consent.

138.    In total, Lead Plaintiffs' expert confirmed that ***15 out of the 18 active websites*** first mentioned by Culper Research are consent farms under the FTC definition of "consent farms," based upon his independent investigation and analysis. The 15 websites that the expert identified as consent farms are: *higherincomejobs.com*, *onlygreatjobs.com*, *stimmoney.com*, *freshcareerfinder.com*, *unclaimedmoneyinfo.com*, *eligibilitylookup.com*, *topjobofferstoday.com*, *jobzoodle.com*, *mybestjobmatch.com*, *localcareerz.com*, *americanjobfinder.com*, *americanresourcehub.com*, *welcomeconfirmation.com*, *getworkfromhomejobs.com*, and *registerednursingcareers.com*.[60]

139.    Additionally, Lead Plaintiffs' expert confirmed that the following five websites are consent farm websites for the additional reason that there is no corresponding value exchange between the individual user and the website in exchange for the individual's user data, and thus

---

[60] Again, the other 22 websites (out of the 40 mentioned by the Culper Report) are currently inactive and thus not testable.

these websites were not "legitimate": *unclaimedmoneyinfo.com*; *stimmoney.com*; *eligibilitylookup.com*; *americanresourcehub.com*; and *welcomeconfirmation.com*. Notably, the current privacy policies for these websites ***admit*** that these websites send information to "Zeta Global," and according to Lead Plaintiffs' expert, these websites changed their privacy policies shortly after the release of the Culper Report.

140.    As explained by Lead Plaintiffs' expert, to determine whether a website was legitimate, he determined whether it actually "delivered what was advertised." These five websites (*stimmoney.com*; *unclaimedmoneyinfo.com*; *eligibilitylookup.com*; *americanresourceshub.com*; and *welcomeconfirmation.com*) required users to register and complete "personalized surveys" before getting access to promised funds or job listings. Lead Plaintiffs' data science expert completed those "personalized surveys" for all five websites, however, the expert found that there was no opportunity to claim money or view jobs either immediately at the end of the survey or afterwards via email or text.  For three of those websites, after completing the survey, the user was taken to a landing page with no other information provided, and no emails or text messages were received in the eleven days following the test. For the other two websites, the survey simply never ended.  According to Lead Plaintiffs' expert, the user was shown ads and other links but no opportunity to claim funds or access job listings:



141.    Lead Plaintiffs' expert's findings thus corroborate the Culper Report's allegations that Zeta was using consent farms, *i.e.*, "websites designed to gather consumer data under false pretenses"[61] during the Class Period. Lead Plaintiffs' expert's independent investigation and findings corroborate the Culper Report's conclusions and establish that Zeta *was* operating consent farms through these 40 websites—including throughout the Class Period.

142.    Accordingly, Zeta's data collection practices were not based on a true "opt-in" framework of consent as the 40 websites mentioned in the Culper Report either did not affirmatively obtain consent for the individual user data or were not based on a legitimate exchange of value for a promised service to the individual users.

### b.    Lead Plaintiffs' Expert Found that Shortly Following the Culper Report, a Majority of the Identified Websites Were Either Deleted Or Their Corresponding Privacy Policies Were Updated

143.    To date, a majority of the websites the Culper Report revealed as sites "that bait visitors into disclosing data to Zeta under the promise of job applications, stimulus checks, or other rewards that don't actually exist" have been scrubbed from the internet. Specifically, Lead Plaintiffs' data science expert found that 22 of the 40 websites are no longer reachable as they were listed in the Culper Report and 12 of those 22 websites were disabled shortly after the publication of the Culper Report on November 13, 2024.

144.    These 12 websites that were deleted after the publishing of the Culper Report include: *apptrck.com, arcamaxjobs.com, hijnow.com, getmorehigherincomejobs.com, higherincomeplans.com, higherincomejobsworld.com, finesthigherincomejobsonline.com,*

---

[61] *Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam*, CULPER RSCH. (Nov. 13, 2024), https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/0819f0d2-64be-46af-8977-6762c6dae944/Culper_ZETA_11-13-24.pdf?ver=1743770140965 at 4 (last accessed on May 12, 2025).

*preferablehigherincomejobs.com, gethigherincomejobonline.com, highincomecareeroptions.com, eliteearningopportunities.com,* and *tophigherincomejobsforu.com.* Currently, if someone wanted to access these websites, they would either encounter a disabled webpage or the web address would redirect them to a separate and distinct site.

145.    Separately, Lead Plaintiffs' expert also found that 12 of the still active websites listed in the Culper Report have changed their privacy policies closely following the revelations of the Culper Report. These websites are: *higherincomejobs.com, onlygreatjobs.com, stimmoney.com, unclaimedmoneyinfo.com, eligibilitylookup.com, jobzoodle.com, localcareerz.com, americanjobfinder.com, americanresourcehub.com, welcomeconfirmation.com, getworkfromhomejobs.com,* and *registerednursingcareers.com*.

146.    Three of these websites, *stimmoney.com*, *unclaimedmoneyinfo.com,* and *eligibilitylookup.com*, changed their privacy policies on November 22, 2024, less than ten days after the Culper Report was published. The remaining 9 of these 12 websites each changed their privacy policies on December 19, 2024, approximately one month after the Culper Report was published. The corresponding privacy policies reveal that each of these 12 websites shares user data with Zeta.

147.    In other words, as demonstrated by Lead Plaintiffs' data science expert's investigation, following the revelations in the Culper Report, Zeta attempted to hide and bury its use of consent-farms by either deleting or disabling the websites mentioned in the Culper Report, or simply updating a website's privacy policy which presently includes language indicating that user data is transmitted to Zeta.

c. **Lead Plaintiffs' Data Science Expert Discovered that Zeta Affiliated Websites Post Fake Job Openings and Obtain User Data Without Any Consent, through "Leaky Form" Behavior**

148.    Lead Plaintiffs' data science expert also discovered that Zeta-affiliated websites use "leaky form"[62] behavior and real-time data collection practices. This means that when a user enters information in a website, that data is immediately transmitted to the website's servers as it is typed without waiting for a form submission or any explicit action like clicking a button. This behavior applies to all input fields, meaning that the website is collecting a user's full name, email address, and phone number—even if the user abandons the website or navigates away from the page without fully completing the sign-up form. In this regard, Lead Plaintiffs' expert further confirms that Zeta was acquiring user data without obtaining opt-in consent, as a user could not possibly give "opt-in" consent if they had not been given the opportunity to do so.

149.    Lead Plaintiffs' data science expert identified *jobslaunch.com* as one example of a website connected to Zeta that engages in leaky form behavior. The expert discovered this website by first identifying *myjobresource.com* as associated with the domains in the Culper Report. *Myjobresource.com* is still online and operational and, according to Lead Plaintiffs' data science expert, it behaves similarly to the websites named in the Culper Report through its "strategy of combining 'offer' framing with broad data collection and opaque redirection."

150.    *Myjobresource.com* redirects its users to *Jobslaunch.com* where this website then purports to offer a job opportunity with a well-known company and directs users to complete a signup form. Notably, Lead Plaintiffs' expert found that *jobslaunch.com* uses hundreds of logos in its URLs, such as Amazon, FedEx, Apple, and Disney, but the website does not actually present

---

[62] *See* Asuman Senol, et al., *Leaky Forms: A Study of Email and Password Exfiltration Before Form Submission*, USENIX (2022), https://www.usenix.org/conference/usenixsecurity22/presentation/senol (last accessed on May 12, 2025).

legitimate job offerings from those companies. As seen in the image below, the form the user sees when redirected to *jobslaunch.com* contains a checkbox with the accompanying text, "Yes, send me job alerts via text & email from JobsLaunch, **Arcamax** & Neuvoo!" Any data sent from *jobslaunch.com* to Arcamax will then be sent to Zeta, given that the Company owns Arcamax. And as seen from the below screenshot, the logo is that of Amazon:



151.    Lead Plaintiffs' expert explained that these logos are incorporated via a URL parameter which indicate that these logos are simply "plug and play" and not tied to any legitimate business. In other words, according to Lead Plaintiffs' expert, there are hundreds of logos that the website designer can input into this particular website, spanning a wide range of industries and countries, primarily focusing on retail, transportation, and food, in the United States and Europe. According to the expert this is a significant indicator that the website is illegitimate and not tied to an actual business or job posting, and corroborates the Culper Report's finding that: "[o]nce visitors land on one of these pages, they are baited into submitting their personal information, as the sites blatantly rip off logos from would-be employers such as FedEx, despite having no affiliation with the employer."

152.    Not only do these websites use false pretenses, *i.e.* sham job opportunities, to attract users but it also engages in leaky forms behavior and real-time data collection. Lead Plaintiffs' data science expert states that: "this kind of implementation bypasses typical user expectations and arguable stretches the definition of 'consent' implied in their privacy policy. It also increases the surface for passive data leakage and unintentional collection, especially in edge cases like autofill or accidental typing." In other words, this type of "leaky form" means that Zeta is acquiring the individuals' user and personal information ***without the user even having the chance to click submit or check a box consenting to the collection of their data***. If the user changes his or her mind in the middle of inputting information, that information is sent to Zeta anyways.

153.    These findings thus confirm that Zeta was, and still is, improperly acquiring data from users either without their explicit and informed consent—and therefore, the data collected was not "opted-in."

>    **d.    Lead Plaintiffs' Data Science Expert Found That Zeta Still Obtains Individual User Data Through Consent Farming**

154.    Lead Plaintiffs' expert was also able to identify additional related websites affiliated to Zeta that were not specifically listed in the Culper Report. The expert was able to identify these websites by reviewing outbound referral traffic from the websites mentioned in the Culper Report and finding additional domains that appear structurally and behaviorally similar, with ties to Zeta. As discussed above, these domains often present as job search platforms, prompt users to enter personal information, collect consent through passive or unclear means, and display corporate branding (*e.g.* logos from Amazon or FedEx) despite not linking to official job postings the majority of the time. Notably, these websites ***admitted*** to sending individual user data to Zeta.

155.    One such example is *jobcase.com*, which was identified through traffic associations with domains in the Culper Report. According to the expert, dozens of similar websites can be

identified via this method, including *mystimulusassistance.com*, *anyunclaimedassetssearch.com*, *seekadvantage.com*, *thecollegereview.com*, *everyjobforme.com*, *jobslaunch.com*, *higher-hire.com*, *expertjobmatch.com*, *careerbuilder.com*, and *jobsflag.com*.

156.    As of the time of the expert's analysis, the *jobcase.com* platform is still online and operational. Lead Plaintiffs' data science expert identified that *jobcase.com* is a job search platform similar in kind to the 40 websites identified in the Culper Report, with behavioral similarity to those websites, including—as phrased by Lead Plaintiffs' expert—the "strategy of combining 'offer' framing with broad data collection and opaque redirection." The below screenshot demonstrates the *jobcase.com* platform as identified by Lead Plaintiffs' expert:



157.    Lead Plaintiffs' data science expert then found that when clicking on the first offer ("Package Handler – Part Time"), the user is redirected to *fedex22.localjobmatchnow.com*, where the FedEx logo is embedded, together with the prompt to enter personal data:



158.    Notably, Lead Plaintiffs' data science uncovered that the hyperlinked privacy policy in the above screenshotted website (*i.e.*, the *fedex22.localjobmatchnow.com* site) ***explicitly mentions Zeta as a recipient of the user data collected from this consent farm operation***:

**Transfers And Sales Of Personal Information To Third Parties**

We allow advertising companies, marketing partners and our Affiliates, etc. ("third parties") to place advertisements on our Site, some of which allow those third parties to collect personal information about you. We also transfer personal information that we have collected from you to other advertising companies, marketing partners, and our Affiliates. These transfers constitute sales of data because our third party partners may store and use it for their own purposes and may also share it with other entities. When we disclose personal information to third parties, we enter a contract that describes the purpose for which that personal information is disclosed and requires the recipient to comply with all applicable privacy laws.

When you sign up to receive job alerts and other relevant third-party offers through this Site, and consent to our disclosing your information, that information will be used by these third parties for the purposes of delivering those job alerts and other relevant third-party offers via email and/or SMS. In order to opt-out from continued marketing from these third-parties, please reply directly to the messages you receive with "STOP".

We also partner with third parties that collect information across various channels, including offline and online, for purposes of delivering more relevant advertising to you or your business. Our partners may place or recognize a cookie on your computer, device, or directly in our emails/communications, and we may share or sell personal information that we have collected with them. Our partners may link the personal information we share with them to the cookie stored on your browser or device, and they may collect information such as your IP address, browser or operating system type and version, and demographic or inferred-interest information. Our partners use this information to recognize you across different channels and platforms, including but not limited to, computers, mobile devices, over time for cross-context behavioral advertising (including addressable TV), analytics, attribution, and reporting purposes.

We may also disclose your personal information to a buyer or other business successor, whether as a going concern or as part of a bankruptcy, liquidation, or similar proceeding, in which personal information held by us about you is among the assets transferred to effectuate a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of our assets.

Finally, in some cases we may disclose your personal information to law enforcement, regulators, judicial authorities, other government entities, or other third parties to comply with any court order, law, or legal process, including to respond to any governmental or regulatory request; to protect the rights, freedoms, or safety of any person; and/or to enforce or apply our terms of use and other agreements, including, if applicable, for billing and collection purposes.

You may request to opt out of our sale of your personal information to third parties (See "Your Rights and Choices" below). If you opt out, going forward, we will not share your information with such third parties for use for their purposes unless you later opt back in.

To learn more about interest-based advertising in general and to opt-out, please visit https://www.aboutads.info/choices. To opt-out of the use of your mobile device/ ID for targeted advertising, please see https://www.aboutads.info/appchoices.

You can view the list of our third party advertising partners and their respective Privacy Policies here:

AAPS, Arcamax, BestBenefitsConnection, Career Boutique, Chevron, DS Prospecting, Disqus, Fortifynance, FreshCareerFinder, Hello Fresh, NewJobConnections, Only Great Jobs, OpenSponsorship, Rivermend, Petspend, Pepsico, Prime Publishing, Results Generation, Popular media, Talent, Trending Jobs, UnclaimedBenefitsBulletin, Unilever, YourEligibilityGuide, Zeta Global.

159.    The similarities between the Culper Report's findings and Lead Plaintiffs' independent expert's findings—confirming the user information is being transmitted to Zeta through deceptive means—is powerful corroboration of the information contained within the Culper Report. Indeed, Culper Research also found that these job boards were fake and utilized fake FedEx logos, including one for *higherincomejobs.com*,[63] a consent farm initially identified by Culper Research:



160.    And as the Culper Report found concerning the above screenshot, "[c]omments from multiple online forums, user complaints, and a September 2023 class action lawsuit suggest that millions of users have been duped into submitting their personal information to

---

[63] *Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam*, CULPER RSCH. (Nov. 13, 2024), https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/0819f0d2-64be-46af-8977-6762c6dae944/Culper_ZETA_11-13-24.pdf?ver=1743770140965 at 6 (last accessed on May 12, 2025).

higherincomejobs.com. See, for example, one father who shared the story of his son's experience, explicitly calling the Zeta-run consent farm 'a well-designed scam'"[64]:



---

[64] *Zeta Global Holdings Corp (ZETA): Shams, Scams, and Spam*, CULPER RSCH. (Nov. 13, 2024), https://img1.wsimg.com/blobby/go/cc91fda7-4669-4d1b-81ce-a0b8d77f25ab/downloads/0819f0d2-64be-46af-8977-6762c6dae944/Culper_ZETA_11-13-24.pdf?ver=1743770140965 at 7 (last accessed on May 12, 2025).

161.    Similarly, Lead Plaintiffs' own investigation uncovered significant additional complaints from users regarding the *jobcase.com* fake job platform that have been ***independently*** identified by Lead Plaintiffs' data science expert and which were not initially identified by Culper Research. As noted by the real user complaints below (sourced from the Better Business Bureau and Reddit.com), during the Class Period, *jobcase.com* was a "bait and switch scam" that posted jobs which were not real, and in the process unethically and deceptively acquired significant user data from consumers for the benefit of Zeta, *i.e.*, there was no true value exchange between the parties and thus, no true "opt-in" consent by Zeta's own admission:



**Kimberle A**

**Date:** 05/09/2024

> **Kimberle A**
>
> **Date:** 05/09/2024
>
> This is a bait and switch scam like I have never seen before. I applied for a job advertised and when I didnt receive a confirmation or a call back from the company I applied with I called them directly. The actual company, Guess what,, they never had an opening for that position. However that didnt stop Jobcase from emailing job opportunities with the companies name on it and when I selected further information it took me to unrelated jobs. This is deceptive and unethical. I have requested to no longer receive all the fake emails they ******* me with. I have a feeling they wont be stopped. I want absolutely no association with this company,



**Icy-Confidence-2977** · 10mo ago

Complete fraud. They keep posting job openings for the company I work for and we aren't hiring. We are actually in layoff mode.

⬆ 3 ⬇    💬 Reply    🏅 Award    ↗ Share    ⋯

162.    Indeed, the screenshot above describing the complaint from username "Icy-Confidence-2977" indicates that it was posted online by that individual on June 30, 2024 at 1:45pm ET.  Notably, both these individuals noted above posted these complaints during the Class Period

and corroborate that the purported jobs in *jobcase.com **did not even exist***. There are dozens or more similar complaints online concerning *jobcase.com*, serving as powerful corroborative evidence that—as identified by Lead Plaintiffs' data science expert—Zeta obtains highly valuable user data through consent farming even to this day.

> **2.    The Data Collected From Disqus, Zeta's Main Source of Consumer Data, Was Not "Opted-In" During The Class Period**

163.    Just a few months prior to the beginning of the Class Period, during the August 9, 2023 Canaccord Genuity Growth conference, Defendant Greiner told investors that Disqus "***accounts for about a third of the data assets*** and identities that are part of our graph, that's an ***opt-in process*** to be part of Zeta's data club."

164.    Thus, at the start of the Class Period, on February 27, 2024, Disqus was a main source of data for Zeta, and accounted for up to ***33%*** of the data in Zeta's data cloud—an astonishing number in light of the fact that Zeta claims to have collected data from 240 million plus Americans and 525 million plus global citizens.

165.    Furthermore, on December 9, 2024, Zeta hosted a Live Virtual Data Summit in which Zeta published a slide that stated Disqus collected and provided all three "Identities," "Identifiers," and "Signals" data to Zeta's total data cloud. As explained in this Data Summit, Identities are "unique individuals, represented by offline PII[65] like an email hash that can be joined to a digital identifier via an authentication event (e.g., login, signup, click-thru)." "Identifiers" are "indices that determined the best way to reach an identity across digital and offline channels (e.g. email hash, MAID,[66] [] phone number)." And "Signals" are "data-in-motion and data-at-rest

---

[65] Personally Identifiable Information.

[66] Mobile Ad Identifier, for example, Apple's IDFA described above *supra* at Section IV.C.1.

processed by Zeta AI to infer intent, interest, and attributes (e.g., intent to buy a car or travel, kids in household)."

166.    According to Defendants, the size and scope of individual user data collection from Disqus was massive. During the March 8, 2022 Morgan Stanley Technology, Media and Telecom Conference, Defendant Steinberg claimed that an extraordinary *6.2 million websites around the world* used Disqus, and that it was operated in "*trillions of pages*":

> Q (Analyst): . . . Where did this data come from? Like, how did you go about collecting 230 million identities in the US?
>
> A (Steinberg): Well, so we started years ago on the premise that first party data was going to be a differentiator in the future. We weren't – I wasn't sure I'd be as prolific as we've been but it's worked out well. And what we did was starting about 10, 12 years ago, we started buying really interesting tools that power publishers, the largest of which is called Disqus – D-I-S-Q-U-S – which is the world's largest commenting platform. 92% of all websites in the world, *which is about 6.2 million of them use the Disqus platform* to allow consumers to interact with their content in exchange for us giving that software away free, they host our JavaScript and our first party tracking pixel on every single page they publish. *It's about a trillion pages of content.*
>
> Every time a consumer interacts with the platform more than two or three times, they are sent to a login process where they either have to create a Disqus account or they have to log into their Disqus account. *450 million people a quarter login to a Disqus account*. So that's a global number, not just the US number. But we also own a platform called Temnos which does other things and we bought some newsletter businesses and some other publishing assets and they sit at the heart of the data creation inside of Zeta Data Cloud.
>
> Q (Analyst): Got it. So I've personally never used the Disqus platform, but when people do log in and they register, like what kind of information do you collect on them during that registration process?
>
> A (Steinberg): Really, it's just their name, their email address *and an opt-in*. That's really all we need because we have so much data in the data cloud today, we're able to sort of append back to it.

167.    Based upon consultation with Lead Plaintiffs' data science expert, however, the data collected from Disqus was not collected under an "opt-in" framework of consent. Using an internet archive search, the screenshot below demonstrates what Disqus' registration and sign-up

page was during the Class Period. Notably, this registration page to sign-up for Disqus' services

was, in sum and substance, the same since Zeta's acquisition of Disqus in December 2017:



168.    Critically, the above does not demonstrate an "opt-in" framework of consent—

contrary to Defendants' repeated assertions during the Class Period. There is no prominent option

to "check a box" that consents to their information being collected, or to not check that box—as

required for an opt-in framework of consent and as analysts were led to believe existed during the

Class Period. *Supra* at ¶¶60; 97. Instead, the framework of consent is *opt-out*, as a user who signs

up for Disqus must first "Sign-Up" and share his or her information, and then, afterwards, must

later access Disqus' separate privacy policy to effectuate an "opt-out."

169.    Indeed, during the Class Period, Disqus buried its "opt-out" form amongst layers

of hyperlinks, including within Disqus' privacy policy, as indicated below:

**4. TARGETED ADVERTISING AND AD PARTNERS.**

Advertising is the predominant way Disqus makes money. Advertising revenue allows Disqus to operate, support and improve the Service. Disqus uses, and also shares with third party ad partners and affiliates who use cookie IDs, device IDs (including mobile), hashed email addresses, IP address, ISP and browser information, demographic or interest data, content viewed and actions taken on the Service or Partner Sites, including information about the websites you've viewed and advertisements you've interacted within in order to provide you with more relevant advertising targeted to your preferences and interests derived from your interaction with the Service, Partner Sites or other third party websites. For a list of third-party ad partners that Disqus is currently working with click here. Disqus may also send you email newsletters and email marketing messages if you have provided us with permission, or consented to receive such emails, as required in the jurisdiction in which you reside. Email marketing messages may be tailored to your interests based on the information described above in this section, for information about how to opt-out and utilize our "Do Not Sell or Share" option please click here.

We partner and share data with third parties that collect information across various channels, including offline and online, for purposes of delivering more relevant advertising to you or your business. Our partners use this information to recognize you across different channels and platforms, over time, (including but not limited to, computers, mobile devices, addressable TV, or other media), for marketing, analytics, attribution, and reporting purposes.

170.    As stated by Alessandro Acquisti, a Professor of Information Technology and

Public Policy at Carnegie Mellon University's Heinz College, to *The Capital Forum*: "During the

[Disqus] account creation phase, there is no option to set one's privacy preferences, nor is there an

option to stop one's data from being used and sold that way. [] ***Only thereafter a user can complete***

***a separate form (if the user finds it) to opt out***. So: ***that's not an opt-in*** (where a user joins a

service and then can opt into their data being used in various ways); that's a 'take it or leave it;'"—

*i.e.*, an opt-out.

### 3.    Former Employees Explain That Zeta Improperly Managed User Data—Including The Consent Of Its Users—And Was Intentionally Opaque With Customers About Its Opt-In Practices

171.    Multiple former employees describe how Zeta internally operated in veiled secrecy

concerning its data collection practices and that Zeta was, at best, opaque and nebulous with its

customers as to whether Zeta's consumer user data was truly opted-in. Further, former employees

also explained how, internally, Zeta knowingly or recklessly disregarded the requested level of consent from its users regarding the use of such user data.

172.    FE-5 was formerly employed by Zeta as Vice President Business Development from December 2021 to August 2023. FE-5's responsibilities as Vice President Business Development included selling Zeta's business to enterprise-sized clients.

173.    According to FE-5, Zeta's enterprise customers, including Sony as one example, had "lots of questions" about Zeta's data collection process with some of the most frequent questions he was asked by his customers being (i) how Zeta collected the user information in their databases and (ii) what sites in the Zeta umbrella had an "opt-in" option and if those users had opted-in or not for having their data shared.

174.    FE-5 recounted always feeling awkward when the opt-in question was asked by the customer because that was information that even he was not given by Zeta. FE-5 described Zeta as "very siloed" and not sharing internally on how the data collection side works. FE-5 recalled that whenever he asked his supervisors and their counterparts on the data collection side if users had opted-in on having their information shared—and telling them that the question was coming from the enterprise customer—*he never got an actual answer*. FE-5 recalled that instead, he was coached or directed to "*dance around the subject*" of the data collection process and user opt-in with the customer by instead listing "a handful" of platforms that the user data was harvested from such as Disqus and ArcaMax. FE-5 was also directed to focus the customer on attributes such as Disqus data being based on "real time transactions."

175.    Notably, FE-5 described some enterprise customers as appearing uncomfortable when he "danced around" the opt-in subject and at times chose to pass on doing business with Zeta, seemingly because of the lack of a direct answer to their question. FE-5 explained that his

supervisors who directed him to "dance around the subject" concerning whether the data was truly opted-in were "real veterans" of the Company who had been at Zeta for ten or more years.

176.    FE-1's account corroborates this. FE-1 was employed by Zeta from May 2022 until February 2024 as a Data Scientist, in Zeta's Prague, Czech Republic location. During his time of employment at Zeta, FE-1's responsibilities included working with clients in developing projects, including building out marketing and advertising models for Zeta's clients.

177.    FE-1 explained that among the data teams at Zeta, internally it was "nebulous" and "cloudy" as to whether users had actually opted-in for their data collection and for their data to be amalgamated in Zeta's data cloud.

178.    FE-3 similarly detailed how Zeta was internally "quiet" about how it gathered consumer data. FE-3 was employed by Zeta from August 2019 to June 2023 as Vice President of Client Services. During his tenure, he was responsible for selling Zeta's consumer marketing services to retail, travel and hospitality, and publishing clients. FE-3 detailed that he specifically sold Zeta's email marketing support to clients, and that most of his clients were retail customers. FE-3 explained that Defendant Gore oversees a data team of 10 employees or less, and that this team knew how Zeta obtained consumer data.

179.    Furthermore, according to FE-3, ***Zeta did not use consumer data the way the Company said it would***. FE-3 explained that Zeta changed algorithms and loosened restrictions to expand its pool of email marketing targets. FE-3 detailed that, for example, after an individual filled out a warranty survey, Zeta attempted to identify a group of people to target with the same characteristics based on certain details the individual shared, including the individual's likes and location. However, FE-3 noted that if the Company was unable to identify enough similar people

based on the characteristics, the Company loosened the criteria to obtain a larger number of email marketing targets.

180.    FE-2 explained how during his tenure, there were times when Zeta *knowingly shared data of consumers who opted-out.* FE-2 was employed by Zeta from before the Class Period until January 2024, as Marketing Campaign Manager (May 2021 to Sept. 2022), Senior Campaign Manager (Oct. 2022 to March 2023), and Mobile Operations (SMS/MMS) Manager (March 2023 to Jan. 2024). FE-2 reported how at times, consumers that opted-out of sharing of their data were accidentally mixed with the population of consumers who opted-in to sharing their data and there was no way for the Company to subsequently separate the opt-in and opt-out consumers. FE-2 explained how Zeta *was aware internally that it was sharing the data of opt-out consumers*, and that this was regularly discussed within his department. According to FE-2, Zeta did *not notify opted-out consumers* when it shared their data during his tenure.

181.    FE-1 gives further corroboration of these practices and Defendants' lack of compliance with consumers' requested level of consent. Specifically, FE-1 explained that Zeta used email and/or *user data from individuals who had not opted-in*, *for the purposes of creating advertising and marketing models*. FE-1 further explained that for users who opted-out, emails would not be sent to them as part of an advertising campaign, *but their data could nonetheless be used in Zeta's data cloud for building out advertising and marketing models*. FE-1 explained that this occurred because when employees at Zeta would use and pull data from the data cloud in order to build out the advertising and marketing models, there was *no specific inquiry as to whether the data was opted-in or opted-out*. Notably, FE-1 also explained that it could be determined who opted to have their email addresses and/or user data shared by running a few

queries through the Company's "Snowflake"[67] system – more specifically, according to FE-1, a user of Snowflake could find out how much of the data cloud was opted-in versus opted-out through such a query.

182.    Notably, after the Culper Report revealed that Zeta improperly used consent farms to acquire its data, customers lost confidence in the Company. This is confirmed by former employees, including FE-6, who worked as a Senior Account Manager at Zeta from June 2024 to November 2024, and reported that shortly after the Culper Research report was released in November 2024, clients terminated their relationship with Zeta because they lost trust in the Company. Indeed, according to FE-4, a friend of his who currently works for a Zeta competitor recently told FE-4 that Zeta's customers were switching to the friend's company since the release of the Culper Report, adding that although Zeta was downplaying the reporting, customers no longer trusted Zeta.

## V.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

183.    Defendants Zeta, Steinberg, Greiner, and Gore made materially false and misleading statements and omissions concerning Zeta's oft-touted "opted-in" data set. The following identifies each of Defendants' materially false and misleading statements and the reasons for each statement's falsity.

### A.    Q4 2023 Earnings Conference Call (February 27, 2024)

184.    On February 27, 2024, after the market closed, Zeta held a conference call for investors to discuss Zeta's financial results for Q4 2023 and fiscal year ("FY") ended December

---

[67] Snowflake is the Company's internal customer data management platform.

31, 2023. During this earnings conference call, in response to analyst inquiry regarding expanding

Zeta's capabilities to mobile, Defendant Steinberg stated:

> Great question, as usual, Elizabeth. We appreciate it. The answer is yes to both. So we see an opportunity to add mobile as a channel to our existing scaled and super-scaled customers, which today would increase our TAM[68] pretty dramatically when you think about it, because we've never really played in that mobile ecosystem because, quite frankly, while the IDFA was around, there was a lot of efficacy there and there were a lot of players running around there. With the elimination of the IDFA, the efficacy of that channel has dissipated ratably. ***So it puts us in a very unique position where we can take assets that we already own, which is the 240 million-plus opted-in individuals,*** which we can tie back to this Zeta ID number, which we can identify in the mobile economy. So, it gives us an advantage that nobody else in the mobile ecosystem has outside of the walled gardens. So, it's a very unique opportunity to do that.

185.    These statements were false, or at minimum, misleading when made and omitted

material facts necessary to make the statements not misleading because at the time of the

statements, the data from "240 million-plus" U.S. individuals was not "opted-in" data, as (1) the

Company later admitted in the December 2024 Data Summit that ***only*** 110 million U.S. individuals

provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and

informed opted-in data with a corresponding exchange of value for the user, as revealed by the

Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta

obtained data through consent farming and that this practice continues to this day (*supra* Sections

IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected

identity, identifier, and signal data from individuals—was data that was not collected under a true

"opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained

data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for

an individual to actually submit or check a box consenting to such acquisition of data, and thus,

---

[68] TAM refers to "Total Available Market," or the total addressable market for a particular product or service of the business.

such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

**B.      FY 2023 Form 10-K (February 28, 2024)**

186.    On February 28, 2024, Zeta filed with the SEC its Form 10-K for FY ended December 31, 2023, which was signed by Defendants Steinberg and Greiner, who also certified as to the report's accuracy and completeness. The Form 10-K stated the following in relevant part:

> Our Zeta Marketing Platform, or ZMP, is the largest omnichannel marketing platform with identity data at its core. The ZMP can analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and the industry's largest ***opted-in data set*** for omnichannel marketing. . . . The ZMP is built on the following four pillars:
>
> 1. ***Opted-in Data Set***[69]
>
> ***Our data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals*** globally with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference.

187.    Zeta's 2023 Form 10-K also contained signed certifications by Defendants Steinberg and Greiner pursuant to Section 302 of the Sarbanes Oxley Act of 2002 ("SOX"). These SOX certifications attested to the accuracy of the Company's financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

188.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the

---

[69] Emphasis in original.

statements the user data from "240 million" U.S. individuals  and "more than 535 million" individuals globally was not "opted-in" data, as (1) the Company later admitted in the December 2024 Data Summit that *only* 110 million U.S. individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected identity, identifier, and signal data from individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals and 535 million global individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

### C.    Morgan Stanley Technology, Media & Telecom Conference (March 4, 2024)

189.    On March 4, 2024, after the market closed, Zeta participated in the Morgan Stanley Technology, Media & Telecom Conference, in which Defendant Steinberg had the following exchange with a Morgan Stanley analyst:

> Q (Analyst): So I just want to start if off with a bit of a high-level question because Zeta sits in this very unique position between the marketing and advertising ecosystems. So for those that might be less familiar with the story, can you just start off with an overview of the business and what was the problem you were trying to solve when you founded the company?

A (Steinberg): Thank you, Elizabeth. So when we founded the company 15 years ago, the real vision was to provide everything a marketer needed in one solution. I had been running a consumer base distribution platform for wireless phones, and we had 17 different vendors to run our marketing. So the vision was, how do we do everything in one place? So today, we have a data cloud; we have a marketing cloud. Our platform ingests the vast majority of the Internet every moment of every day. ***We have 240 million opted-in Americans in our data cloud that we're seeing across 5.2 million publisher platforms on a first-party basis***. We ingest all of that information, we and we use artificial intelligence . . . to synthesize that into intent-based scores – what does a consumer intend to buy next?

190.    And later, during the same Morgan Stanley Technology, Media & Telecom Conference, the same analyst asked to "dive a little bit deeper into that data layer that's embedded kind of natively into the app," noting that "the data is really a key differentiator for you guys" and asking, "How have you collected these data sources?  And really how did you combine such a big data asset?" Defendant Steinberg emphasized that Zeta "own[ed] some of the largest job boards in the United States. We own Disqus which is the world's largest commenting platform, which is embedded in 2 million of the platforms. We own ***ArcaMax***, ***which is one of the largest publishers of opted-in newsletters***," and explained that Zeta protected its individual users, who were "***the 240 million Americans in our data cloud have opted-in to be there***."

191.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, "240 million American individuals" did not opt-in to be a part of Zeta's "data cloud," as (1) the Company later admitted in the December 2024 Data Summit that ***only*** 110 million U.S. individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report (including specifically for ArcaMax users) and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's

preeminent source of user data which collected identity, identifier, and signal data from individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

### D. Q2 2024 Earnings Conference Call (July 31, 2024)

192. On July 31, 2024, after the market closed, Zeta held a conference call for investors to discuss Zeta's financial results for Q2 2024 ended June 30, 2024. During this earnings conference call, Defendant Steinberg stated the following:

> Realizing the full potential of Gen AI requires propriety data. Over the last 15 years, we have invested and innovated to assemble one of the largest proprietary ***opted-in data clouds***. Our flexible and scalable data platform enhances and extends investments that enterprises have made in modern data warehouses, such as Snowflake and Databricks, and has a robust identity resolution capability built right in.

193. These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta's data cloud that was composed of 240 million U.S. individuals was not "opted-in," as (1) the Company later admitted in the December 2024 Data Summit that ***only*** 110 million U.S. individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which

identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected identity, identifier, and signal data from individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric and 535 million global individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

### E.  Fox Business Interview (October 25, 2024)

194.  On October 25, 2024, during the trading day, Defendant Steinberg went on-air with Fox Business, aimed at business and market-related news, and stated the following in relevant part:

> Q (Interviewer): For people who aren't as sophisticated and aren't familiar with Zeta, David, tell me exactly what it is your Company can do beyond what the Oracles, and the S&Ps, the Salesforces, or the service-now companies that promise all these kinds of things for advertising and simplifying can do?
>
> A (Steinberg): Well I think the biggest difference between us and everybody else is we own one of the world's largest first-party data set – *so over 240 million Americans have opted-in to our data cloud*.  And then what we are doing is we are using a series of artificial intelligence algorithms to figure out, as John [Sculley] said, what do people intent to do next, with the highest level of intent.

195.  These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, "over 240 million Americans" did not opt-in to be a part of Zeta's "data cloud," as (1) the Company later admitted in the December 2024 Data Summit that *only* 110 million U.S.

individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected identity, identifier, and signal data from individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

**F.    Company Press Release (November 13, 2024)**

196.    On November 13, 2024, Zeta issued a press release titled "Zeta Global Response to Short-Seller Report" in which the Company responded to the revelations of the Culper Report. In this press release, Defendant Zeta stated:

> Zeta is confident in its data collection practices, policies and processes to ensure compliance with applicable laws. ***We do not operate so-called "consent farms."*** Zeta has made significant investments in its data protection, data governance, and privacy oversight and is regularly audited and reviewed by partners and clients. In addition, Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners.

197.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the

statements, Zeta was, in fact, collecting data from consent farms, and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

**G.    Zeta Update On Company In Response To Recent Price Movements (November 14, 2024)**

198.    On November 14, 2024, Defendants Steinberg and Greiner participated in a webinar titled "Zeta: Update on Company in Response to Recent Price Movements" in which they addressed the Company's stock decline caused by the publishing of the Culper Report. During this webinar, published online, Defendant Steinberg stated that:

> ***In a hundred percent of the cases where we collect a consumer's data, there's a value exchange*** whether they're going through Disqus or subsidiary and they want to be able to make a comment on a website, share content to their social graph or loved ones if they want to apply to get a job on a job board, if they want to get an electronic newsletter for information that is important to them. All of that is the trade of value in exchange for them signing into our ecosystem.

199.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, it was not true that in a "hundred percent of the cases" where Zeta was collecting consumer data there was a "value exchange," as Zeta was, in fact, collecting data from consent farms in which the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

H.    **Zeta's Form 8-K (November 14, 2024)**

200.    On November 14, 2024, Zeta issued a Form 8-K in which it attached its November 13, 2024 press release titled "Zeta Global Response to Short-Seller Report" in which the Company responded to the revelations of the Culper Report. In this Form 8-K, Defendant Zeta stated:

> Zeta is confident in its data collection practices, policies and processes to ensure compliance with applicable laws. ***We do not operate so-called "consent farms."*** Zeta has made significant investments in its data protection, data governance, and privacy oversight and is regularly audited and reviewed by partners and clients. In addition, Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners.

201.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms, and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

I.    **Zeta's Rebuttal Presentation (November 20, 2024)**

202.    On November 20, 2024, and in response to the Culper Report, Zeta published a presentation to its website titled "Setting the Record Straight – Zeta Provides the Facts on its Robust Accounting Processes and Controls Data Collection Policies, and Privacy Oversight."  In this presentation, on slide 4, Zeta stated: "Zeta gathers data lawfully. ***Zeta does not operate 'consent farms,'*** often defined as sites that deceptively acquire personal information from people, often with the promises of jobs or contest prizes."

203.    Then, on slide 5 in the same presentation, Zeta stated: "Apptness and ArcaMax gather data lawfully.  ***They are not 'consent farms.'***"

204.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms—including through Apptness and ArcaMax—and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

**J.    William Blair Analyst Conference Call (November 20, 2024)**

205.    In direct response to the Culper Report, Zeta organized an investor conference call with William Blair to defend the Company's data collection practices. The Company held this conference during the trading day on November 20, 2024, exactly a week after the Culper Report was published. Defendants Steinberg, Greiner, Gore, and Hayes each participated in this conference. During the call, Defendant Gore stated the following in response to analyst concerns regarding Zeta's data collection practices and how "investors" can evaluate "the quality of Zeta data assets":

> And as part of that check, you should ask the question, is the data asset collecting data in the path of the consumer? And when I say that, what I mean is, do you actually have code on page where consumer is interacting with a website and agreeing to a terms of service or ***actually applying a consent flag as part of an opt-in so that you're doing it in a way that is exposed to them and they have controls of the way their data is used. That data needs to be used to enhance their experience. That's the basic value exchange that takes place.***

206.    Additionally, in this same conference call, the analyst asked Defendant Gore: "And if we now take this, the data collection mechanism and think about some of the claims made in [the Culper] report, what is Zeta doing actively? And maybe, Ben [Hayes], you can jump in here, but what processes, what controls do you have in place to ensure that the data you're collecting is

opted in, it's consented, that it complies with consumer data protection laws, that it complies with regulations, and that you're not running afoul of any of those?" Defendant Gore responded:

> ***The one thing I want to make really clear is that we have 240 million people in our graph that are opted-in*** for tracking and monitoring for digital marketing, display ads, CTV ads, calculation of intent. Again, this is not dissimilar than what the walled gardens do. Whether you're running an analytics package from Google or you're visiting search queries, they synthesize intent and interest the same way.

207.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, "240 million" American individuals did not opt-in to be a part of Zeta's data cloud, as (1) the Company later admitted in the December 2024 Data Summit that *only* 110 million U.S. individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected identity, identifier, and signal data from individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

208.    Defendant Gore also stated in the same conference call:

And then, there's a third type of publisher in the world, a performance marketing publisher, *where there's an explicit exchange between a consumer opting for some kind of service. And in that process, they're willing to opt-in to a service and provide their data as well*. *Apptness falls into that category*.

209.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms—including through Apptness— and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

210.    Separately, Defendant Hayes also participated in the William Blair Analyst Conference Call and gave statements therein. In response to analyst concerns regarding Zeta's data collection practices, Defendant Hayes stated the following:

Yeah. Absolutely. I mean, we operate our sites in a legal and auditable way. *To put this in the clearest terms, we do not operate any sites that trick or mislead consumers into giving us their data, which is what those companies [i.e., Fluent and MediaAlpha] were accused by the FTC of having done.*

211.    These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms that "trick or mislead consumers into giving" user data, and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

K.     **CNBC Interview (November 27, 2024)**

212.   Defendants again publicly responded to Culper Report on November 27, 2024, after the market closed. Defendant Steinberg went on-air with CNBC, aimed at business and market-related news, defended the Company's data acquisition practices and again championed Zeta's opt-in framework of consent:

> Q (Interviewer): …I gotta ask a question about the Company, and the stock. The stock was hit on the short report earlier this month. One of the claims raised in that report is that Zeta has what are called "consent farms," websites that are getting people to hand over more data than they intend. Are you involved in the consent farms at all? Would you frame it differently what these practices are? What should investors know about that?
>
> A (Steinberg): ***No. We never do consent farms***. Our organization is one of the most powerful as it relates to our data. We have spent hundreds of millions of dollars over the years *in acquiring companies that create first party, opted-in data, where we partner with the consumer*. *The consumer's always getting a value exchange; whether they're getting a newsletter or able to comment on a site or share different content to their social graph*. A consent farm is when somebody is running misleading ads to get somebody to sign up for something that they have no intention of giving them. *We never do that and we have never done that*.

213.   These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms, and the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

L.     **Zeta Data Summit (December 9, 2024)**

214.   On the morning of December 9, 2024, Defendants held its "Zeta Data Summit" to discuss Zeta's data collection practices. In that Data Summit, Defendant Steinberg stated:

I think one of the things I've really talked about openly over the last few weeks is, *there are companies that have created data sign up ecosystems where they would make promises to a consumer that were not true. Zeta has never done that. Anybody who has ever come to apply or join the Zeta Data Cloud is getting a value proposition in return*. Whether it's the ability to make a comment on an article, share an article to a family member or a social graph, sign up for a job. I mean, we've helped create hundreds of thousands of job applications and tens of thousands of hired individuals over the last period. And we take very seriously the value that is given to the consumer in exchange for them joining our ecosystem. *And it's something that we've focused on for many years*, and we will continue to focus on forever.

215.   These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was, in fact, collecting data from consent farms in which the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

216.   Separately, Defendant Hayes stated in the Zeta Data Summit that:

So, the concept of a dark pattern basically means a consumer interface that either is inducing something, a consumer to do something fraudulently, or that is making it essentially much more difficult to opt out than it was to opt in. So, Zeta for our part understands that marketers are well-served by engaging with consumers who want to be engaged with, and put consumer experience, therefore towards the front of our priorities. *So first, anyone who comes to one of our owned and operated properties, there is a value exchange there. They're getting something for any data that they provide, and that is straightforward and we believe fair*.

217.   These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, Zeta was collecting data from consent farms in which the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and Lead Plaintiffs' own expert-based investigation, which

identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1).

### M.   Interview With Anthony Pompliano (December 12, 2024)

218.   On December 12, 2024, after the market closed, Defendant Steinberg went on-air with Anthony Pompliano ("Pompliano"), a widely subscribed and viewed podcaster who publishes his interviews on YouTube, aimed at the investing community. In this interview, titled "How Short Sellers Attack Public Companies," Defendant Steinberg discussed the Culper Report and Zeta's "opted-in" data set, asserting that every single person that gave their data to the Company had opted-in and received something of value in exchange. Specifically, he stated:

> **In the United States, 245 million people have opted in to be in our data cloud**. Now, what [Culper Research was] accusing us of is getting people to sign up without a value proposition on the other side. **And in a hundred percent of the cases, if people opt into our data cloud, they're getting a value exchange**, they're able to get a newsletter or they're able to use a technological product that we built or a company we bought that provides them with the service.

219.   These statements were false, or at minimum, misleading when made and omitted material facts necessary to make the statements not misleading because at the time of the statements, "245 million people" in the United States have not "opted in to be in our data cloud," and it was not true that "in a hundred percent of the cases, if people opt into our data cloud, they're getting a value exchange," as (1) the Company later admitted in the December 2024 Data Summit that **only** 110 million U.S. individuals provided "opted-in" data (*supra* ¶¶109-110); (2) the data collected was not consensual and informed opted-in data with a corresponding exchange of value for the user, as revealed by the Culper Report and by Lead Plaintiffs' own expert-based investigation, which identified that Zeta obtained data through consent farming and that this practice continues to this day (*supra* Sections IV.E and IV.H.1); (3) data from Disqus—Zeta's preeminent source of user data which collected identity, identifier, and signal data from

individuals—was data that was not collected under a true "opt-in" framework of consent (*supra* Section IV.H.2); (4) amongst other practices, Zeta obtained data through "leaky form" behavior, *i.e.*, acquiring user data from individuals without waiting for an individual to actually submit or check a box consenting to such acquisition of data, and thus, such data could not possibly be "opted-in," (*supra* Section IV.H.1(c)); and (5) Defendants removed all references to "opt-in" in their 2024 Form 10-K (including for the 240 million U.S. individuals metric), and Defendants themselves implicitly conceded that such data was never opted-in in the first place as such a correction was done in order to avoid any continuing "misinterpretations" (*supra* Section IV.G).

## VI.   OVERVIEW OF SCIENTER ALLEGATIONS

220.   At all relevant times, Defendants acted with scienter. The facts alleged herein support that the Individual Defendants either had actual knowledge of the truthful facts that they omitted to disclose and which contradicted their false or misleading statements, or acted with reckless disregard for the truth or falsity of those statements and omissions. Zeta has the scienter of its management-level employees, including each of the Individual Defendants.

221.   Numerous allegations set forth above and below give rise to the strong inference that Defendants intentionally or recklessly misled investors about (1) the fact that 240 million plus Americans and 535 million plus global citizens "opted-in" to be a part of Zeta's data cloud, and (2) that Zeta was not collecting user data through "consent farms."

### A.   Defendant Steinberg Circumvented Section 16 Of The Exchange Act And Zeta's Own Insider Trading Compliance Policy In Order To Obscure, Expedite, And Maximize Extraordinary And Unusual Profits During The Class Period

222.   Lead Plaintiffs' investigation has uncovered that Defendant Steinberg had substantial motive and opportunity to misrepresent the nature of Zeta's consent for data. During the Class Period, Defendant Steinberg engaged in an audacious scheme to sell massive quantities

of Zeta securities, which he had the opportunity to acquire by nature of his position as Zeta's Founder and CEO and through the vesting of performance-based restricted stock awards, while systematically obscuring his gigantic profits via a labyrinth of related entities wholly controlled by him but masquerading as "independent." The sales were suspicious in quantity and timing, and inconsistent with Steinberg's pre- and post-Class Period trading practices. Steinberg was motivated to conceal his true opinion of the Company's business and operations and project a level of confidence in Zeta's future that he did not actually possess in order to reap enormous profits during the Class Period. By obscuring his stock sales and making numerous, materially false and misleading statements about Zeta's data collection practices, including the level of "opted-in" consent for data, Steinberg was able to maintain investor confidence in the Company, which would have quickly eroded had the market learned he was simultaneously divesting his shares *en masse*.

223.    Section 16 of the Exchange Act requires officers, directors, and ten percent beneficial owners of an issuer to disclose changes to their beneficial ownership of the issuer's securities by filing Form 4s with the SEC. Examination of these filings before, during, and after the Class Period reveals that neither Steinberg, nor any of the various entities through which Steinberg beneficially owned Zeta stock, sold Zeta stock in open-market transactions during the Class Period. In fact, Steinberg appears *never* to have sold a single share of Zeta common stock in an open-market transaction.

224.    Instead, throughout the Class Period, Steinberg orchestrated an elaborate scheme to divest his shares of Zeta stock via a web of LLCs and trusts in order to circumvent: (1) Section 16's reporting requirements (17 C.F.R §§ 240.16a-2, 16a-3); (2) Section 16's mandatory 90-day "cooling off" period for officers and directors (17 C.F.R. 240.10b5-1(c)(1)(ii)(B)); (3) the

"blackout periods" imposed by Zeta's own Insider Trading Compliance Policy; and (4) Section 16(b)'s "short-swing" rule (17 C.F.R. 240.16b-6(c)).

225.    Because Defendant Steinberg's scheme involves the avoidance of filing ownership disclosures on Form 4s and, as discussed below, the majority of the relevant Class Period Form 144s failed to include trade addenda setting forth confirmed sales of unregistered shares within the preceding three months, Lead Plaintiffs' allegations are largely predicated on the number of shares Steinberg and his controlled entities stated their "intention" to sell in the Form 144s. Based on Lead Plaintiffs' investigation and analysis of all available information, however, Lead Plaintiffs estimate that Steinberg, through various entities he controlled, sold at least ***13,371,398 shares*** of Zeta Class A Common Stock for total proceeds (and profits, as the shares were originally acquired for no consideration) of ***$270,660,177.43***. While the volume of Steinberg's Class Period sales is staggering, just as troubling is the fact that, of that amount, ***$201,247,175.65***, or ***over 74%***, was sold pursuant to less-restrictive 30-day cooling off periods, and ***$159,996,225.97*** worth, or ***over 59%***, was sold during quarterly "blackout windows" in circumvention of Zeta's Insider Trading Compliance Policy ("ITP"). Moreover, Lead Plaintiffs estimate that Steinberg sold approximately ***$25,662,196.80*** worth of Zeta common stock through these controlled entities in circumvention of Section 16(b)'s rule requiring forfeiture of profits from "short-swing" transactions.

### 1.    Steinberg's Scheme Circumvented Section 16 Reporting Requirements

226.    Distinct from Section 16, SEC Rule 144, 17 C.F.R. § 230.144, is a safe-harbor exception to the general prohibition against selling unregistered securities. Pursuant to Rule 144, "affiliates" may sell unregistered securities "for the account of an affiliate of the issuer" so long as the sales otherwise comply with certain reporting and volume requirements. 17 C.F.R. § 230.144(b)(2). A qualifying "affiliate" is a "person that directly, or indirectly through one or

more intermediaries, controls, or is controlled by, or is under common control with, such issuer." 17 C.F.R. § 230.144(a)(1). Affiliates must file a notice of the proposed Rule 144 sale on SEC Form 144 each time the affiliate has "a bona fide intention" to sell more than 5,000 shares or $50,000 of the issuer's securities. 17 C.F.R. § 230.144(h)(1)-(3). To this end, the Form 144 notice must be filed "concurrently with either the placing with a broker of an order to execute a sale…or the execution directly with a market maker of such a sale." 17 C.F.R. § 230.144(h)(3).

227.    During the Class Period, nine separate trusts and one LLC, each of which was controlled by and acting in concert with Defendant Steinberg, filed thirty Form 144s (and two Form 144/As) noticing the proposed sale of some ***13,371,398 shares*** of Class A common stock, for total proceeds (and profits) of ***$270,660,177.43***.[70] In comparison, during the 378-day period immediately preceding the Class Period (the "Control Period"), eight trusts and two LLCs, each of which Lead Plaintiffs allege were controlled by and acting in concert with Defendant Steinberg, filed twenty-one Form 144s noticing the proposed sale of 9,379,937 shares of Class A common stock, for total profits of $81,984,042.71.[71] Finally, since the Class Period ended, four of the same

---

[70] Those filers were: (1) "Southbeach Trust R6" (CIK 0002006594) (*see* Form 144s filed on 03/22/24, 06/28/24, 10/11/24, and 12/13/24); (2) "Bayside II Charitable Remainder Trust" (CIK 0001969492) (*see* Form 144 filed on 03/28/24); (3) "Bayside III Charitable Remainder Trust" (CIK 0002013953) (*see* Form 144 filed on 03/28/24); (4) "Family Trust No. S4" (CIK 0001995395) (*see* Form 144s filed on 04/12/24, 07/19/24, 10/15/24, 12/13/24, 01/10/25, and 01/10/25); (5) "Family Trust III" (CIK 0001985611) (*see* Form 144s filed on 04/12/24, 06/10/24, 09/13/24, 12/13/24, 01/03/25, 01/10/25, 01/10/25, and Form 144/A filed on 01/03/25); (6) "Family Trust No. C5" (CIK 0001989510) (*see* Form 144s filed on 05/10/24, 08/09/24, 09/17/24, 12/13/24, 01/10/25, 01/10/25, and Form 144/A filed on 01/17/25); (7) "Bayside Holding Company IX, LLC," also referred to as "Bayside Holdings IX LLC" (CIK 0001973624) (*see* Form 144 filed on 06/07/24); (8) "Family Trust IX" (CIK 0001997856) (*see* Form 144s filed on 06/07/24 and 09/13/24); (9) "BE 2023 Irrevocable Trust" (CIK 0001986183) (*see* Form 144 filed on 08/09/24); and (10) "DN 2023 Irrevocable Trust" (CIK 0001985968) (*see* Form 144 filed on 08/09/24).

[71] The entities that filed Form 144s during the Control Period were comprised of the same entities that filed Form 144s and Form 144/As during the Class Period, except neither "Bayside III Charitable Remainder Trust" nor "Family Trust IX" filed during the Control Period, and also

*(Footnote continued on next page)*

trusts have filed seven Form 144s (all on April 17, 2025 and May 9, 2025) noticing the proposed sale of 2,092,467shares of Class A common stock, for total profits of $26,606,266.38. Lead Plaintiffs will collectively refer to the twelve different entities (ten of which filed Form 144s during the Class Period and two that only filed Form 144s during the Control Period) that submitted Form 144s and 144/As as the "Steinberg Affiliates."[72]

228.    Because the Rule 144 reporting requirements exist separate and apart from the Section 16 reporting requirements, Steinberg and/or the entities through which Steinberg beneficially owned Zeta common stock avoided having to submit Form 4s simultaneously with or shortly after the Steinberg Affiliates submitted Form 144s by disclosing (in prior-filed Form 4s) that he Steinberg gifted shares to unnamed "trust[s] managed by an independent trustee that was established for trust, estate and tax planning purposes…." Steinberg Form 4 filed 05/24/24, at n.1; *see also* Steinberg Form 4 filed 08/09/24 at n.1; Steinberg Form 4 filed 12/13/14 at n.1. In so doing, Steinberg effectively asserted those purportedly "independent" trusts to which the shares were gifted (including the Steinberg Affiliates) were not subject to Section 16 disclosure requirements.[73]

229.    Under 17 C.F.R. § 240.16a-8(b), however, "[h]oldings and transactions in the issuer's securities held by a trust…may be reportable [under Section 16] by other parties." The

---

included the "Kristen Steinberg 2021 Irrevocable Trust" (CIK 0001969493) and "Excelsior IX, LLC" (CIK 0001971753).

[72] Together with Steinberg, the various Steinberg Affiliates constitute a single "affiliate," insofar as they all satisfy the definition(s) of "person" under Rule 144(a)(2)(i)-(iii), and Steinberg himself is an affiliate of Zeta.

[73] The intentional distinction between these so-called "independent" trusts and the five to seven unnamed "Family Trusts" through which Steinberg admitted beneficial ownership of Zeta common stock via Form 4s and other ownership disclosures is made apparent by the fact that, within the same Form 4s, Steinberg discloses gifts to "trust[s] managed by an independent trustee" while simultaneously disclosing the discrete beneficial ownership of the Family Trusts for which "Mr. Steinberg is co-trustee…." *Compare* Steinberg Form 4, filed 05/24/24, at n.1, *with id.* at n.6. Therefore, Steinberg's unnamed "Family Trusts" are distinct from the trusts included in the Steinberg Affiliates that noticed proposed sales on Form 144s during the Class Period.

fact that Steinberg himself was not the trustee of the Steinberg Affiliates does not excuse him from reporting sales of those shares on Form 4s. If, for instance, Steinberg was a beneficiary of the Steinberg Affiliate trusts, maintained beneficial ownership of the shares held by the Steinberg Affiliate trusts, and/or *shared* investment control with the "independent" trustee, then any transactions by the Steinberg Affiliate trusts "shall be attributed to and reported by both the beneficiary and the trust." 17 C.F.R. § 240.16a-8(b)(3). Throughout the Class Period, Lead Plaintiffs allege Steinberg was a beneficiary of the Steinberg Affiliate trusts, maintained beneficial ownership of the Zeta common stock held and sold by the Steinberg Affiliates, and shared investment control over the Steinberg Affiliate trusts.

230.    With respect to beneficial ownership, 17 C.F.R. § 240.16a-1(a)(2) defines the term beneficial owner as "any person who, directly or indirectly, through any contract, arrangement, understanding, relationship or otherwise, has or shares a direct or indirect pecuniary interest in the equity securities…." Pecuniary interest is further defined as "the opportunity, directly or indirectly, to profit or share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i). Indirect pecuniary interest, in turn, is defined to specifically include "[a] person's interest in securities held by a trust…." 17 C.F.R. § 240.16a-1(a)(2)(ii)(E). Lead Plaintiffs allege Defendant Steinberg maintained beneficial ownership in the Zeta common stock gifted to, and ultimately sold by, the Steinberg Affiliates. Lead Plaintiffs also allege Steinberg was the "Settlor" of each of the Steinberg Affiliate trusts—the person who established and/or funded the Steinberg Affiliate trusts. Under 17 C.F.R. § 240.16a-8(b)(4), "[i]f a settlor subject to section 16 of the Act reserves the right to revoke the trust without the consent of another person, the trust holdings and transactions shall be attributed to and reported by the settlor instead of the trust…." Throughout the Class Period, Lead Plaintiffs allege Defendant Steinberg was the settlor of the

Steinberg Affiliate trusts and reserved the right to revoke the Steinberg Affiliate trusts without the consent of any other person.

        a.    **Connections Between Steinberg and the Steinberg Affiliates Support Lead Plaintiffs' Allegations that Steinberg Controlled the Steinberg Affiliates, Using Them to Obscure, Expedite, and Maximize His Extraordinary Profits**

231.    Additional facts corroborate Lead Plaintiffs' allegations that Steinberg controlled the Steinberg Affiliates. First, Steinberg is closely linked to Florida attorney Joel Zychick, who is himself associated with CPA Philip Strassler. Together, Zychick and Strassler signed the vast majority of the Form 144s submitted on behalf of the Steinberg Affiliates during the Class Period. Second, Lead Plaintiffs' investigation shows that Steinberg's personal entities and the Steinberg Affiliates have business and mailing addresses and phone numbers in common, as well as other connections to Zychick and Strassler.

232.    For example, at least two Miami Beach companies associated with Defendant Steinberg use 1521 Alton Road, Suite 676 as their principal address.[74] The first is the "Siegel Family Limited Partnership," for which Steinberg and Zychick are general partners. The other is the "Diane Siegel Family Limited Partnership," for which Zychick serves as the registered agent and as a general partner, along with Steinberg.[75] This address is also the mailing address for Steinberg's private wealth management advisory firm (*i.e.*, "family office"), "Excalibur

---

[74] All entity addresses set forth in this paragraph were listed in the Florida Department of State's Division of Corporation records database. A Google search reveals that 1521 Alton Road is the address of The UPS Store South Beach, which offers mailbox services. *See* https://locations.theupsstore.com/fl/miami-beach/1521-alton-rd (last visited May 8, 2025).

[75] Upon information and belief, Lead Plaintiffs allege that Diane Siegel is Defendant Steinberg's mother. Relevantly, Diane Siegel is also the Treasurer of the David A. Steinberg Family Foundation. Zychick is listed as a trustee for several trusts linked to Diane's late husband, Irving Siegel (Steinberg's stepfather, an entrepreneur who funded Steinberg's first business venture), including The Irving Siegel Charitable Foundation, the GST Trust U/W Irving Siegel, and the QTIP Trust U/W Irving Siegel.

Management Company IX, LLC," for which Zychick is listed as a manager and member. Finally, 1521 Alton Road, Suite 676 is the address associated with Steinberg's 501(c)(3) corporation, the "David A. Steinberg Family Foundation" (for which Zychick serves as the Secretary). The unique identifiers assigned to individuals and entities who have filed disclosures with the SEC (known as Central Index Keys or "CIKs") showed that, during the Class Period, nine of the twelve Steinberg Affiliates identified the same business and mailing address as the family partnerships, corporation, and family office in the paragraph directly above: 1521 Alton Road, Suite 676, Miami Beach, Florida, 33139.[76]

233.    Next, the address of Zychick's law firm, Zcounsel Inc., is 929 Alton Road, Suite 500, Miami Beach, Florida, 33139. *See* https://zcounsel.com/ (last visited May 6, 2025). During the Class Period, the unique identifiers or CIKs associated with the remaining three Steinberg Affiliates (Family Trust No. S4, Family Trust No. C5, and Family Trust IX) shared that same business and mailing address: 929 Alton Road, Suite 500, Miami Beach, Florida, 33139.[77] Finally, Zychick is also the manager of KS Trust LLC (KS being the initials of Kristen Steinberg,

---

[76] While Family Trust III, BE 2023 Irrevocable Trust, and DN 2023 Irrevocable Trust listed their business and mailing addresses as 1521 Alton Road during the Class Period, they did not include the suite number. Very recently, two Steinberg Affiliates that identified 1521 Alton Road as their addresses during the Class Period changed their addresses. Southbeach Trust R6 changed its address to 42 Beacon Hill Lane, New Canaan, CT, 06840, while Family Trust III changed its address to 328 Crandon Blvd., Suite 119-363, Key Biscayne, FL, 33149. A Google search reveals this is the address of The UPS Store Key Biscayne, which offers mailbox services. *See* https://locations.theupsstore.com/fl/key-biscayne/328-crandon-blvd (last visited May 7, 2025).

[77] While Family Trust No. C5 listed its address as 929 Alton Road, Suite 500 during the Class Period, it too very recently changed its address to 42 Beacon Hill Lane. Family Trust No. S4, likewise, very recently changed its address to 105 Chestnut Street, Suite 33, Needham, MA 02492 and its phone number to 617-969-8700. A Google search reveals that this is the address of an accounting firm, Steven and Ciccone Associates, PC. *See* http://www.stevensandciccone.com/contact_us.html (last visited May 7, 2025).

Steinberg's current wife), which lists 1521 Alton Road as its mailing address and 929 Alton Road as its principal address.

234.    The chart below summarizes the overlapping business and mailing addresses and phone numbers for Steinberg's personal entities and the Steinberg Affiliates as well as their direct connections to Zychick and Strassler:



| | Zychick is a Signatory, Member, Officer, or Partner | Strassler is a Signatory | CP Address: 1521 Alton Road | CP Address: 929 Alton Road (Zychick office address) | CP Phone: 516-680-2715 (Zychick office phone) | CP Phone: 516-729-5555 (Strassler personal phone) | Steinberg is an Officer |
|---|---|---|---|---|---|---|---|
| **Steinberg Affiliates (Filed Form 144(s) in Class Period or Control Period)** | | | | | | | |
| Southbeach Trust R6 | ✓ | | ✓ | | ✓ | | |
| Bayside II Charitable Remainder Trust | ✓ | | ✓ | | ✓ | | |
| Bayside III Charitable Remainder Trust | ✓ | | ✓ | | ✓ | | |
| Bayside Holding Company IX, LLC | ✓ | | ✓ | | ✓ | | |
| Excelsior IX, LLC | | ✓ | ✓ | | ✓ | | |
| Kristen Steinberg 2021 Irrevocable Trust | | | ✓ | | ✓ | | |
| BE 2023 Irrevocable Trust | ✓ | | ✓ | | ✓ | | |
| DN 2023 Irrevocable Trust | ✓ | | ✓ | | ✓ | | |
| Family Trust III | | ✓ | ✓ | | | ✓ | |
| Family Trust IX | | ✓ | | ✓ | | ✓ | |
| Family Trust No. S4 | ✓ | | | ✓ | ✓ | | |
| Family Trust No. C5 | ✓ | | | ✓ | ✓ | | |
| **Steinberg Personal Entities** | | | | | | | |
| David A. Steinberg Family Foundation | ✓ | | ✓ | | ✓ | | ✓ |
| Excalibur Management Company IX, LLC | ✓ | | ✓ | ✓ | | | |
| Siegel Family Limited Partnership | ✓ | | ✓ | | | | ✓ |
| Diane Siegel Family Limited Partnership | ✓ | | ✓ | | | | ✓ |

### b.    Form 4 and Form 144 Details Support Lead Plaintiffs' Allegations that Steinberg Controlled the Steinberg Affiliates

235.    Even putting aside the myriad connections between Defendant Steinberg, Zychick, Strassler, and the Steinberg Affiliates, additional details in the Form 4s and Form 144s filed during the Class Period support Lead Plaintiffs' allegations that the Steinberg Affiliates are not

"independent" of Steinberg and, at all relevant times, Steinberg maintained beneficial ownership over the shares acquired and disposed by the Steinberg Affiliates.

236.    First, footnotes, which purport to describe gifts of Zeta common stock from Steinberg and his related entities to "independent" trusts, state that the gifted shares "will also be used to satisfy any tax withholding obligations arising from the vesting of certain restricted stock awards." Steinberg Form 4 filed 05/24/24, at n.1; *see also* Steinberg Form 4 filed 08/09/24 at n.1; Steinberg Form 4 filed 12/13/14 at n.1. The Zeta Global Holdings Corp. 2021 Incentive Award Plan (attached as Exhibit 10.10 to the FY23 10-K) bestows authority on Zeta's Board or a Committee of Zeta's Board to grant restricted stock and restricted stock unit awards exclusively to Zeta employees, consultants, and directors. Further, the Employment Agreement between Zeta and Steinberg, attached as Exhibit 10.16 to the FY23 10-K, awarded 700,000 shares of restricted stock to Steinberg after the pricing of Zeta's IPO and, as discussed below, on October 9, 2024, Steinberg received an award of 1,531,076 shares of Zeta Class A common stock pursuant to the vesting of previously granted performance-based restricted stock units. On information and belief, Lead Plaintiffs allege that the "tax withholding obligations arising from the vesting of certain restricted stock awards" referred to in those Form 4s were Steinberg's obligations. Thus, while Steinberg and/or his related entities gifted Zeta common stock to the Steinberg Affiliates, Steinberg nevertheless maintained beneficial ownership over those gifted shares insofar as he continued to "share in any profit derived from a transaction in the subject securities." 17 C.F.R. § 240.16a-1(a)(2)(i).

237.    In the same vein, seventeen of the thirty-two Form 144s and Form 144/As submitted on behalf of the Steinberg Affiliates throughout the Class Period indicated the proposed

sales were being made in reliance on Rule 10b5-1 trading plans.[78] The June 7, 2024 Form 144 submitted on behalf of Bayside Holding Company IX, LLC even describes prior Rule 144 sales as "10b5-1 Sales." Rule 10b5-1 trading plans are adopted by persons transacting in an issuer's securities who may become aware of material nonpublic information regarding that issuer: In other words, *insiders*. If the Steinberg Affiliates trusts were truly "independent," it is unclear how or why they would be privy to material nonpublic information such that it would be necessary or appropriate for them to enter into Rule 10b5-1 trading plans. Lead Plaintiffs allege that the Steinberg Affiliates were *not*, in fact, independent, and that throughout the Class Period Defendant Steinberg controlled the Steinberg Affiliate trusts.

238.    While Form 144 requires that filers disclose details regarding proposed Rule 144 sales, Form 144 also requires filers to disclose certain transactional details as to all securities "sold during the past 3 months by the person for whose account the [proposed] securities are to be sold." Of the thirty-two Form 144 and Form 144/As filed on behalf of the ten Steinberg Affiliates during the Class Period, twenty-one indicate that "[a]dditional Sales within the past 3 months [are] included on the attached Trade Addendum," or "[a]dditional sales within the past 3 months for all affiliates [are] included on the attached Trade Addendum." No such addenda were actually attached to the filings.[79] Thus, the Steinberg Affiliates, throughout the Class Period, repeatedly

---

[78] *See* Bayside II Charitable Remainder Trust, Form 144 (filed 03/28/24); Bayside III Charitable Remainder Trust, Form 144 (filed 03/28/24); Family Trust No. S4, Form 144s (filed 04/12/24, 07/19/24, 10/15/24, and 01/10/25); Family Trust III, Form 144s and 144/A (filed 04/12/24, 06/07/24, 09/13/24, 01/03/25, and 01/10/25); Bayside Holding Company IX, LLC, Form 144 (filed 06/07/24); Family Trust IX, Form 144s (filed 06/07/24 and 09/13/24); Family Trust No. C5, Form 144s and 144/a (filed 09/17/24, 01/10/25, and 01/17/25).

[79] The Form 144s filed on behalf of Family Trust III on June 7, 2024 and September 13, 2024, however, did include referenced trade addenda.

failed to disclose preceding sales on at least twenty-one Form 144s as required, further obscuring their transactions during the Class Period.

239.    Nevertheless, *some* of the Form 144s the Steinberg Affiliates submitted during the Class Period did include *some* preceding sales. Those incomplete disclosures further corroborate the relationships between, and Steinberg's control over, the various Steinberg Affiliates. The Form 144 filed on June 7, 2024, on behalf of Bayside Holding Company IX, LLC, for example, listed preceding sales for Bayside II Charitable Remainder Trust, Bayside III Charitable Remainder Trust, and Family Trust III; the Form 144 filed on January 9, 2024, on behalf of Bayside Holding Company IX, LLC, listed sales within the preceding three months for both itself as well as the Kristen Steinberg 2020 Irrevocable Trust; the Form 144 filed on June 7, 2024, on behalf of Family Trust IX listed sales within the preceding three months for Family Trust III; and, finally the Form 144 filed on November 9, 2023, on behalf of Excelsior IX, LLC, listed sales within the preceding three months for itself, the Kristen Steinberg 2021 Irrevocable Trust, Family Trust III, and Bayside Holding Company IX, LLC. Taken together, these Form 144s evidence that sales for Bayside Holding Company IX, LLC, Bayside II Charitable Remainder Trust, Bayside III Charitable Remainder Trust, Family Trust III, Kristen Steinberg 2020 Irrevocable Trust, Excelsior IX, LLC, and Family Trust IX were all made *for the same account/affiliate*.

### 2.    Steinberg's Scheme Circumvented The SEC's Mandatory 90-Day Cooling-Off Period For Officers And Directors

240.    SEC rules require a minimum "cooling-off period" between the date a Rule 10b5-1 trading plan is adopted or modified and when trading under the plan may commence. With respect to officers and directors of the issuer, "no purchases or sales [may] occur until expiration of a cooling-off period consisting of the later of: (i) Ninety days after the adoption of the contract, instruction, or plan or (ii) Two business days following the disclosure of the issuer's financial

results on a Form 10-Q…or Form 10-K…for the completed fiscal quarter in which the plan was adopted….” 17 C.F.R. § 240.10b5-1(c)(1)(ii)(B)(1). If the person entering into the Rule 10b5-1 trading plan is *not* an officer or director of the issuer, however, the mandatory cooling-off period is just “30 days after the adoption of the contract, instruction or plan….” Section VI.A. of ITP, attached as Exhibit 19.1 to Zeta’s Annual Report for the fiscal year ended December 31, 2024, mirrors these statutory requirements.

241.    Defendant Steinberg’s scheme to gift shares of Zeta common stock to the Steinberg Affiliates enabled him to systematically circumvent the 90-day cooling-off period for officers and directors in favor of the much less-restrictive 30-day cooling-off period for other insiders, thereby expediting and maximizing his profits during the Class Period while obscuring his ties to the vast quantities of sales.

242.    On March 28, 2024, both Bayside II Charitable Remainder Trust (“Bayside II”) and Bayside III Charitable Remainder Trust (“Bayside III”) filed Form 144s noticing same day proposed sales of 695,318 gifted shares of Zeta Class A common stock for total profits of $7,599,825.74. Both Form 144s indicated the proposed sales were being made pursuant to Rule 10b5-1 trading plans adopted on March 1, 2024. Notwithstanding the fact that the less-restrictive 30-day cooling-off period for sales of non-officer/director insiders would not expire until March 31, 2024, such that Bayside II and Bayside III couldn’t commence trading under those Rule 10b5-1 plans until April 1, 2024, if Steinberg were to have appropriately sold those shares for an account in his name, the 90-day cooling-off period would have prohibited their sale until May 31, 2024. Instead, Defendant Steinberg, via his controlled affiliates Bayside II and Bayside III, was able to adopt Rule 10b5-1 trading plans in the first fiscal quarter of 2024 and sell $7,599,825.74 worth of Zeta common stock within the same quarter. But for Steinberg’s scheme to circumvent Section 16

and obscure his connections to the profits from the sales, he would have had to have retained his shares through the release of the next earnings report.

243.    Steinberg employed or caused to be employed the same methodology again and again throughout the Class Period, systematically using the Steinberg Affiliates to sidestep the minimum 90-day cooling off period while racking up covert and extraordinary profits of **$201,247,175.65** for himself, as the chart below demonstrates. The highlighted rows identify sales made *within 30 days* of the adoption of a trading plan, which total **$19,147,725.74**.

| Steinberg Affiliate: | Form 144 Date: | Proposed Sale Date: | 10b5-1 Plan Adoption Date: | Quantity of Shares: | Profit: |
|---|---|---|---|---|---|
| Bayside II | 03/28/24 | 03/28/24 | 03/01/24 | 371,993 | $4,065,883.49 |
| Bayside III | 03/28/24 | 03/28/24 | 03/01/24 | 323,325 | $3,533,942.25 |
| Trust S4 | 04/12/24 | 04/12/24 | 01/16/24 | 320,718 | $3,906,345.00 |
| Trust III | 04/12/24 | 04/12/24 | 01/16/24 | 198,945 | $2,423,150.00 |
| Bayside Holding | 06/07/24 | 06/07/24 | 05/10/24 | 705,000 | $11,547,900.00 |
| Trust III | 06/07/24 | 06/10/24 | 05/10/24 | 1,992,760 | $33,119,671.20 |
| Trust IX | 06/07/24 | 06/10/24 | 05/10/24 | 558,472 | $9,281,804.64 |
| Trust S4 | 07/19/24 | 07/19/24 | 06/10/24 | 566,925 | $11,707,001.25 |
| Trust III | 09/13/24 | 09/17/24 | 08/16/24 | 2,020,651 | $55,022,326.73 |
| Trust IX | 09/13/24 | 09/17/24 | 08/16/24 | 549,480 | $14,962,340.40 |
| Trust C5 | 09/17/24 | 09/17/24 | 08/16/24 | 858,754 | $23,564,209.76 |
| Trust S4 | 10/14/24 | 10/14/24 | 09/13/24 | 294,142 | $9,456,665.30 |
| Trust III | 01/10/25 | 01/16/25 | 12/16/24 | 560,304 | $9,710,068.32 |
| Trust C5 | 01/10/25 | 01/16/25 | 12/16/24 | 267,242 | $4,631,303.86 |
| Trust S4 | 01/10/25 | 01/16/25 | 12/16/24 | 248,965 | $4,314,563.45 |
| | | | **Total:** | 9,837,676 | $201,247,175.65 |

### 3.    Steinberg's Scheme Circumvented The "Blackout Periods" Imposed By Zeta's Insider Trading Compliance Policy

244.    Zeta's ITP prohibits Zeta's officers, directors, and employees from purchasing or selling "any security of the Company during the period beginning on the 14th calendar day before the end of any fiscal quarter of the Company and ending upon completion of the second full trading day after the public release of earnings data for such fiscal quarter…." *Id*. at § IV.A. These periods

are known as the "blackout periods." Steinberg's scheme also circumvented Zeta's blackout periods.

245.    While purchases and sales of Zeta securities made pursuant to approved Rule 10b5-1 trading plans may otherwise occur during the blackout periods, this exception does *not* apply to Rule 10b5-1 trading plans that are *themselves* adopted within the blackout periods. *See* ZETA ITP at § VI.A. (requiring that Rule 10b5-1 trading plans be "entered into in good faith" when not in possession of material nonpublic information "and not otherwise in a blackout period"). Nevertheless, when *not* made pursuant to a Rule 10b5-1 trading plan, officers, directors, and employees may not purchase or sell Zeta securities during a blackout period. By gifting shares of Zeta common stock to the Steinberg Affiliates, therefore, Defendant Steinberg circumvented Zeta's ITP prohibition of purchases and sales during blackout periods.

246.    On May 6, 2024, Zeta issued a press release announcing its financial results for the first quarter ended March 31, 2024 (the "1Q24 8-K"). Under Zeta's ITP, the blackout period associated with Q1 2024 was March 14, 2024, through May 8, 2024 (the "1Q24 Blackout Period"). As referenced above, on March 28, 2024, both Bayside II and Bayside III filed Form 144s noticing same day proposed sales of 695,318 gifted shares of Zeta Class A common stock for total profits of $7,599,825.74. By gifting shares to the Bayside II and Bayside III affiliate trusts, which then adopted Rule 10b5-1 trading plans with less-restrictive 30-day cooling off periods, Defendant Steinberg was able to schedule the sale of $7,599,825.74 worth of Zeta Class A common stock firmly within the 1Q24 Blackout Period.

247.    In addition to the $7,599,825.74 worth of noticed, proposed sales during the 1Q24 Blackout Period made pursuant to Rule 10b5-1 trading plans, an additional Form 144 submitted on behalf of Southbeach Trust R6 ("Southbeach Trust") also noticed a proposed sale during the

1Q24 Blackout Period, but did *not* specify that the proposed sale was being made pursuant to a Rule 10b5-1 trading plan. On March 22, 2024, Southbeach Trust filed a Form 144 noticing a same day proposed sale of 78,570 gifted shares of Zeta Class A common stock for total profits of $868,198.50. By gifting these shares to Southbeach Trust (a non-employee affiliate which Steinberg controlled), which in turn then sold the shares within the 1Q24 Blackout Period, Defendant Steinberg circumvented Zeta's ITP.

248.    Steinberg employed the same methodology again and again throughout the Class Period, systematically using the Steinberg Affiliates to sidestep the ITP's blackout periods and racking up covert, massive profits, as the chart below demonstrates.

| Steinberg Affiliate: | Form 144 Date: | Proposed Sale Date: | Blackout Period: | Quantity of Shares: | Profit: |
|---|---|---|---|---|---|
| Bayside II | 03/28/24 | 03/28/24 | 1Q24 | 371,993 | $4,065,883.49 |
| Bayside III | 03/28/24 | 03/28/24 | 1Q24 | 323,325 | $3,533,942.25 |
| Southbeach | 03/22/24 | 03/22/24 | 1Q24 | 78,570 | $868,198.50 |
| Trust S4 | 07/19/24 | 07/19/24 | 2Q24 | 566,925 | $11,707,001.25 |
| Southbeach | 06/28/24 | 06/28/24 | 2Q24 | 184,397 | $3,254,607.05 |
| Trust III | 09/13/24 | 09/17/24 | 3Q24 | 2,020,651 | $55,022,326.73 |
| Trust IX | 09/13/24 | 09/17/24 | 3Q24 | 549,480 | $14,962,340.40 |
| Trust C5 | 09/17/24 | 09/17/24 | 3Q24 | 858,754 | $23,564,209.76 |
| Trust S4 | 10/14/24 | 10/14/24 | 3Q24 | 294,142 | $9,456,665.30 |
| Southbeach | 10/11/24 | 10/11/24 | 3Q24 | 46,837 | $1,483,327.00 |
| Trust III | 01/10/25 | 01/16/25 | FY24 | 560,304 | $9,710,068.32 |
| Trust C5 | 01/10/25 | 01/16/25 | FY24 | 267,242 | $4,631,303.86 |
| Trust S4 | 01/10/25 | 01/16/25 | FY24 | 248,965 | $4,314,563.45 |
| Trust III | 01/03/25 | 01/03/25 | FY24 | 222,245 | $4,198,208.05 |
| Trust III | 01/10/25 | 01/22/25 | FY24 | 293,703 | $5,089,872.99 |
| Trust C5 | 01/10/25 | 01/22/25 | FY24 | 92,008 | $1,594,498.64 |
| Trust S4 | 01/10/25 | 01/22/25 | FY24 | 146,521 | $2,539,208.93 |
| | | | Total: | 7,126,062 | $159,996,225.97 |

249.    All told, Defendant Steinberg, via the Steinberg Affiliates, noticed proposed sales of a whopping ***$159,996,225.97*** worth of Zeta Class A common stock ***during Zeta's blackout periods***.

250. The specific nature of the January 10, 2025, Form 144s filed by Trust III, Trust C5, and Trust S4, noticing proposed sales of 1,076,511 gifted shares of Zeta Class A common stock on January 16, 2025 for total profits of $18,655,935.63 is particularly egregious. Each of these proposed sales was also made pursuant to Rule 10b5-1 trading plans adopted on December 16, 2024 – *within the FY24 Blackout Period*.

251. Due to Steinberg's position as the Founder and CEO of Zeta, he had a duty to ensure the Company's policies were duly followed, including Zeta's ITP, which states that violations thereof may "result in your dismissal from the Company or even serious criminal and civil charges against you and the Company." Instead, Steinberg personally flouted Zeta's ITP.

### 4. Steinberg's Scheme Circumvented Section 16(b)'s Rule Against "Short-Swing" Profits, Allowing Him To Covertly Lock-In Expedited Huge Profits Of Over $25 Million During The Class Period

252. Defendant Steinberg's scheme also operated to circumvent Section 16(b)'s rule requiring forfeiture of profits from "short-swing" purchases and sales by officers and directors, such that "any profit realized by [an officer or director of an issuer] from any purchase and sale, or any sale and purchase, of any equity security of such issuer…within any period of less than six months…shall inure to and be recoverable to the issuer…." 15 U.S.C. § 78p(b).

253. While Rule 16b-3(d) exempts from Section 16(b) certain transactions "involving an acquisition from the issuer," the exemption only applies if those transactions were non-discretionary and: (1) "approved by the board of directors" or an affirmative vote of the majority of shareholders; or (2) held "for a period of six months prior to the date of such acquisition…." 17 C.F.R. § 240.16b-3(d). Under Rule 16b-5, "[b]ona fide gifts" are also exempt from Section 16(b)'s short-swing profit rule. 17 C.F.R. § 240.16b-5.

254. Lead Plaintiffs allege, upon information and belief, that Defendant Steinberg circumvented Section 16(b)'s short-swing profit rule by immediately gifting shares of Zeta

common stock that had just vested to the non-officer Steinberg Affiliates, which then in turn sold those shares on the open market less than six months after Steinberg acquired the shares from Zeta, which shares were acquired without specific approval of Zeta's board of directors or an affirmative vote of the majority of Zeta's shareholders.

255.    On December 13, 2014, Trust III, Trust C5, Trust S4, and Southbeach Trust all filed Form 144s noticing same day proposed sales of 1,149,740 gifted shares for total profits of **$25,662,196.80**.[80] Each of those Form 144s indicated the shares to be sold were "[a]cquired from the Settlor of the Trust for whose account the securities are being sold," and that the settlor/donor— Steinberg—originally acquired the shares on October 9, 2024, *just over two months prior to their sale*. Previously, on October 11, 2024—*before* the release of the Culper Report—Steinberg filed a Form 4 with the SEC noticing his acquisition of 1,531,076 shares of Zeta Class A common stock on October 9, 2024. Footnote 1 to the Form 4 indicated that Steinberg acquired these shares pursuant to Zeta's determination, "[o]n October 9, 2024," "that the performance conditions" of certain performance-based restricted stock units ("PSUs") previously granted to Steinberg "were met…resulting in these securities being earned…." Importantly, those performance conditions were "based on the volume-weighted average closing price per share of the Issuer's Class A common stock during the final 20 consecutive trading days of each fiscal quarter," creating the opportunity for Steinberg to manipulate the timing of the vesting of said PSUs on the basis of material, non-public information. As such, Lead Plaintiffs allege Steinberg "purchased" the shares

---

[80] Trust III and Trust C5 subsequently filed Form 144As on January 3, 2025 and January 17, 2025, respectively, which purported to correct certain details regarding their December 13, 2024 Form 144s. While Trust C5's Form 144A simply clarified that of the shares identified for proposed sale, 282,439 were sold outside of a Rule 10b5-1 trading plan and 7,851 were sold under a Rule 10b5-1 trading plan, Trust III's Form 144A appeared to "correct" a number of details in the December 13, 2024 Form 144, including the number of shares to be sold (increased to 513,564 from 510,358) and the date the settlor/donor acquired the shares (10/09/24 to 01/01/15).

when they vested on October 9, 2024 and that those shares were not exempted from Section 16(b)'s "short-swing" rule.

256. By immediately gifting the shares to the Steinberg Affiliates, which sold the shares on the open market approximately two months later (some four trading days after Zeta's December 9, 2024 Data Summit, but *before* the final corrective disclosure), Steinberg and the entities through which he beneficially owned Zeta common stock circumvented Section 16(b)'s rule against short-swing transactions and expeditiously and covertly locked in massive profits of $25,662,196.80.

257. Finally, Defendant Steinberg made exactly one open market purchase of Zeta Class A common stock during the Class Period—a purchase of 53,676 shares at $19.24/share, for a total cost of $1,032,726.24—on November 18, 2024, shortly after Defendants' denouncements of the Culper Report. To the extent Section 16(b) liability is not limited to the purchase and sale of the same certificates of stock, and matching particular shares bought and sold is irrelevant due to the fungible nature of shares of stock, Lead Plaintiffs allege Steinberg's November 18, 2024 purchase and subsequent Class Period sales of Zeta Class A common stock via the Steinberg Affiliates (including, but not limited to, those shares sold by Trust III, Trust C5, Trust S4, and Southbeach Trust on December 13, 2024) circumvented Section 16(b)'s rule against short-swing transactions and resulted in impermissible profits.

258. The foregoing allegations demonstrate Defendant Steinberg's motive and opportunity to make materially false and misleading statements and omissions throughout the Class Period while he simultaneously and surreptitiously used his complex web of Steinberg Affiliates to sell massive quantities of Zeta common stock for eye-popping profits of ***$270,660,177.43***.

**B.    Zeta Closely Monitored Its Own Data Collection Practices In Response To The FTC's Lawsuit Against Fluent**

259.    Recent lawsuits filed by the FTC against data and marketing companies ignited a fear of regulatory action against Zeta, and compelled Defendants to closely monitor the Company's data collection practices during the Class Period. Notably, on July 17, 2023, the FTC filed a Complaint against Fluent, LLC ("Fluent"), a digital marketing services company and Zeta's competitor. The FTC alleged that Fluent "operated a massive 'consent farm' enterprise, using deceptive ads and websites to induce nearly one million consumers a day to provide their personal information..."[81] The FTC called Fluent's "consent farm" business unlawful, stating that by "induc[ing] consumers to provide their personal information, Defendant and their affiliate marketers have misleadingly promised consumer jobs interviews and free rewards, when in fact the promised jobs typically did not exist, and the promised rewards were virtually impossible to obtain." [82] Fluent generated "tens of millions of dollars in revenue" from selling this information, according to the FTC. [83] Fluent agreed to settle the enforcement action in exchange for monetary penalties and a host of strict injunctive provisions, including the requirement that all data purchased from Fluent before May 26, 2023 be destroyed.

260.    In response to the Fluent enforcement action and ongoing FTC investigation against MediaAlpha, Inc. ("MediaAlpha"), and in an attempt to appease investor concern about possible regulatory intervention, Zeta disclosed that it diligently tracks its data collection policies.

---

[81] Complaint for Civil Penalties, Permanent Injunction, Monetary Relief, and Other Relief, *United States v. Fluent, LLC, et al.*, No. 9:23-cv-81045 (S.D. Fla. July 17, 2023), ECF No. 1

[82] *Id.*

[83] *Id.*

Specifically, during the William Blair Analyst Conference Call on November 20, 2024, an analyst asked Defendant Hayes:

> Q (Analyst): Still on the data side, I think there's some investor concern and, Ben, maybe you can jump in here. But there's investor concern that the FTC has filed complaints recently with companies like Fluent and MediaAlpha[84] over their kind of data collection practices. If you think about Zeta's data collection relative to the practices that these two companies were following, what is similar, if anything, what is different? Can you just compare and contrast that with us, please, Ben?

> A (Hayes): Yeah. Absolutely. I mean, we operate our sites in a legal and auditable way. To put this in the clearest terms, *we do not operate any sites that trick or mislead consumers into giving us their data, which is what those companies were accused by the FTC of having done. We have an extensive privacy program that reviews not only our own sites, but partner sites from which we receive data.* We do everything in an auditable way. *We can validate every opt-in that we have.* We can produce a time and date stamp, a screenshot of the registration path, and the privacy policy that was connected with that.

261.   Not only did Defendant Hayes guarantee that Zeta does not operate consent farms, but he also assured the investment community that the Company actively appraises both its and its partners' own data collection practices and that it could "validate every opt-in" Zeta had, including the 240+ million purported opt-ins that it admitted just weeks later to not actually possessing. Defendant Hayes' admission that Zeta monitors its data collection policies supports the inference that Defendants knew—or were severely reckless in not knowing—the falsity of their statements concerning Zeta's opted-in data set and acquisition of user data through consent farms. Indeed, at the same November 20, 2024 conference, Defendants claimed to *consistently* be monitoring FTC

---

[84] In February 2023, public company MediaAlpha disclosed in its Form 10-K that the FTC was looking into MediaAlpha's "compliance with the FTC Act and the Telemarketing Sales Rule, as they relate to the advertising, marketing, promotion, offering for sale, or sale of healthcare-related products, the collection, sale, transfer or provision to third parties of consumer data, telemarketing practices, and/or consumer privacy or data security." Just days before the publication of the Culper Report, on November 4, 2024, MediaAlpha issued a Form 8-K announcing that the company had received a settlement demand from the FTC along with notice that, absent a settlement, the government was prepared to recommend the filing of a complaint against MediaAlpha based on that investigation, which would seek injunctive and monetary relief and civil penalties.

complaints within their industry, and stated that they were aware of the Fluent complaint when it

"first happened," *i.e.*, July 2023, or just a few months before the Class Period:

> Q (Analyst): And there are cases, I think, when some FTC complaint or ruling, it
> could change a data collection practice. It could impact some way that you view
> your own practices. Have you had to make any changes to your internal kind of
> data collection practices after you've seen what's happened at – or what the FTC
> did not like at Fluent and MediaAlpha?
>
> A (Hayes): I should say, not as a result of this report, certainly. But we're a
> marketing company and a data company. And so, we view the FTC as our primary
> regulator. And so, *we routinely track their actions in the marketing space and
> calibrate as necessary*. So, *we were very aware of the Fluent case when it
> happened*. *We first assured ourselves that we weren't doing the things that Fluent
> was substantively accused of doing, and we weren't.*

262. Defendant Hayes admitted during the Class Period that FTC actions taken against

Fluent and MediaAlpha prompted Zeta to closely monitor its data collection practices just before

the start of the Class Period, and that Defendants "assured" themselves concerning such practices.

As such, Defendants were either aware—or were severely reckless in not knowing—the falsity of

their statements.

### C.    Zeta Claimed To Record And Document Each And Every "Opt-in" That Came In, Strongly Supporting An Inference of Scienter

263. C-Suite and high-level executives at Zeta claimed that Zeta would "validate,"

record, and monitor every opt-in consent from each individual user's data acquired by the

Company. Moreover, Zeta and the Individual Defendants also emphasized repeatedly that Zeta

was heavily invested in oversight of its data collection practices and integrity. This strongly

supports an inference of scienter, as Defendant Zeta and the Individual Defendants had actual

knowledge of—or were severely reckless in not knowing—exactly how many individuals opted-

in to share their data with the Company, thus demonstrating that they knew that their statements

concerning the number of individuals "opted-in" to Zeta's data set were false and misleading.

264.    For example, on June 7, 2023, during the William Blair Growth Stock Conference, Defendant Greiner told analysts that: "From the very beginning of Zeta's data cloud, it's been built on that premise of opt-in. ***When someone sends us or goes through that authentication process opt-in***, ***we literally take a screen grab of it to document that this person has opted in***.. . . We have a Chief Privacy Officer [Defendant Hayes] ***that lives every single day in this domain***."

265.    Winnie Shen, Zeta's SVP of the Data Cloud, substantiated this claim, stating in the August 9, 2023 Canaccord Genuity Growth Conference that: "80% of our data is all proprietary owned and operated data. So, I talked about being in the company for 14 years. I was collecting the permissions on the users around IMMA acquisition. That's more strict than the actual compliance is requiring, ***but we would literally snapshot on a quarterly basis that opt-in pages of what that looks like, so there are kind of future-proofing ourselves even back then***."

266.    During the Class Period, and in direct response to the publishing of the Culper Report, Zeta assured its investors that the Company heavily invests in its own data privacy oversight and in reviewing its data partners' privacy practices. On November 13, 2024, in a press release titled "Zeta Global Response to Short-Seller Report," the Company stated that:

> Zeta is confident in its data collection practices, policies and processes to ensure compliance with applicable laws. We do not operate so-called "consent farms." Zeta ***has made significant investments in its data protection, data governance, and privacy oversight and is regularly audited and reviewed by partners and clients***. In addition, ***Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners.***

267.    Thereafter, and during the Class Period, Defendant Hayes stated on November 20, 2024, during the William Blair Analyst Conference Call that:

> ***We have an extensive privacy program that reviews not only our own sites, but partner sites from which we receive data. We do everything in an auditable way. We can validate every opt-in that we have. We can produce a time and date stamp, a screenshot of the registration path, and the privacy policy that was connected with that.***

268.    Moreover, Zeta's privacy policy throughout the Class Period also corroborated the Company's practice of documenting individual users' consent. During the Class Period, Zeta's privacy policy stated:

> Fully identifiable personal data (such as email address, name, or postal address) in the Zeta Data Cloud is in all cases collected first when an individual consents to have their data used for marketing purposes. This permission is generally provided at a web page where an individual provides an email address and/or a phone number or other data and checks a box authorizing their data to be used for marketing purposes, transferred to third parties, and augmented with other data obtained from other sources. Once we have obtained this consent (*of which we maintain a record*), we supplement the data initially provided by the individual with additional online and offline data.

269.    The import of this process of recording and documenting *each* purported opt-in is that the Defendants were acutely aware—or were severely reckless in not having their represented awareness—that (1) less than half of 240 million plus U.S. individuals and not all of the 535 million plus global individuals that Zeta claimed to collect data from in its data cloud had actually opted-in to be a part of that data cloud, and (2) the true nature of consent for major services that sent user data to Zeta (*e.g.*, Disqus) was not based on an opt-in framework of consent.  Moreover, this purported documentation would reveal, as disclosed in the Culper Report and corroborated by Lead Plaintiffs' own data science expert, the falsity and misleading nature of Defendants' initial and strident claims that Zeta did not utilize consent farms to deceptively acquire private user data.

**D.    The Individual Defendants' Data-Focused Positions In The Company And Repeated Assertions Regarding Zeta's "Opted-In Data Set" Supports A Strong Inference Of Scienter**

270.    The Individual Defendants' specific data-focused positions within Zeta and numerous statements reflecting their deep understanding of, and active engagement in, the Company's data collection processes and the overarching "opted-in" framework of consent they claimed existed, demonstrate that they knew—or were severely reckless in not knowing— that (1) the 240 million plus U.S. individuals and 535 individuals globally had not actually "opted-in" to

share their data with the Company, and (2) that Zeta was indeed obtaining data through consent farms—and that Defendants' statements to investors stating otherwise were false and misleading. Defendants Steinberg, Greiner, Gore and Hayes' awareness and involvement is evidenced through their specific executive positions and repeated statements to investors, including through statements made before and during the Class Period.

271.    The Individual Defendants each held high-level executive positions with the Company that establish their awareness of the details of Zeta's data collection practices. Defendant Steinberg founded Zeta and served as the Company's CEO and President and Chairman of the Board. Moreover, he built the data collection processes and the opted-in framework that the Company employed and touted. FE-6 confirmed Defendant Steinberg's involvement, reporting that Steinberg led Zeta's monthly all-hands meetings during FE-6's tenure, from June 2024 to November 2024, and they were recorded. FE-5 similarly explained that the chief-level officers at Zeta were updated on different aspects of Zeta's business because he recalled that Vice President of Client Development Ben Eason, and the SVP who he reported to before that, met regularly in "C-level meetings." Defendant Greiner, as the Company's CFO, similarly would have had access to and known about how many individuals opted-in to share data with the Company.

272.    Notably, both Defendants Gore and Hayes held specified high-level positions that, by their terms, required them to monitor and review Zeta's data collection practices. Defendant Gore, as Zeta's Chief Data Officer, "is responsible for the Zeta's global data and analytics strategy" and "developing Zeta's identity graph," according to his biography on Zeta's website. According to FE-3, Defendant Gore oversees a data team of 10 employees or less, and this team knew how Zeta obtained consumer data. Defendant Hayes, as Zeta's Chief Privacy Officer, oversees the Company's privacy compliance program, which entails ensuring the Company's data collection

practices comply with the relevant regulatory requirements concerning collection of data (including the Company's opt-in/opt-out practices). The Individual Defendants' specified data-focused positions within the Company, and their corresponding responsibility to review Zeta's data collection policies, strongly supports that they knew—or were severely reckless in not knowing—that 240 million plus Americans and 535 million plus global individuals had not actually "opted-in" to share their data with Zeta and that Zeta was indeed collecting user data from consent farms.

273.    Moreover, the Individual Defendants also frequently spoke about Zeta's supposed opt-in framework of consent for data collection—raising their particularized inference of scienter and knowledge. For example, on March 15, 2022, during the Roth Capital Partners Conference, Defendant Steinberg told the market that he founded Zeta with the belief that "owning first-party data, not relying on third party for data would be a massive differentiator in where the regulatory and marketing ecosystems were going," and with that goal in mind, "we began to build a opted-in consumer database." Defendant Steinberg then highlighted that: "555 million people have opted-in globally to our database and 235 million Americans have opted-in to our database . . ."

274.    Thereafter, on March 13, 2023, during another Roth Capital Partners Conference, Steinberg emphasized that he was the architect and founder of Zeta's data collection practices, stating that: "I was telling the story, I think, earlier today, seven years ago we made the decision to start building this permission-based data cloud and I had to sit in front of my then board of directors and explain to them how we were going to build one of the largest data clouds in the world but we were never going to sell that data to anybody for any price at any time."

275.    Defendant Steinberg's particularized scienter is further elevated given his admitted knowledge as to the specifics of the opt-in consent framework regarding Zeta's acquired major

businesses, including Disqus. Indeed, on March 8, 2022, during Morgan Stanley Technology, Media and Telecom Conference, an analyst with Morgan Stanley asked Defendant Steinberg:

> Q (Analyst): Got it. So I've personally never used the Disqus platform, but when people do login and they register, like what kind of information do you collect on them during that registration process?
>
> A (Steinberg): ***Really, it's just their name, their email address and an opt-in.. . . Every time a consumer interacts with the platform more than two or three times, they are sent to a login process where they either have to create a Disqus account or they have to log into their Disqus account***.

276.     Defendant Greiner also spoke about the genesis of Zeta's data collection and specifics of how Zeta confirmed that the data it collected was "opted-in." On June 7, 2023, during the William Blair Growth Stock Conference, Defendant Greiner stated that: "From the very beginning of Zeta's data cloud, ***it's been built on that premise of opt-in***." Greiner then highlighted his familiarity with the specifics of Zeta's consent framework by claiming that: "***When someone sends us or goes through that authentication process opt-in, we literally take a screen grab of it to document that this person has opted in***."

277.     Defendant Gore also asserted his particularized knowledge. On November 20, 2024, Zeta held an investor conference call with William Blair, in which Defendant Gore stated unequivocally that:

> ***The one thing I want to make really clear is that we have 240 million people in our graph that are opted-in*** for tracking and monitoring for digital marketing, display ads, CTV ads, calculation of intent. Again, this is not dissimilar than what the walled gardens do.

278.     During the same conference call with Willaim Blair, Defendant Gore asked Defendant Hayes to "talk about the different kinds of consent and controls that we have in [Zeta's] ecosystem." Hayes demonstrated his knowledge about Zeta's data collection practices when he stated:

***Zeta meets or exceeds consent requirements for the consumer data it collects***. It's important to note that there are relatively few opt-in requirements found in US privacy laws at the federal or state level. As a general rule, US privacy law allows for businesses to collect, use, and sell personal data without prior consent. ***Zeta not only obtains opt-in consent wherever it is required by the law, but also in several instances where it is not.***

279.    The Individual Defendants' strong and repeated assertions, including discussion of the specifics of Zeta's consent framework and commitment to data oversight at the Company, demonstrate that they knew—or were severely reckless in not knowing—that 240 million plus Americans and 535 million plus global citizens had not actually opted-in to be a part of Zeta's data cloud and that Zeta was indeed collecting user data through consent farms, rendering Defendants' statements to the contrary false and misleading.

**E.    Following The Culper Report, Defendants Admitted Zeta Had Misled The Market And That It Had Not Been "Transparent" With Investors, Supporting A Strong Inference Of Scienter**

280.    Following the publication of the Culper Report on November 13, 2024, Defendants made a series of admissions (some contradicted shortly thereafter with continuing false statements) admitting that the Company had previously misled the investing market and that Defendants had not been "transparent with the investment community" concerning Zeta's data collection practices, supporting a strong inference of scienter for Defendants' false and misleading statements outlined in *supra* Section V.

281.    On November 20, 2024, a week after Culper Research published its report, Zeta held an investor conference call with William Blair to address the allegations laid out in the report. Present at this call were Defendants Steinberg, Greiner, Gore, and Hayes. The meeting started off with an analyst from William Blair asking Defendant Steinberg to detail his "reaction to the report, how [he] responded, how [he] plan[s] to respond if people want more information, where can they go, and just [his] overall perceptions of what's in the report?"

282.    In response, Defendant Steinberg stated:

If you look at our data collection practices and utilization practices and policies, we've been able to convince 40% of the Fortune 100 that our policies are totally clean. They're not just legal, they are very much ethical. And most of them did massive deep dives into our business before selecting us. *What I would tell you is we made a mistake in not doing the same thing with Wall Street*, which allowed these types of lies to proliferate. If we had done a better job focusing on transparency and everything that we need to do, we would not be in this position.

283.    The analyst then remarked that: "for external parties like investors, maybe it can be somewhat challenging to just evaluate the quality of Zeta data asset, the practices, the controls, et cetera, that you have in place when you're collecting data." After noting that Zeta had an investor meeting coming up on December 9, 2024, the analyst asked Defendant Gore specifically: "if investors, in the meantime, just want to get some insight into how you collect data or how to judge the quality, what are some of the things that we can look at as external parties to just get better insight into Zeta's data?"

284.    In response, Defendant Gore acknowledged that: "if you're an investor, and even if you're a customer sometime or in the market for our products, it's really hard to cut through the noise." He then stated that investors, when evaluating a company, should look for "companies that practice active compliance," "size, scale and durability" of a company's data sets, and "what is the data activation model" of the company. Defendant Gore finished his answer by stating: "And, again, I would be the first to say that, at Zeta, we are so careful about these three things and *we're going to be a better job at being more transparent* about this with you on [December] 9th, and also through the call today."

285.    On December 9, 2024, Zeta held its Data Summit to further address the Culper Report and provide "transparency" to investors on Zeta's data collection processes. During the Data Summit, Defendant Gore stated that:

117

One thing to remember is that we are very transparent with customers at the outset of our relationships around data, around privacy, how we collect data, how we use data, and how we synthesize data into intelligence. This is part of our pitch and part of our process and actually part of our advantage. *So – although it was not as transparent with the investment community*, this is something that's a regular practice for us and we passed the security audits of some of the most highly regulated industries you can think about banking and healthcare.

286.    In the same Data Summit, Defendant Steinberg stated thereafter:

Yeah, I mean, I think as I said earlier, right, the calls which I've been on many, many with Neej, many directly, the calls start out inquisitive. The good news is the vast majority of our clients had already been through a data securitization process. They'd already been through this and as we've said, I think repeatedly, *we have not done as good a job with our transparency to investors as we have with our clients.*

287.    However, despite Defendants' repeated claims of customer (as opposed to investor) transparency, multiple former employees confirm that Zeta's customers were still kept in the dark about how the Company collected data. Indeed, according to FE-5, Zeta's enterprise customers, including Sony as one example, had "lots of questions" about Zeta's data collection process with some of the most frequent questions he was asked by his customers being (i) how Zeta collected the user information in their databases and (ii) what sites in the Zeta umbrella had an "opt-in" option and if those users had opted-in or not for having their data shared. FE-5 recounted always feeling awkward when the opt-in question was asked by the customer because that was information that even he was not given by Zeta. FE-5 described Zeta as "very siloed" and not sharing internally on how the data collection side works. FE-5 recalled that whenever he asked his supervisors and their counterparts on the data collection side if users had opted-in on having their information shared—and telling them that the question was coming from the enterprise customer—*he never got an actual answer*. FE-5 recalled that instead, he was coached or directed to "*dance around the subject*" of the data collection process and user opt-in with the customer by instead listing "a handful" of platforms that the user data was harvested from such as Disqus and ArcaMax. FE-5

was also directed to focus the customer on attributes such as Disqus data being based on "real time transactions."

288.    Notably, FE-5 described some enterprise customers as appearing uncomfortable when he "danced around" the opt-in subject and at times chose to pass on doing business with Zeta, seemingly because of the lack of a direct answer to their question. FE-5 explained that his supervisors who directed him to "dance around the subject" concerning whether the data was truly opted-in were "real veterans" of the Company who had been at Zeta for ten or more years.

289.    Moreover, multiple former employees confirmed that Zeta was not even transparent about its data collection processes with its own employees, let alone its clients. FE-1, a former data scientist at Zeta, reported that internally it was "*nebulous*" and "*cloudy*" as to whether users had actually opted-in for their data collection and for their data to be amalgamated in Zeta's data cloud. FE-3, the former Vice President of Client Services at Zeta, similarly detailed how Zeta was internally "quiet" about how it gathered consumer data.

290.    Defendants again conceded their lack of transparency with the investment community in a March 10, 2025 press release titled "Zeta Global Statement on Data Terminology Updates." In this press release, Zeta's reiterated its disclosure from its Data Summit on December 9, 2024, namely, that only 110 million U.S. individuals opted-in to share their data with the Company. This disclosure corrected Defendants' previous false and misleading statements that 240 million U.S. individuals had opted-in. The press release goes on to state that, consistent with its presentation during the Data Summit, "and as part of our ongoing efforts to provide shareholders with clear and accurate disclosures, we refined our terminology to better reflect the evolving nature of data permissions. As such, Zeta proactively made the decision to update related disclosures in its FY2024 10-K filing." Here, Zeta is referring to its removal of the "opted-in" language from its

2024 Form 10-K filing. According to the Company, "[t]his update ensures that our terminology aligns with the nature of permissions across our data assets to prevent misinterpretations." As such, Zeta conceded that its Class Period representations using "opted-in" language was *not* clear and accurate and *was* subject to misinterpretation.

### F.    Zeta's First Party Opted-In Data—Its "Secret Sauce"—Was Core To The Company's Business, Such That Defendants Knew How Zeta Obtained Its Data

291.    Zeta consistently touted its first party "opted-in" data set as the "central" feature of its business that differentiated it from its competitors, and as the Company's "***secret sauce***"—core to the Company's identity and business operations. Given the critical importance of consent to Zeta's data set, it would be absurd to suggest that Defendants were unaware of its true nature. Indeed, in an interview with *Yahoo Finance* on the day of the IPO—and in response to the market's interest in how Zeta acquired consumer user data in the highly-scrutinized environment— Defendant Greiner, as Zeta's CFO, had the following exchange:

> Q (*Yahoo Finance*): As you guys have gone public, I want to ask you about the future. How Zeta Global really plans to navigate amid this atmosphere when there's so much backlash around companies, platforms, applications, collecting personal data that can be used for digital advertisers and for marketing efforts. ***How is Zeta Global going to navigate against that crackdown that we are seeing***?
>
> A (Greiner): It's a great question, and we benefit from the rapid acceleration from the shift to digital transformation coming out of COVID.  In the setting of privacy and personalization, what's unique about Zeta is—even if you zoom out and look at the evolving regulatory landscape from GDPR all the way through CCPA and even this week's announcements—*what's unique about our model is that we're philosophically, and the foundation of our data, is all built on permissioned data; data that's been opted-in*. We don't rely at all on the third party cookie. This is all permissioned first party data that we work with, with the secret sauce being our artificial intelligence that wraps itself around that data and is able to unlock intent for our customers. ***And that's really the central part of our business model***.

292.    Defendant Steinberg also emphasized to investors that Zeta's acquisition of opted-in data was fundamental to the Company's business. On March 15, 2022, during the Roth Capital

Partners Conference, Steinberg stated that: "14 years ago, when John Sculley and I founded this company, it was on the premise that not only did we need to put everything together, but owning first-party data, not relying on a third party for data would be a ***massive differentiator*** in where the regulatory and marketing ecosystems were going. So, ***we began to build an opted-in consumer database*** . . . . "

293.    Defendant Steinberg continued to emphasize the significance of Zeta's opted-in data set. On March 13, 2023, during a Roth Capital Partners Conference, when describing the progress of Zeta, Steinberg emphasized: "now, along the way, I think we've made some pretty good bets, right? ***The first one was owning first party opted-in data was going to be a really valuable asset.*** And I was telling the story, I think, earlier today, seven years ago we made the decision to start building this permission-based data cloud..." On July 31, 2024, during Zeta's 2Q24 earnings call, Defendant Steinberg stated: "Over the last 15 years, we have invested and innovated to assemble one of the largest proprietary ***opted-in data clouds***."

294.    On October 25, 2024, Defendant Steinberg went on-air with Fox Business and stated the following in relevant part:

> Q (Interviewer): For people who aren't as sophisticated and aren't familiar with Zeta, David, tell me exactly what it is your Company can do beyond what the Oracles, and the S&Ps, the Salesforces, or the service-now companies that promise all these kinds of things for advertising and simplifying can do?
>
> A (Steinberg): Well ***I think the biggest difference between us and everybody else is we own one of the world's largest first-party data set – so over 240 million Americans have opted-in to our data cloud***. And then what we are doing is we are using a series of artificial intelligence algorithms to figure out, as John [Sculley] said, what do people intent to do next, with the highest level of intent.

295.    Zeta also leveraged the promise of an opted-in data set to assure investors that the Company's data acquisition practices went above and beyond any regulatory requirements. For example, on June 7, 2023, during the William Blair Growth Stock Conference, an analyst asked

Defendant Greiner: "how do you control privacy regulations in your platform?" Greiner responded: "It's interesting. We have a slide in our investor materials that looks at – as that regulatory environment has evolved over time from GDPR to CCPA to even CPRA that's most recently announced, the single thread in all of that that's important is its opt-in. ***Privacy-first opt-in. From the very beginning of Zeta's data cloud, it's been built on that premise of opt-in***." On March 4, 2024, during the Morgan Stanley Technology, Media & Telecom Conference, Defendant Steinberg noted that the fact that "***the 240 million Americans in our data cloud have opted in to be there***" helps the Company to "always be on the right side of regulation."

296.    Furthermore, Zeta's primary product, the ZMP, is heavily dependent on the Company's collection of opted-in data, and Defendants consistently emphasized the critical role that "opted-in data" plays in powering the ZMP, calling it the first "pillar" of the ZMP. As discussed above, and as touted as part of Zeta's IPO offering documents, the ZMP hosted consumer identity data "at its core," leveraging machine learning algorithms and the "industry's ***largest opted-in data set***."

297.    Given the significance of opted-in data to Zeta's main product and overarching business model, Defendants were either aware, or were severely reckless in not knowing, that the Zeta's data set, which was the Company's "secret sauce," did not consist of opted-in data for 240 million U.S. individuals and 535 million individuals globally—as evidenced by their admission that less than half of those U.S. individuals had opted in, and the Company's subsequent removal— entirely—of the words "opted-in" to describe its data set in its 2024 Form 10-K and last admission on March 10, 2025.

**G.    Analysts' Frequent Interest In And Questions About Zeta's Opt-In Consent Framework Meant That Defendants Were Informed**

298.    Analysts frequently asked Defendants about Zeta's data collection processes and opt-in consent framework. Given the frequency and import of these questions, the Individual Defendants were prepared to—and did—answer these questions during earnings and conference calls. As part of their preparation, Defendants were obligated to investigate the Company's use of an opt-in consent framework and knew—or were severely reckless in not knowing—that, in fact, 240 million plus Americans and 535 million plus global individuals had not actually "opted-in" to share their data with the Company, and that their statements to investors stating otherwise were false and misleading.

299.    On November 30, 2021, Credit Suisse published its "Takeaways from Credit Suisse's 25th Annual Technology Conference." Notably, one of Credit Suisse's key takeaways was that, "Zeta's proprietary data set comes from a diverse set of sources: the publisher network and commenting platform are the biggest drivers, followed by newsletters/subscriptions - all of which are **_opt-in_** data sets (which is a key selling point)." As demonstrated here, analysts have regarded Zeta's opt-in data sets as a critical component of the Company's operations. Consequently, Defendants received frequent inquiries about Zeta's data set both prior to and throughout the Class Period.

300.    For example, on March 8, 2022, during the Morgan Stanley Technology, Media and Telecom Conference, an analyst with Morgan Stanely, asked Defendant Steinberg: "Where did this data come from? Like, how did you go about collecting 230 million identities in the US?"

301.    Then, on March 8, 2023, during the KeyBanc Capital Markets Emerging Technology Summit, Defendant Gore spoke about Zeta's proprietary data. In response, an analyst

with KeyBanc, asked Gore, "let me just maybe clarify, this is all opt-in?" and then the analyst noted, "yeah. Just an important – everybody is always worrying about their data these days."

302.    On June 7, 2023, during the William Blair Growth Stock Conference, an analyst with William Blair asked Defendant Greiner: "The data asset, right, you're giving customers data as part of your value prop. What is the source of that data? How do you capture it? What's proprietary about it?" Later during that same conference, that same analyst asked: "And then, one of the natural kind of questions that comes up whenever I think investors hear data is what about the privacy aspect of it? How do you control for privacy regulations in your platform?"

303.    Approximately two months later, Defendants received even more questions about Zeta's data set. On August 9, 2023, during the Canaccord Genuity Growth Conference an analyst with Canaccord Genuity asked Zeta to "talk a little bit about the data that powers the identity graph, like where it comes from, right? It's getting harder – with third-party cookies and privacy concerns and all that sort of stuff, it's getting harder to kind of track what people are doing. How does Zeta do it and how do you build this proprietary data asset?"

304.    On March 4, 2024, during the Morgan Stanley Technology, Media & Telecom Conference, an analyst with Morgan Stanley wanted "to just to dive a little bit deeper into that data layer that's embedded kind of natively into the app." The analyst highlighted that "clearly, the data is really a key differentiator year for you guys" and then asked Defendant Steinberg to "kind of walk us through what are some of the main identifiers? How have you collected these data sources? And really how do you combine such a[] big data asset?"

305.    On March 3, 2025, during the Morgan Stanley Technology, Media & Telecom Conference Fireside Chat, an analyst asked Defendant Steinberg:

> And I want to switch a little bit to kind of data aspect and how it was built. You guys have clearly talked about a lot of the advantages that people get when they use

your data, that's why they're coming to you. But just take a step back and help us understand how the data was compiled. And then you've also done some technology tuck-ins for data including LiveIntent. So it'd be great just to get an update on that partnership as well and what you're hearing from customers.

306.    On November 20, 2024, when Defendants held an analyst meeting with William Blair in response to the publishing of the Culper Report, an analyst with William Blair asked numerous questions about Zeta's data collection and opt-in consent framework. First, the analyst noted that: "I think for external parties like investors, maybe it can be somewhat challenging to just evaluate the quality of Zeta data asset, the practices, the controls, et cetera, that you have in place when you're collecting data." Then the analyst asked Defendant Gore, "if investors [] just want to get some insight into how you collect data or how to judge the quality, what are some of things that we can look at as external parties just to get better insight into Zeta's data?" Gore responded by talking about three main points surrounding data collection practices. In response, the same analyst asked: "And on that point, can you maybe just compare and contrast to how Zeta is collecting its data in light of those – in light of that three-point framework you laid out?" This analyst then asked: "what processes, what controls do you have in place to ensure that that data that you're controlling is opted in, its consented, that it complies with consumer data protection laws, that it complies with regulations, and that you're not running afoul of any of those?" Here, Defendant Gore continued to mislead analysts and investors by responding:

> ***The one thing I want to make really clear is that we have 240 million people in our graph that are opted-in*** for tracking and monitoring for digital marketing, display ads, CTV ads, calculation of intent. Again, this is not dissimilar than what the walled gardens do. Whether you're running an analytics package from Google or you're visiting search queries, they synthesize intent and interest the same way.

307.    Defendants prepared for and organized this analyst conference to provide transparency on Zeta's data collection, however, Zeta continued to mislead its investors about its opted-in data set.

308.    In preparing for repeated and expected questions from analysts about Zeta's data collection and opt-in consent framework, and in hosting Zeta's own conferences specifically to discuss the topic of data collection, the Individual Defendants would have discovered—or would have been severely reckless in not discovering—that (1) the 240 million plus U.S. individuals and 535 individuals globally had not actually "opted-in" to share their data with the Company, and (2) that Zeta was indeed obtaining data through consent farms—and that Defendants' statements to investors stating otherwise were false and misleading.

**H.    Former Employees Corroborate Defendants' Reckless Disregard For The Acquisition And Handling Of Consent From Its Users**

309.    Former employees give compelling accounts that demonstrate Defendants' conscious recklessness concerning how Zeta's data is collected and used, including ***the knowing sharing of opted-out data*** and ***utilizing data that was not opted-in*** for Zeta's advertising and marketing models for its campaigns. This reckless disregard for the consent provisions of the user data that Zeta acquired is illustrative of Defendants' conscious disregard for basic data privacy and acquisition and handling of user consent, and further supports an inference of scienter in this matter.

310.    FE-2 explained how during his tenure, there were times when Zeta knowingly shared data of consumers who opted-out. FE-2 was employed by Zeta from before the Class Period until January 2024, as Marketing Campaign Manager (May 2021 to Sept. 2022), Senior Campaign Manager (Oct. 2022 to March 2023), and Mobile Operations (SMS/MMS) Manager (March 2023 to Jan. 2024). FE-2 explained how at times, consumers who opted-out of sharing of their data were accidentally mixed with the population of consumers who opted-in to sharing their data and there was no way for the Company to subsequently separate the opt-in and opt-out consumers.  FE-2 explained how Zeta was aware internally that it was sharing the data of opt-out consumers, and

that this was regularly discussed within his department. According to    FE-2, Zeta did not notify opted-out consumers when it shared their data during his tenure.

311.    FE-1 gives further corroboration of these practices and Defendants' lack of compliance with consumers' requested level of consent. Specifically, FE-1 explained that Zeta used email and/or user data from individuals who had not opted-in, for the purposes of creating advertising and marketing models. FE-1 further explained that for users who opted-out, emails would not be sent to them as part of an advertising campaign, but their data could nonetheless be used in Zeta's data cloud for building out advertising and marketing models. FE-1 explained that this occurred because when employees at Zeta would use and pull data from the data cloud in order to build out the advertising and marketing models, there was no specific inquiry as to whether the data was opted-in or opted-out. Notably, FE-1 also explained that it could be determined who opted to have their email addresses and/or user data shared by running a few queries in Snowflake – more specifically, according to FE-1, a user of Snowflake could find out how much of the data cloud was opted-in versus opted-out through such a query.

312.    And according to FE-3, Zeta did not use consumer data the way the Company said it would. FE-3 explained that Zeta changed algorithms and loosened restrictions to expand its pool of email marketing targets. FE-3 detailed that, for example, after an individual filled out a warranty survey, Zeta attempted to identify a group of people to target with the same characteristics based on certain details the individual shared, including the individual's likes and location. However, FE-3 noted that if the Company was unable to identify enough similar people based on the characteristics, the Company loosened the criteria to obtain a larger number of email marketing targets.

## I.     Defendants' SOX Certifications Are Further Indicia Of Scienter

313.     Appended to Zeta's Form 10-K for the fiscal year ended December 31, 2023, filed on February 28, 2024, are signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Steinberg and Greiner attested to the accuracy of the Company's operations set forth in this filing. Specifically, Defendants Steinberg and Greiner certified that:

> (1) the accompanying Annual Report on Form 10-K for the fiscal year ended December 31, 2023 (the "Report") fully complies with the requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and (2) the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

314.     As signatories of the SOX certifications, Defendants Steinberg and Greiner had a duty to review and confirm that accuracy of the reported financial condition and results of operations as disclosed in 10-K. This responsibility included verifying the accuracy of statements such as the ones below:

> Our Zeta Marketing Platform, or ZMP, is the largest omnichannel marketing platform with identity data at its core.  The ZMP can analyze billions of structured and unstructured data points to predict consumer intent by leveraging sophisticated machine learning algorithms and ***the industry's largest opted-in data set for omnichannel marketing.*** . . . The ZMP is built on the following four pillars:
>
> 1. ***Opted-in Data Set***[85]
>
> ***Our data set contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally*** with an average of more than 2,500 attributes per individual, which may be demographic, behavioral, psychographic, transactional, or indicative of preference.

315.     Given this responsibility and corresponding investigation, Defendants either had actual knowledge—or were severely reckless in not knowing—that the data it was ingesting from 240 million U.S. individuals and 535 million individuals globally was not opted-in data.

---

[85] Emphasis in original.

## VII.    DEFENDANTS' SCHEME TO DEFRAUD THE MARKET

316.    Throughout the Class Period, in violation of Rule 10b-5(a) and (c), Defendant Steinberg conducted a fraudulent scheme and course of conduct whereby he secretly divested massive quantities of Zeta common stock via a complex matrix of purportedly independent entities, in which he in fact maintained a significant pecuniary interest, to obscure colossal profits. *See supra* Section VI.A. Knowledge of the true nature of these transactions would have been highly material to investors, as the fact that the Founder, CEO, and Chairman of Zeta was inappropriately divesting of huge chunks of stock, particularly in close proximity to the time of Zeta's financial reporting (when executive sales should have been "locked up" pursuant to SEC rules and the Company's own policy), would have signaled that he was not nearly as confident in the stock as he claimed to be in public. Consequently, Steinberg's scheme artificially inflated the value of Zeta's stock.

317.    The fundamental purpose of requiring officers, like Steinberg, to file Form 4s is "to give investors an idea of the purchases and sales by insiders ***which may in turn indicate their private opinion as to prospects of the company***."[86]

318.    Steinberg's act of gifting his stock to purportedly "independent" affiliates, which he secretly controlled and had a beneficial ownership in, and selling large quantities of said stock while side-stepping the reporting requirements of Section 16, allowed Steinberg to conceal his "opinion as to the prospects of the company," and fraudulently project a level of confidence in Zeta's future that he did not actually possess.

---

[86] *See, e.g., CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 290 (2d Cir. 2011) (emphasis added).

319.    Executives are often compensated in the form of stock awards, a practice that has only grown in recent years, in order to "promote better long-term alignment of a CEO's goals with those of shareholders."[87] Zeta's 2025 Proxy, filed April 30, 2025, explained that in 2024, the Company granted approximately 90% of its executive's target direct compensation in the form of performance-based restricted stock units ("PSUs"): "We believe that PSUs effectively align the interests of our executives with those of our stockholders by directly linking compensation to the value of our Class A Stock." However, "the extent to which CEO pay is linked to the company's performance depends not only on the amount of stock CEOs are paid, but also on how much of that stock they retain."[88] In theory, if an executive is granted and retains large amounts of a company's stock, they are incentivized to perform better, making said stock rise in value. Many executives hold their stock, even when they are not legally required to do so, to demonstrate solidarity with shareholders and confidence in the future of the company.

320.    Here, it appeared to the shareholders as if Steinberg had not sold a single share of the Company during the Class Period, demonstrating rock-solid faith in Zeta's fundamentals. However, while simultaneously making outward proclamations of faith in the Company, during the Class Period, ten Steinberg Affiliates filed thirty Form 144s and two Form 144/As (amended Form 144s) noticing the proposed sale of some ***13,371,398 shares*** of Class A common stock, for total proceeds (which is equal here to profits, since the shares were acquired via gift) of ***$270,660,177***.

---

[87] *See* Josh Bivens and Jori Kandra, *CEO pay slightly declined in 2022 but it has soared 1,209.2% since 1978 compared with a 15.3% rise in typical workers' pay*, ECON. POLICY INST. (Sept. 21, 2023), https://www.epi.org/publication/ceo-pay-in-2022/#:~:text=There%20is %20a%20simple%20logic,a% 20long%20way%20to%20go) (last accessed May 7, 2025).

[88] Robert J. Jackson, Jr., *Private Equity and Executive Compensation*, 60 UCLA L. REV. 638, 646 (2013).

321.    Steinberg seized on this façade of unblemished stock investment, and therefore faith, in the Company. For example, in the days following the publishing of the Culper Report, Steinberg purchased 53,676 shares of Zeta. In a November 18, 2024 press release announcing this purchase, Steinberg is quoted:

> Last week's 'report' was filled with false claims and objectively wrong information about Zeta Global," Steinberg said. "Members of the Board, Company leadership, and I are showing our confidence in our Company's integrity by making these purchases." "We will not allow untrue claims to derail our forward momentum that has delivered strong results for shareholders over the last three years." "*I believe the current share price is undervalued," said Steinberg, "and I am bullish about our future*.

322.    Form 4s show that Steinberg held these shares for the remainder of the Class Period, further enforcing the public-facing charade that he believed in the value of his investment.

323.    On this same day, November 18, 2024, the price of Zeta's common stock rose approximately 11%, from $17.58 per share at closing on November 15, 2024, to $19.58 per share at closing on November 18, 2024. An analyst report from Canaccord Genuity, published on November 19, 2024, applauded management's response to the Culper Report: "what we've seen from management to date feels like a pretty earnest response . . . yesterday, Zeta management, including the CEO, President, CFO, and several board members, executed open market purchases of the stock with personal funds that amounted to more than $3M in total."[89]

324.    Then on December 13, 2024, less than a month after Steinberg announced his post-Culper Report purchase as a sign of how "bullish" he was about Zeta's future, four purportedly independent entities (who were actually controlled by Steinberg) filed Form 144s to notice the sale of *1,152,946* shares of Zeta (dwarfing the 53,000 shares purchased weeks earlier) for proceeds of

---

[89] David Hynes Jr., et al., "Time is the wisest counselor of all; cooler heads prevailing as information flow improves," CANACCORD GENUITY, Nov. 19, 2024.

***$23,828,432.28***. Three of these Form 144s state that the shares had been gifted to the entities on December 11, 2024—just two days earlier.[90] By using his network of affiliates, Steinberg was able to project one message to the public—*i.e.*, bullish confidence in the stock—while privately unloading more than ***20 times*** as many shares as he purchased. Selling the shares through his affiliates also allowed Steinberg to avoid Section 16 reporting requirements and the public scrutiny which would have surely arisen due to the very short interval between his publicly-announced purchase and the massive sale.

325.    On paper, Q3 2024 was a good quarter for Zeta. In addition to the artificial inflation caused by the misstatements and omissions pleaded herein, the Company saw a bump in revenue from political candidate spending in advance of the 2024 election and increased business from five large agency "Hold-Co" customers. However, as Steinberg knew, both of these revenue sources were fleeting. For example, an analyst from Barclays downgraded Zeta shortly before the Q2 2024 earnings call, explaining, "We think it could be difficult for ZETA to continue expanding within agency HoldCos at the same rate" and "We believe that ZETA's 2H25E revenue growth could see deceleration as it laps election marketing spend from 2H24."[91]

326.    Publicly, during the Q3 2024 Earnings Call on November 11, 2024, Steinberg proclaimed: "right now, we're feeling very, very good about the business. We're firing on 10 of 12 cylinders, and we really feel like the engine is doing well, and we're very bullish on Q4." But unknown to investors, during the Zeta ITP-required blackout period in advance of the Q3 2024

---

[90] The fourth Form 144 originally reported that the 510,358 shares the entity planned to sell had been gifted to it on December 2, 2024 (just *two weeks* after Steinberg's public purchase of Zeta stock), but it was later amended to state the gift had occurred on February 18, 2018. None of the filed Form 4s show any gifts made on December 2, 2024.

[91] Ryan MacWilliams, et al., *Agency Ramps A Tough Act To Follow; Downgrade to EW*, Barclays, Oct. 18, 2024.

earnings release, five of the Steinberg Affiliates filed Form 144s noticing a sale or plan to sell some **3,769,864** shares of Zeta, with a value of over **$100 million**.

327.    If Steinberg had personally noticed these sales on Form 4s, aside from being in clear violation of SEC rules and Zeta's ITP policy, it would have been a strong signal to the market that, far from being "bullish on Q4," Steinberg believed Zeta's stock had reached the peak of its value. However, since the sales were reported on Form 144s by entities that appeared to be unconnected to Steinberg, no such red flags were raised.

328.    Similarly, in Q4 2024, Zeta repurchased $31 million worth of shares. When an analyst from Roth Capital Partners asked about this repurchase during the Q4 / FY 2024 Earnings Call on February 2, 2025, Steinberg stated: "the stock, we thought, dropped to a stupid place, so we massively accelerated buying the stock. We still think it's very low and we'll continue to buy it at an accelerated pace."

329.    However, Steinberg's actions made it clear he did not personally believe the stock price was "stupid" or "very low." During the blackout period in advance of this call, Steinberg Affiliates filed Form 144s for the planned or actual sales of almost 3 million shares, with a value of approximately **$56 million**. If analysts saw it as a positive sign that Zeta repurchased $31 million worth of shares, they would certainly consider it to be material that entities controlled by Steinberg **dumped $56 million worth of shares on the market during this same period**. However, since the affiliates deceptively purported to be independent, Steinberg was able to conceal his connection to these massive sales, and all the implications inherent therewith.

330.    Additionally, at the time the Steinberg Affiliates sold their shares, Steinberg had personal knowledge of material non-public information, *i.e.* that Zeta's data set was not, in fact, "opted in," that the assertions in the Culper Report were true, and that Zeta could no longer

misrepresent these facts in its financial reporting. Through his scheme of using a complex matrix of purportedly independent entities to sell Zeta securities, he was once again able to sell shares when he was personally prohibited from doing so by SEC rules and Zeta's ITP, securing massive proceeds, and avoiding public scrutiny, all in violation of Rule 10b-5 (a) and (c).

331.    In addition to Zeta's culpability for Steinberg's acts via the doctrine of *respondeat superior*, throughout the Class Period, Zeta, by and through its Board of Directors, continued to grant large amounts of Zeta securities to Steinberg as part of his compensation package without regard to whether Steinberg was following SEC rules about properly reporting these grants and the sales thereof. Zeta also failed to monitor or prevent sales from occurring during "cooling off" periods mandated by both the SEC and Zeta's ITP or the "blackout" periods required by Zeta's ITP. It was Zeta's duty to not only have ITPs in place, but to ensure they were being followed by personnel at every level—even by Steinberg himself. By failing in this duty, Zeta was complicit in Steinberg's scheme.

## VIII.    LOSS CAUSATION

332.    Lead Plaintiffs incorporate by reference the allegations set forth above. Defendants, as alleged herein, directly and proximately caused Lead Plaintiffs' and Class members' economic loss.  The market for Zeta's securities was open, well-developed and efficient at all relevant times. Throughout the Class Period, Zeta's common stock traded at artificially inflated prices, with the common stock closing high of $36.74 during the Class Period as a direct result of Defendants' materially misleading statements and omissions of material fact, which were widely disseminated to the securities market, investment analysts, and the investing public. More specifically, Defendants misrepresented the composition and value proposition of Zeta's data set throughout the Class Period, repeatedly stating to the market that its data derived from "opt-in" individuals and that Zeta was not collecting data from consent farms. Lead Plaintiffs and other members of

the Class purchased or otherwise acquired Zeta's common stock relying upon the integrity of the market price for Zeta's common stock, but which included the artificial inflation caused by these misrepresentations of material fact.

333.    The economic loss suffered by Lead Plaintiffs and other members of the Class was a direct result of Defendants' wrongful conduct, which inflated the prices of Zeta securities and resulted in the subsequent declines in value when defendants' prior false and misleading statements and omissions were revealed through the foregoing curative disclosures. The declines in the price of Zeta common stock pled herein were a direct result of the nature, extent and impact of Defendants' prior false and misleading statements and omissions being revealed to investors and the market. The timing and magnitude of the price declines of Zeta common stock negates any inference that the losses suffered by Lead Plaintiffs and other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific factors unrelated to Defendants' wrongful conduct.

334.    As explained more thoroughly in Sections IV.E-G, the truth underlying Defendants' false and misleading statements and omissions of material fact related to the composition of Zeta's data set and exposure to potential liability and regulatory action came to light through a series of four partial corrective revelations, while at the same time Defendants continued to mislead the market.

335.    **First**, on November 13, 2024, at approximately 1:28 p.m. Eastern Standard Time, Culper Research published the Culper Report, which partially revealed to investors that the composition of Zeta's data set was not comprised of the "240 million opted-in individuals" that Defendants had repeatedly represented throughout the Class Period, and that Zeta used consent farms to deceptively bait people into disclosing their personal data.  The market responded swiftly

to the revelations contained within the Culper Report, and due to the removal of artificial inflation caused by Zeta's class period misrepresentations and omissions, Zeta share value plummeted from a daily high of $28.51 per share to close at $17.76 per share—a decline of 37.07% on unusually high trading volume of over 45.3 million shares traded.

336.    While the price of Zeta stock fell by 37.07% on November 13, 2024, the NYSE declined by only 0.04% and the S&P 500 rose by 0.02%, undercutting any possible inference that the cause of Zeta's stock price decline was due simply to market forces.

337.    Defendants stemmed Zeta's stock price decline and reintroduced artificial inflation into the Company's shares by promptly issuing a public denial of the facts included in the Culper Report on November 13, 2024, after trading hours, calling it "misleading," and "riddled with misrepresentations, speculative conjecture, and categorically false statements." Zeta's press release objectively denied that it "operate[d] so-called 'consent farms,'" and brushed aside the Culper Report's concerns about Zeta's opt-in data, explaining that "Zeta reviews the opt-in/opt-out processes and privacy policies of its data partners," and "is confident in its data collection practices, policies and processes to ensure compliance with applicable laws." As a result of the denials, Defendants successfully maintained artificial inflation in its stock price, and the next morning, Zeta's stock even rebounded to open at $19.12 per share, up 7.66% from the prior day's close. Over the next two weeks, Defendants continued to make statements falsely refuting the facts of the Culper Report and misleadingly touting its data set, which reinflated the Company's stock price as high as $27.79 per share.

338.    As set forth in Section IV.E above, investment analysts following Zeta, including RBC Capital Markets, Canaccord Genuity, Needham, and Morgan Stanley, directly attributed the November 13, 2024 stock decline to the revelations within the Culper Report, but also indicated

that Zeta's subsequent denials of the facts within the report, at the very least, created uncertainty as to the veracity of the Culper Report, with several analysts fully embracing Defendants' false reassurances.

339.    **Second**, on the morning of December 9, 2024, the Company hosted the "Zeta Data Summit," during which the Company revealed, for the first time, that Zeta did not have "240 million opted-in individuals in the U.S.," as they had previously represented, but rather only "a subset of the population, ***about 110 million that we actually have opt-in email permission for.***" Notably, Defendants in the Data Summit continued to mislead the market in an effort to prop up the falling share price, notwithstanding the partial correction and revelation of truth that day. Specifically, Defendants doubled-down on the claim that Zeta did not operate "consent farms."

340.    Although Defendants continued to mislead the market regarding Zeta's data set composition, operation of consent farms, and potential exposure to liability during the Data Summit, the market reacted negatively to these new Company-specific disclosures that partially corrected prior statements regarding Zeta's data set and use of consent farms, which, importantly, corroborated the Culper Report. Zeta shares declined from an open of $26.10 per share in the morning of December 9, 2024, to close at $22.97 per share the same day on unusually high trading volume, as the artificial inflation was removed from the stock price.

341.    While the price of Zeta stock fell 12.26% on December 9, 2024, the NYSE and the S&P 500 declined by only 0.5% and 0.61%, respectively.

342.    **Third**, on February 26, 2025, Zeta filed with the SEC its Annual Report on Form 10-K, in which Defendants corrected their Class Period statements by quietly removing references to "opt-in" with respect to the Company's data. For example, as shown in the below comparison, the Company no longer touted its "opted-in" data set as one of its ZMP's four pillars. Whereas,

Zeta's prior 2023 Form 10-K had stated that the Zeta Marketing Platform was "built on the following four pillars: 1. ***Opted-in*** Data Set….Our data set contains more than 240 million ***opted-in*** individuals in the U.S. and more than 535 million ***opted-in*** individuals globally . . . ." Zeta's 2024 Form 10-K removed references to Zeta's "opted-in" data set. Defendants corrected this language by removing all references to "opted-in"—to indicate that the Zeta Marketing Platform was "built on the following four pillars: 1. Zeta's Data Set….Our data set, which contains more than 245 million individuals in the U.S. and more than 535 million individuals globally…." Notably, this was in ***direct contradiction*** to what Defendants said just weeks earlier in the Anthony Pompliano podcast and throughout the Class Period.

343.    Zeta's correction further corroborated the revelations in the Culper Report regarding Zeta's data and the use of consent farms, and removed additional artificial inflation caused by Defendants' Class Period misrepresentations related to the composition and collection of Zeta's data set, as these revelations further exposed the true value of the data and potential increased exposure to liability from the collection thereof. Although analyst consensus was that Zeta's financial results beat market expectations and should have caused Zeta's stock to increase, the revelation of previously concealed truth inherent in this quiet revision of language further dissipated artificial inflation, and Zeta shares declined from an open of $20.48 per share in the morning of February 26, 2025, to close at $17.77 per share on the same day with unusually high trading volume. The stock continued to decline on February 27, 2025, to close at $16.65 per share, again on high trading volume.

344.    While the price of Zeta stock fell by 13.74% on February 26, 2025, the NYSE and the S&P 500 rose by 0.04% and 0.01%, respectively. Similarly, on February 27, 2025, the price of

Zeta stock fell by 6.30% while the NYSE and the S&P 500 declined by only 0.63% and 1.59%, respectively.

345.    **Fourth**, and finally, on March 10, 2025, *The Capitol Forum* promoted via X (f/k/a Twitter) an article that drew attention to the fact that "Zeta's 2024 annual filing walked back these claims and references to consumers opting in to data sharing…," which *The Capitol Forum* noted, raises "questions over how the company sources and promotes its data set…."  Importantly, the article included a quote from Zeta, acknowledging that the Company changed its language in their annual filing "to provide shareholders with clear and accurate disclosures," and that the "update ensures our terminology aligns with the nature of permissions across our data assets to prevent misinterpretations." That same day, Zeta proceeded to publish this same statement in a press release entitled, "Zeta Global Statement on Data Terminology Updates." This new information provided shareholders with the final piece of the puzzle that their "opt-in" language was *not* clear and accurate and *was* subject to misinterpretation.

346.    Upon learning this revelatory concession, along with other details uncovered in *The Capitol Forum* investigation related to Zeta's data collection practices and potential regulatory exposure, additional artificial inflation was removed from Zeta's stock, and its value declined from the previous day's closing price of $15.82 per share to close at $14.03 per share on March 10, 2025, on unusually high trading volume of 9,987,500 shares traded.

347.    Although the price of Zeta stock fell by 11.31% on March 10, 2025, the NYSE and the S&P 500 declined by only 1.89% and 2.70%, respectively.

348.    As outlined above, when the market learned the true nature of Zeta's data and liability risk, through these four revelatory disclosures on November 13, 2024, December 9, 2024, February 6, 2025, and March 10, 2025, the price of Zeta's securities declined immediately as the

artificial inflation was removed from the market price of the stock, causing substantial damage to Lead Plaintiffs and the Class.

349.    The timing and magnitude of the Company's common stock price declines on each of those days negates any inference that the losses suffered by Lead Plaintiffs and the Class were caused by changed market conditions, macroeconomic or industry factors, or Zeta-specific facts unrelated to Zeta and the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiffs and other Class members was a direct result of Zeta and the Individual Defendants' fraudulent statements and the corresponding artificial inflation in Zeta's common stock prices and the subsequent significant decline in the value of Zeta's common stock when the truth about Zeta and the Individual Defendants' prior acts of misconduct was revealed.

## IX.    PRESUMPTION OF RELIANCE

350.    To the extent that Lead Plaintiffs allege that Defendants made affirmative misstatements, Lead Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    Zeta's common stock traded in an efficient market;

(d)    the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of Zeta common stock;

(e)    Lead Plaintiffs and other members of the Class purchased Zeta common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts;

(f)    Zeta common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(g)    as a regulated issuer, Zeta filed periodic public reports with the SEC and the NYSE;

(h)    Zeta regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(i)    Zeta was followed by securities analysts employed by major brokerage firms who wrote reports, which were distributed to those brokerage firms' sales force and certain customers and that were publicly available and entered the public marketplace; and

(j)    Unexpected material news about Zeta was reflected in and incorporated into the Company's stock price during the Class Period.

351.    As a result of the foregoing, the market for Zeta common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of Zeta common stock. All persons and entities who or which purchased or otherwise acquired Zeta common stock during the Class Period suffered similar injuries through their purchase of Zeta common stock at artificially inflated prices, and thus, the presumption of reliance applies.

352.    A class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), to the extent the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## X.    CLASS ACTION ALLEGATIONS

353.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class of all persons and entities who or which purchased or otherwise acquired the publicly traded common stock of Zeta during the period from February 27, 2024, through March 10, 2025, both dates inclusive (the "Class Period"), and were damaged thereby (the "Class").  Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Defendant who is an individual; (iii) any person who was an officer, director or control person of Zeta during the Class Period and their immediate family members; (iv) any firm, trust, corporation, or other entity in which any Defendant has or had a controlling or beneficial interest; (v) Zeta employee retirement and benefit plan(s), if any, and their participants or beneficiaries, to the extent they made purchases through such plan(s); and (vi) the legal representatives, affiliates, subsidiaries, heirs, successors-in-interest, or assigns of any such excluded person or entity, in their capacities as such.

354.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Zeta's shares actively traded on the NYSE. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. During the Class Period, an average of over 4.6 million shares were publicly traded daily on the NYSE, with over 230 million shares outstanding during the Class Period. Record owners and other members of the Class may be identified from records maintained by Zeta or its transfer agent and may be notified of the pendency of this Action by mail, using the form of notice similar to that customarily used in securities class actions.

355.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

356.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

357.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, earnings, demand for its products, and specifically, whether Defendants' statements and omissions misrepresented;

(c)    whether, and to what extent, the market price of Zeta common stock was artificially inflated during the Class Period because of the material misstatements alleged herein;

(d)    whether Defendants acted with the requisite level of scienter;

(e)    whether Defendants Steinberg, Greiner, Gore, and Hayes were controlling persons of Zeta;

(f)    whether Defendants engaged in a scheme and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of Zeta common stock; and

(g)    whether the members of the Class have sustained damages as a result of the conduct complained of herein, and if so, the proper measure of such damages.

358.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this Action as a class action.

## XI.    THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

359.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not apply to any of the false or misleading statements pled in this Complaint. The statements complained of herein were: (i) historical statements or statements of purportedly current facts and conditions at the time the statements were made; (ii) mixed statements of present and/or historical facts and future intent; and/or (iii) omitted to state material current or historical facts necessary to make the statements not misleading.

360.    Further, to the extent that any of the false or misleading statements alleged herein could be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements. Given the then-existing facts contradicting the Defendants' statements, any generalized risk disclosures made by the Defendants were not sufficient to insulate them from liability for their materially false and misleading statements.

361.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, the Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the

speaker knew the statement was false or misleading, did not actually believe the statements, had no reasonable basis for the statements, and were aware of undisclosed facts tending to seriously undermine the statements' accuracy.

## XII.    CONTROL PERSON ALLEGATIONS

362.    The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company and were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information about the Company, including its business, operations, earnings, revenue, and demand for its products. The Individual Defendants participated in the drafting, preparing, and/or approving the public statements and communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.

363.    The Individual Defendants, as senior executive officers of the Company, were able to and did control the content of the various SEC filings, press releases, and other public statements issued by or on behalf of Zeta during the Class Period. These Individual Defendants were provided copies of the documents and statements alleged herein to be materially false and misleading prior to or shortly after their issuance and/or had the ability and opportunity to prevent their issuance or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the public statements detailed herein.

364.    The Individual Defendants, because of their positions of control and authority as senior executive officers, directors, and/or senior management had access to adverse undisclosed information about Zeta's business through their access to internal corporate documents and information, conversations and associations with other corporate officers and employees,

attendance at regularly-held meetings, as well as other management and Board of Directors meetings thereof, and reports and other information provided to them in connection therewith.

365.   As senior officers and controlling persons of a publicly held company whose common stock was, during the relevant time, registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to Zeta's operations and business, and to correct any previously-issued statements that were or had become materially misleading or untrue, so that the market price of Zeta common stock would be based upon truthful and accurate information. The Individual Defendants' wrongdoing during the Class Period violated these specific requirements and obligations.

366.   The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud and deceit on all persons and entities who purchased or otherwise acquired Zeta common stock during the Class Period, by disseminating materially false and misleading statements and omitting material adverse facts. The scheme deceived the investing public regarding Zeta's business, operations, and management, and the intrinsic value of Zeta's common stock, and caused Lead Plaintiffs and members of the Class to purchase Zeta's common stock at artificially inflated prices.

367.   In making the statements complained of herein, the Individual Defendants, who were senior officers and controlling persons of Zeta, were acting on behalf of the Company in the regular course of business. Therefore, each of the statements made by the Individual Defendants is attributable to the Company.

## XIII.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

### COUNT I

**For Violation Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5(b)**
**Against All Defendants**

368.    Lead Plaintiffs repeat, incorporate, and realleges each and every allegation contained above as if fully set forth herein.

369.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(b), on behalf of Lead Plaintiffs and the Class, against Defendants.

370.    During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; and (b) cause Lead Plaintiffs and other members of the Class to purchase Zeta common stock at artificially inflated prices.

371.    The Defendants made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

372.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

373.    During the Class Period, the Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

374.    Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to misrepresent to investors that (1) Zeta's "secret sauce" first party consumer data set of over 240 million U.S. adults – nearly 90% of the population – as well as hundreds of millions of other global users, had "opted-in" to Zeta's ZMP when, in fact, the vast majority had not opted in at all, and (2) the Company had not obtained user data through consent farms, when in reality it did, and this was done to conceal this information from the investing public and to support the artificially inflated prices of the Company's common stock.

375.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Zeta common stock at artificially inflated prices and were harmed when the truth about Zeta negatively impacted the price of the Company's common stock. Lead Plaintiffs and the Class would not have purchased Zeta common stock at the prices they paid, or at all, had they been aware that the market prices for Zeta common stock had been artificially inflated by the Defendants' fraudulent course of conduct.

376.    As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

377.    By virtue of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

378.    This claim is timely within the applicable statute of limitations and repose.

## COUNT II

### For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b5(a) And (c) Against Defendants Zeta And Steinberg

379.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

380.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a) and (c), on behalf of Lead Plaintiffs and the Class, against Defendant Zeta and Steinberg.

381.    During the Class Period, Defendants Zeta and Steinberg, individually and in concert, directly or indirectly, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Zeta securities in an effort to maintain artificially high market prices for Zeta securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). This scheme involved Defendant Steinberg's sale of Zeta securities through a nexus of entities which were purportedly independent, but which he actually controlled, beneficially owned, and had a pecuniary interest in, allowing him to side-step SEC rules and Zeta's ITP.

382.    Defendant Zeta and the Individual Defendants individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class in connection with the purchase and sale of Zeta common stock; which did: (i) deceive the investing public, including Lead Plaintiffs and the Class, by (1) touting that Zeta's first party consumer data set consisted of over 240 million opted-in U.S. individuals when, in truth, the vast majority had not opted-in at all, and (2) claiming that the Company did not receive user data from "consent

farms," when in reality it did; (ii) artificially inflate and maintain the market price of Zeta common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase Zeta common stock at artificially inflated prices and suffer losses when the true facts became known.

383.    As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), the Defendants engaged in the fraudulent scheme to misrepresent to investors that (1) Zeta's proprietary first party consumer data set consisted of over 240 million U.S. individuals – and hundreds of millions of other global users – that had "opted-in" to share its data with the Company, and (2) that the Company did not receive user data from "consent farms," when in reality it did. This scheme was enacted to support the artificially inflated prices of the Company's common stock and allow Defendant Steinberg to sell enormous quantities of Zeta common stock and make a profit of over $270 million during the Class Period.

384.    These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Zeta common stock during the Class Period in an effort to maintain artificially high market prices for Zeta common stock.

385.    As described above, Defendants Zeta and Steinberg acted with scienter in that they participated in this scheme knowing, or with deliberate recklessness, that the public documents and statements issued or disseminated by Zeta and/or Steinberg, certain ownership disclosures filed on Form 4s and Form 144s with the SEC, were materially false and misleading; and knew that such statements or documents would be issued or disseminated to the investing public, in violation of the securities laws. Steinberg, by virtue of his receipt of material non-public information regarding Zeta; his control over, and/or receipt and/or modification of those Form 4s

and Form 144s; and his knowing use of "affiliate" entities to conduct trades, participated in the fraudulent scheme and course of conduct alleged herein.

386.    Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Zeta common stock, which artificial inflation was removed from the stock when true facts became known. Lead Plaintiffs and the Class would not have purchased Zeta common stock at the prices they paid, or at all, had they been aware that the market prices for Zeta common stock had been artificially inflated by Defendants' fraudulent course of conduct.

387.    As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered economic harm in an amount to be established at trial.

388.    By reason of the foregoing, the Exchange Act Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to the Lead Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of Zeta securities during the Class Period.

## COUNT III

**For Violation of Section 20(a) of the Exchange Act
Against the Individual Defendants**

389.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

390.    This Count is asserted pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), on behalf of Lead Plaintiffs and the Class, against each of the Individual Defendants.

391.    As set forth above, each of the Individual Defendants acted as controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

392.    By reason of their high-level positions of control and authority as Zeta's most senior officers and/or management, the Individual Defendants had the authority to influence and control, and did influence and control, the decision-making and activities of Zeta and its employees, and to cause Zeta to engage in the wrongful conduct complained of herein. The Zeta Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Zeta during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

393.    The Individual Defendants communicated with investors or the public on behalf of Zeta during the Class Period. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were made and had the ability to prevent the issuance of the statements or to cause the statements to be corrected. Therefore, these Individual Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Zeta during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

394.    Zeta violated Section 10(b) of the Exchange Act by virtue of the acts and omissions of its senior executives and/or management, including the Individual Defendants, as alleged in this Complaint.

395.    By virtue of their positions as controlling persons of Zeta and as a result of their own aforementioned conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to Lead Plaintiffs and the other members of the Class who purchased or otherwise

acquired Zeta common stock during the Class Period. As detailed above, during the respective times, these Defendants served as officers, directors, and/or senior personnel of Zeta.

396.    The Individual Defendants acted as controlling persons of Zeta within the meaning of Section 20(a) of the Exchange Act by virtue of their executive and/or senior positions and their culpable participation, as alleged above. The Individual Defendants had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contends were false and misleading. The Individual Defendants were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

397.    In particular, the Individual Defendants had direct involvement in and responsibility over the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and had the power and ability to control public statements about Zeta and the actions of the Company and its employees. Moreover, the Individual Defendants were each directly involved in providing false information and certifying and/or approving the materially false or misleading statements disseminated by Zeta during the Class Period. As a result of the foregoing, the Individual Defendants each were controlling persons of Zeta within the meaning of Section 20(a) of the Exchange Act.

398.    As alleged above, Zeta violated Section 10(b) of the Exchange Act by its material misrepresentations and omissions as alleged in this Complaint. By virtue of their positions as controlling persons of Zeta and as a result of their own aforementioned conduct, the Individual

Defendants are each liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who purchased or otherwise acquired Zeta common stock. Moreover, as alleged above, during the respective times that the Individual Defendants served as officers, directors, and/or senior management of Zeta, each of the Individual Defendants culpably participated in the material misstatement and omissions made by Zeta, as set forth above.

399.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases or acquisitions of Zeta common stock during the Class Period.

400.    This claim is timely within the applicable statutes of limitations and repose.

## XIV.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action maintainable under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiffs as class representatives, and appointing Labaton Keller Sucharow LLP and Kahn Swick & Foti, LLC as Class Counsel pursuant to Rule 23(g);

(b)    Awarding Lead Plaintiffs and the Class compensatory damages and equitable relief, including all damages and relief provided for under the Exchange Act, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including to attorneys' fees and expert fees; and

(d)    Awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## XV.    JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury of all issues so triable.

DATED: May 12, 2025                          Respectfully submitted,

*/s/ Lauren A. Ormsbee*
**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
David Saldamando
Alexandra E. Forgione
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiff Allegheny County Employees' Retirement System and Lead Counsel for the Proposed Class*

*/s/ Kim E. Miller*
**KAHN SWICK & FOTI, LLC**
Kim E. Miller (KM-6996)
J. Ryan Lopatka
250 Park Ave., 7th Fl
New York, NY 10177
Telephone: 212.696.3730
Fax: 504.455.1498
kim.miller@ksfcounsel.com
j.lopatka@ksfcounsel.com

-and-

Craig Geraci
Matthew Woodard *(pro hac vice)*
Alexandra Pratt *(pro hac vice)*
1100 Poydras St., Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Fax: (504) 455-1498
craig.geraci@ksfcounsel.com
matthew.woodard@ksfcounsel.com
alexandra.pratt@ksfcounsel.com

*Counsel for Lead Plaintiff Amir Konigsberg and Lead Counsel for the Proposed Class*