**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ZETA GLOBAL HOLDINGS CORPORATION SECURITIES LITIGATION | Case No. 1:24-cv-08961-DEH-SDA<br><br>**ORAL ARGUMENT REQUESTED** |

**DEFENDANTS ZETA GLOBAL HOLDINGS CORP., DAVID A. STEINBERG, CHRISTOPHER GREINER, NEEJ GORE, AND BENJAMIN HAYES'S MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS


Preliminary Statement ..... 1

Background ..... 2

A. Zeta Is a Data Advertising Revolutionary ..... 2

B. Zeta's Dataset Includes 245 Million Individuals Who Gave Opt-In Consent ..... 3

C. Short-Seller Culper Research Launches an Attack and Zeta Responds ..... 4

Argument ..... 5

I. Plaintiffs Fail to Plead a Section 10(b) Claim ..... 5

A. Plaintiffs Fail to Plead Any Actionable Misstatements or Omissions ..... 5

1. The Complaint Reflects Impermissible Puzzle Pleading ..... 6

2. Allegations Based on the Purported Analysis of an Anonymous "Expert" Should Be Disregarded ..... 6

3. Statements About Zeta's "Opt-In" Dataset Were Not False ..... 8

4. Statements Denying Zeta's Use of "Consent Farm" Were Not False ..... 11

5. Plaintiffs' Confidential Witnesses Should Be Disregarded ..... 13

B. Plaintiffs Fail to Plead a Strong Inference of Scienter ..... 15

1. Plaintiffs Have Not Pled Motive and Opportunity ..... 15

2. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness ..... 18

3. The Non-Fraudulent Inference Is More Compelling ..... 21

C. Plaintiffs Fail to Adequately Plead Loss Causation ..... 22

1. No Allegations Show That "Consent Farm" Statements Caused Losses ..... 22

2. The March 10th Disclosures Do Not Support Loss Causation ..... 23

II. Plaintiffs Fail to Plead a Scheme Liability Claim ..... 24

III. Plaintiffs Fail to Plead a Section 20(a) Claim ..... 25

Conclusion ..... 25

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*,
47 F. 3d 47 (2d Cir. 1995)........................................................................................... 15

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
663 F. Supp. 3d 334 (S.D.N.Y. 2023)............................................................................. 7

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ........................................................................................ 8, 9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007).......................................................................................... 1, 5

*Bazzelle v. Novocure Ltd.*,
2025 WL 843668 (S.D.N.Y. Mar. 18, 2025) ................................................................. 17

*Boluka Garment Co., Ltd. v. Canaan Inc.*,
547 F. Supp. 3d 439 (S.D.N.Y. 2021)..................................................................... 23, 25

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021)............................................................................. 6

*Chapman v. Mueller Water Products*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020)........................................................................... 17

*City of Birmingham Firemen's & Policemen's Supp. Pension Sys. v. Ryanair Holdings PLC*,
2022 WL 4377898 (S.D.N.Y. Sept. 22, 2022)................................................................. 9

*City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*,
565 F. Supp. 3d 478 (S.D.N.Y. 2021)..................................................................... 16, 17

*City Pension Fund for Firefighters & Police Officers in the City of Tampa v. Generac Holdings, Inc.*,
765 F. Supp. 3d 775 (E.D. Wis. Feb. 7, 2025)............................................................... 19

*Cox v. Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ..................................................................................... 20

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014)........................................................................................... 24

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)......................................................................................................... 1

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)........................................................................................15, 20

*Fila v. Pingtan Marine Enter. Ltd.*,
195 F. Supp. 3d 489 (S.D.N.Y. 2016)............................................................................24

*Francisco v. Abengoa, S.A.*,
481 F. Supp. 3d 179 (S.D.N.Y. 2020)........................................................................14, 15

*Gissin v. Endres*,
739 F. Supp. 2d 488 (S.D.N.Y. 2010)............................................................................25

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)........................................................................20, 25

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015)............................................................................21

*Hensley v. IEC Elecs. Corp.*,
2014 WL 4473373 (S.D.N.Y. Sept. 11, 2014)................................................................19

*In re Adient plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020)....................................................................21

*In re Checkpoint Therapeutics Sec. Litig.*,
2025 WL 1434400 (S.D.N.Y. May 19, 2025) ..................................................................10

*In re Dexcom, Inc. Class Action Sec. Litig.*,
2025 WL 1399196 (S.D. Cal. May 14, 2025)....................................................................6

*In re DraftKings Inc. Sec. Litig.*,
650 F. Supp. 3d 120 (S.D.N.Y. 2023).......................................................................*passim*

*In re eSpeed, Inc. Sec. Litig.*,
457 F. Supp. 2d 266 (S.D.N.Y. 2006)............................................................................21

*In re Gildan Activewear, Inc.*,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)........................................................................15, 17

*In re Hain Celestial Grp. Inc. Sec. Litig.*,
2022 WL 18859055 (E.D.N.Y. Nov. 4, 2022)..................................................................22

*In re Hansen Nat. Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007) ..........................................................................22

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021)............................................................14, 18

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) .......... 25

*In re Longtop Fin. Techs. Ltd. Sec. Litig.*,
910 F. Supp. 2d 561 (S.D.N.Y. 2012) .......... 20

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014) .......... 11, 13, 15, 21

*In re Mylan N.V. Sec. Litig.*,
666 F. Supp. 3d 266 (S.D.N.Y. 2023) .......... 23

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) .......... 23, 24

*In re Sanofi Sec. Litig.*,
87 F. Supp. 3d 510 (S.D.N.Y. 2015) .......... 1

*In re Supercom Inc. Sec. Litig.*,
2018 WL4926442 (S.D.N.Y. Oct. 10, 2018) .......... 21

*In re Wachovia Equity Sec. Litig.*,
753 F. Supp. 2d 326 (S.D.N.Y. 2011) .......... 16, 18

*Johnson v. Siemens AG*,
2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) .......... 20

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001) .......... 15, 18

*Kraft v. Third Coast Midstream*,
2021 WL 860987 (S.D.N.Y. Mar. 8, 2021) .......... 25

*Krouner v. Am. Heritage Fund*,
899 F. Supp. 142 (S.D.N.Y. 1995) .......... 11

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .......... 22

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) .......... 5, 12, 14

*Lucescu v. Zafirovski*,
2018 WL 1773134 (S.D.N.Y. Apr. 11, 2018) .......... 19

*Marquez v. Bright Health Grp., Inc.*,
755 F. Supp. 3d 266 (E.D.N.Y. 2024) .......... 19

*Meyer v. Organogenesis Holdings Inc.*,
727 F. Supp. 3d 368 (E.D.N.Y. 2024) .......... 19

*North Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016).......... 17, 18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000).......... 7, 18

*Ong v. Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018).......... 9

*Pitman v. Immunovant Inc.*,
2024 WL 964258 (E.D.N.Y. Feb. 25, 2024).......... 21

*Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*,
11 F.4th 90 (2d Cir. 2021) .......... 24

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*,
2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) .......... 7

*Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012).......... 23

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004).......... 6

*Russo v. Bruce*,
777 F. Supp. 2d 505 (S.D.N.Y. 2011).......... 15

*Saraf v. Ebix, Inc.*,
632 F. Supp. 3d 389 (S.D.N.Y. 2022).......... 21

*SEC v. Rio Tinto plc*,
41 F.4th 47 (2d Cir. 2022) .......... 24

*Singh v. Deloitte LLP*,
123 F.4th 88 (2d Cir. 2024) .......... 9

*Smith v. PureCycle Techs., Inc.*,
2024 WL 5186586 (S.D.N.Y. Dec. 20, 2024) .......... 12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).......... 15

*U.S. v. Anderson*,
2006 WL 1580023 (D. Minn. June 5, 2006) ........ 16

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ........ 23

*Welgus v. TriNet Grp., Inc.*,
2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ........ 11

**STATUTES**

15 U.S.C. § 78u-4(b)(1) ........ 5

15 U.S.C. § 78u-4(b)(2) ........ 5, 15

15 U.S.C. § 78u-4(b)(3)(A) ........ 5

15 U.S.C. § 1350(b) ........ 21

## PRELIMINARY STATEMENT[1]

The securities laws do "not provide investors with broad insurance against market losses." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Yet that is exactly what Plaintiffs seek. Faced with a stock drop following a biased (and false) short-seller report, Plaintiffs boil the ocean in search of a false or misleading statement on which to pin their losses. They have not found one. Instead, Plaintiffs string together allegations challenging two categories of statements: (1) factual statements referencing the number of users in Zeta's opt-in dataset; and (2) Zeta's denials of a self-interested short-seller's accusations that Zeta operates so-called "consent farms." But Plaintiffs fail to establish a single actionable false or misleading statement, or to raise a strong inference of scienter as to any Defendant. The Complaint should be dismissed on several grounds.

*First*, Plaintiffs allege Zeta, a cutting-edge digital marketing company with a vast database of user data, lied to the market about the number of users who provided opt-in consent for sharing data. Specifically, Plaintiffs assert Defendants falsely stated Zeta had 240+ million individuals in its opt-in dataset. Plaintiffs are wrong, and even the sources cited in the Complaint confirm that 240+ million users did, in fact, provide opt-in consent for sharing data. Plaintiffs' misguided contention that Zeta had less than 240 million users in its opt-in dataset confuses digital marketing opt-ins with email marketing opt-ins (a *subset* of opt-in users).

*Second*, Plaintiffs rely on a report issued by Culper Research, a short seller seeking to cause—and profit from—a decline in Zeta's stock price (the "Culper Report"). Among other falsehoods, the Culper Report spuriously claims Zeta operates websites that deceive users into

---

[1] Citations and quotations are omitted, emphasis is added, and "Ex. _" citations refer to exhibits in the accompanying declaration. The Court may consider documents incorporated by reference, SEC filings, and "information already in the public domain." *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 539 n.13 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). "Complaint" refers to the Amended Class Action Complaint, ECF No. 92 (Ex. 1, cited as "¶ _").

providing data, or "consent farms." Zeta swiftly denied the allegations and provided additional context and clarity about its data collection practices. Plaintiffs have no factual allegations, let alone particularized ones, supporting their claims that Zeta's denials were false or misleading. Plaintiffs' attempts to muster up facts through anonymous witnesses—an unnamed "expert" whose "methodology" amounts to little more than trawling the internet and former employees who did not work in data collection—do nothing to salvage these fatal flaws.

*Third*, Plaintiffs' claims fail for the independent reason that the Complaint does not raise a strong inference that Defendants acted with scienter. Plaintiffs do not allege that three of the four Defendants benefited from any purported fraud. And their conspiratorial allegations that Zeta's CEO leveraged inside information to sell stock secretly via various trusts make little sense, and do not support scienter given that he did not control any of the trusts and Plaintiffs have pled nothing that raises suspicion about the timing or amount of the purported sales. The rest of Plaintiffs' hodgepodge scienter theories are speculative and allege no facts, internal documents, or confidential witnesses with any inside knowledge to contradict the challenged statements.

*Fourth*, Plaintiffs fail to advance a viable theory of loss causation for the consent farm allegations. Of the purported corrective disclosures, only the Culper Report discusses consent farms, but all of the challenged statements come *after* that report. Also, the corrective disclosures on March 10, 2025 did not reveal anything to the market and thus cannot support loss causation.

*Finally*, Plaintiffs' undeveloped "scheme liability" claim fails under settled law.

## BACKGROUND

### A. Zeta Is a Data Advertising Revolutionary

Founded in 2007, Zeta is an industry leading, data-driven, and cloud-based marketing technology enterprise that empowers companies to acquire, grow, and retain customers. ¶¶ 3-4. Zeta processes and analyzes data collected from online consumers, which it uses to enhance the

marketing products it offers to its corporate customers. ¶ 41. Zeta obtains data through a variety of sources, including owned platforms it acquired such as Disqus, Apptness, and ArcaMax. ¶ 45.

The Individual Defendants are all Zeta officers: David Steinberg is Zeta's co-founder and CEO; Christopher Greiner is the Chief Financial Officer; Neej Gore is the Chief Data Officer; and Benjamin Hayes is the Senior Vice President, Privacy and Chief Privacy Officer. ¶¶ 28-31.

### B. Zeta's Dataset Includes 245 Million Individuals Who Gave Opt-In Consent

Internet users generate a host of data available to digital marketers, including demographic, behavioral, transactional, and preference data. ¶ 79. Online marketing can take several forms, including: (1) digital marketing, or the broad use of digital channels and platforms (such as websites, social media, and search engines) to promote products or services to consumers via targeted advertisements; and (2) email marketing, a subcategory of digital marketing in which companies and advertisers send marketing emails directly to customers who have consented to receive them. Ex. 3, Data Summit Slides at 29; Ex. 4, 11/20/24 Slides at 6, 11.

Zeta became a market leader by building a dataset representing more than 240 million consumers who consented to the use of their data for marketing purposes—or "opted-in." ¶ 5. In its communications to its shareholders and the SEC, Zeta described how it defined opted-in data:

> The principal way that we collect individual opted-in data is directly from the consumers *when they register or interact* with our platform (such as the DISQUS commenting system), or with partners' services. We also use various tracking technologies, both proprietary and those provided through third-party suppliers in order to connect to individuals across marketing channels for the purpose of targeting consumers and delivering campaigns.

Ex. 5, 2023 10-K at 15.

There are different types of consumer consent. For digital marketing, Zeta obtains opt-in permission from users who register for a website or agree to terms of service. *Id*. at 6. For email marketing, which constitutes a subset of the 245 million users in Zeta's broader opted-in dataset,

users must provide specific consent to receive emails. *Id.*; Ex. 3, Data Summit Slides at 29.

### C. Short-Seller Culper Research Launches an Attack and Zeta Responds

On November 13, 2024, Culper Research issued the Culper Report, which negatively characterized Zeta's data collection practices, particularly Zeta's methods of obtaining opt-in data. ¶¶ 86-87. While the Culper Report made other untrue allegations that are neither mentioned nor challenged in the Complaint, as relevant here, it accused Zeta of engaging in deceptive practices through "consent farms," or websites designed to collect consumer data under false pretenses such as fake job applications or stimulus checks. Ex. 6, Culper Report at 2. The Culper Report claimed Zeta's acquisitions of Apptness and Arcamax were integral to the alleged consent farming operations, that Aptness and Arcamax leveraged deceptive methods to gather consumer data, and that data from those entities significantly contributed to Zeta's revenue growth. *Id.* at 17-18. The report bore all the characteristics of a short attack, in which an investor with a short position in a stock publishes a negative "report" on the company in order to drive down the stock price and profit from its position. *See id.* at 1. Shortly after publication, Zeta's stock declined. ¶ 10.

Later that day, Zeta issued a press release intended to correct the record. Ex. 7, 11/13/24 Press Release. Among other things, Zeta explained that Culper was a short seller and that its attack was based on conjecture and misrepresentations, including inaccurately cited financial metrics. *Id.* Zeta expressed confidence in its accounting processes, data collection practices, and compliance with applicable laws, denied that it operated so-called "consent farms," and emphasized that the contributions from Apptness and Arcamax are not material to its business. *Id.* Zeta also directed investors to review its financial statements for accurate information. *Id.*

On December 9, 2024, Zeta hosted its annual "Data Summit" investor conference. Ex. 3, Data Summit Slides at 1. At the summit, Gore discussed Zeta's data privacy practices in detail and explained the important distinction between the larger umbrella of digital permission and the

smaller subset of email permission. His presentation included a slide, which explained to the audience the difference between digital marketing and email marketing, and reaffirmed that Zeta's data cloud included 245 million "US Individuals Providing Permission to Online Tracking":




*Id.* at 29. On February 26, 2025, Zeta filed its 2024 10-K. Among other updates, Zeta revised its description of its dataset, calling it "Zeta's Data Set," rather than the "Opted-In Data Set." ¶ 121.

## <u>ARGUMENT</u>

### I. PLAINTIFFS FAIL TO PLEAD A SECTION 10(B) CLAIM

To assert a Section 10(b) claim for securities fraud, Plaintiffs must plead facts showing (1) a material misrepresentation or omission; (2) scienter; and (3) loss causation. *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 790 (S.D.N.Y. 2020). They must also satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, which require Plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and "with respect to each [alleged] act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (*i.e.*, scienter). 15 U.S.C. §§ 78u-4(b)(1), (2); *ATSI*, 493 F.3d at 99; Rule 9(b). Complaints that fail to meet these standards must be dismissed. 15 U.S.C. § 78u-4(b)(3)(A).

#### A. Plaintiffs Fail to Plead Any Actionable Misstatements or Omissions

Plaintiffs challenge nineteen statements falling into two categories: (1) statements that

Zeta's opted-in dataset had 240+ million users; and (2) statements denying that Zeta operated so-called consent farms. *See* Ex. 2, Statement Chart. Yet "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Plaintiffs fail to meet this basic requirement.

**1. The Complaint Reflects Impermissible Puzzle Pleading**

The Complaint reflects impermissible "puzzle pleading" and should be dismissed on that basis alone. "Plaintiffs in this circuit have long been on notice that a complaint predominantly marked by lengthy block quotes followed by pro forma reasons why the statements quoted are allegedly false fails to state a claim because it is insufficiently particular under the PSLRA." *Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 477–78 (S.D.N.Y. 2021). But that is precisely what Plaintiffs have done here. The 160-page Complaint purports to recite the challenged statements, but it does so by impermissibly "relying primarily on bolded text in [lengthy] block quotations." *Id.*; *see In re Dexcom, Inc. Class Action Sec. Litig.*, 2025 WL 1399196, at *5 (S.D. Cal. May 14, 2025) (unexplained emphases "introduce[] additional ambiguity" and constitute puzzle pleading). Although Defendants have attempted to identify the challenged statements in Exhibit 2 (something Plaintiffs could have done to disentangle their allegations and avoid this pleading problem, but did not), the Complaint is exactly the kind of pleading that fails to meet the particularity requirement because it "does little to describe what portion of each quotation constitutes a false representation, instead placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts." *Born*, 521 F. Supp. 3d at 479.

**2. Allegations Based on the Purported Analysis of an Anonymous "Expert" Should Be Disregarded**

Plaintiffs attempt to rely on an anonymous "expert" to support their claims, *e.g.*, ¶¶ 130-

62, but the purported expert's allegations fail to supply the particularized facts required to survive a motion to dismiss and should be disregarded. "[W]hen relying on expert opinions as the basis for pleading securities fraud, plaintiffs must allege with sufficient particularity that the expert was in a position to know the relevant fact claimed." *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, 2024 WL 5399664, at *17 (N.D. Cal. Sept. 18, 2024); *see Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000) (same standard for confidential witnesses). Thus, allegations that omit "information about the [expert's] qualifications, how the analysis was performed, or the data upon which the [expert] relied" must be rejected. *CareDx*, 2024 WL 5399664, at *17; *see also Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 372–73 (S.D.N.Y. 2023) (rejecting allegations from "an anonymous valuation expert" because the complaint "does not set out the factual bases for that secondhand opinion . . . nor provide any information as to the identity, qualifications, or methodology of the expert that would tend to support his or her reliability").

Plaintiffs' purported expert—proffered anonymously without a declaration, CV, or list of sources relied upon—misses the mark in every respect. Plaintiffs vaguely describe him as a "data science expert" with a PhD in "Information Management and Systems" who "has worked with Fortune 100 firms to develop privacy and security solutions." ¶¶ 130-31. Notably absent are any specifics. There are no allegations, let alone particularized facts, describing where he received his credentials, the companies with which he has worked, the nature of his research, whether he has any experience with the kinds of analyses he purports to perform here, or whether he has any specific understanding of Zeta's industry or the regulatory framework in which it operates.

Likewise, the methodologies and data he used to perform his "analysis" are not alleged at all. For example, Plaintiffs claim the "expert" analyzed data from "Semrush," which the Complaint describes as "a digital marketing analytics firm that sources online traffic estimates,"

to conclude that certain websites were associated with a "massive scale of collection of data from individuals." ¶133 & n.57. But Plaintiffs have not provided any information about the parameters or techniques the "expert" used to analyze this data, and much of the rest of his "analysis" appears to have been based, not on any sophisticated method or training, but on anecdotal observations from visiting websites (which anyone, with or without a PhD, could do). *See* ¶¶ 138-40, 144-46.

These missing details are essential to assess whether the "expert" possesses the information or experience necessary to proffer his opinions. These allegations should be disregarded.

**3. Statements About Zeta's "Opt-In" Dataset Were Not False**

Plaintiffs challenge eight statements regarding the number of opted-in consumers in Zeta's dataset—all of which either specifically identify the number as 240 (later, 245) million or describe Zeta's opted-in dataset as "one of the largest"—by asserting Defendants either mischaracterized Zeta's data as opted-in or misstated the number of opted-in users in the dataset. *See* ¶¶ 184-95, 206-07, 218-19; Ex. 2, Statement Chart. These allegations fail for multiple reasons.

*First*, Plaintiffs fail to identify a false or misleading statement of fact. Citing the way some bloggers and other unofficial sources use the phrase "opt in," Plaintiffs complain Zeta misused that term. *E.g.*, ¶ 55. But investors do not rely on blogs to interpret statements issuers and executives make in SEC filings or earnings calls; investors turn to the context the company itself provides. *See Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 353-54 (2d Cir. 2022) ("*BMS*") (where company "made clear at all times" it was not defining "strong," plaintiffs could not rely on outside sources for interpretation). Zeta expressly disclosed that it collected "individual opted-in data . . . directly from the consumers when they register or interact with our platform (such as the DISQUS commenting system), or with partners' services." Ex. 5, 2023 10-K at 15. Nothing in Zeta's statements to investors indicated that its opt-in data collection always required users to "check a box" or take any action beyond what Zeta disclosed. And Zeta's

disclosure takes on particular weight given the lack of consensus in the broader market as to what constitutes opted-in data—indeed, *Plaintiffs' Complaint* is internally inconsistent. *Compare* ¶ 54 (asserting "opt-in" requires a user to "take some affirmative action") *with* ¶ 168 (claiming "opt-in" requires a user "to check a box"). Because the Complaint itself "reflects the lack of consensus," Zeta "could not mislead" investors by its use of that term. *BMS*, 28 F.4th at 354.

*Second*, even if the Court considers the allegations advanced by Plaintiffs' anonymous "expert" (and it should not), those allegations cannot save the Complaint. ¶¶ 167-70. The "expert" opines that data collected by Zeta from its Disqus platform "was not collected under an 'opt-in' framework of consent." *Id*. But the sum of the *facts* supporting this conclusion is a screenshot of the Disqus registration page, which shows on its face that Disqus users were required to consent to the site's privacy policy and terms of service to register for the platform—exactly as Zeta disclosed—and thus opted in to sharing data. ¶ 167 ("All users of our service are also subject to our Terms of Service," hyperlinked). The remainder of the so-called analysis proffered by the "expert" is little more than a difference of opinion about what constitutes opt-in data, an opinion that is inconsistent with Zeta's public statements. Regardless of their provenance, "opinions cannot substitute for facts under the PSLRA." *BMS*, 28 F.4th at 354; *Singh v. Deloitte LLP*, 123 F.4th 88, 95 n.9 (2d Cir. 2024) ("an opinion cannot 'rescue' a deficient pleading"); *City of Birmingham Firemen's & Policemen's Supp. Pension Sys. v. Ryanair Holdings PLC*, 2022 WL 4377898, at *3 (S.D.N.Y. Sept. 22, 2022) ("expert opinions are 'inappropriate at the pleading stage'" and would not salvage defects in PSLRA complaint). Accordingly, even opinions from *named* experts are frequently stricken from securities fraud complaints because such analyses were created "for the purpose of this litigation" and generate "evidentiary uncertainty" inappropriate for resolution at the pleading stage. *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 224

(S.D.N.Y. 2018); *see In re Checkpoint Therapeutics Sec. Litig.*, 2025 WL 1434400, at *26 (S.D.N.Y. May 19, 2025). And, to the extent Plaintiffs claim the "expert's" "analysis" of websites other than Disqus supports the falsity of the opt-in statements, that, too, suffers from the same flaws as his Disqus "analysis," plus the additional flaw that Plaintiffs do not allege the hodgepodge of websites the expert vaguely claims were "Zeta-affiliated" even contributed to 245 million "opted-in" figure. *See, e.g.*, ¶¶ 148, 154.

*Third*, Gore's statement at the Zeta Data Summit in December 2024, that Zeta had 110 million "opt-in ***email*** permission" users, ¶ 109; *see also e.g.*, ¶¶ 185, 188, 191, 192, does not reveal the falsity of any statements regarding the Company's 240+ million opted-in digital marketing users. By selectively emphasizing a partial phrase, Plaintiffs try to make it appear as though Gore revised Zeta's opt-in figures from 245 to 110 million. Plaintiffs are wrong. Not only do Plaintiffs elide Gore's modifier that the 110 million users were those for whom Zeta "actually ha[s] opt-in *e-mail* permission," a "*subset*" of the larger dataset, ¶ 109, and his explanation a few sentences prior that "*digital and email permission are different*," *id.*, Plaintiffs' characterization is contradicted by the very slide that accompanied Gore's statement. On that slide, Zeta explained that while 245 million individuals had provided "permission to online tracking" as of November 2024, 110 million had provided "permission *to email*"; that is, a subset had provided permission *to receive marketing emails*, not just provided consent to digital tracking. Ex. 3 at 29; *supra* at 3. Far from undermining the opt-in statements, the Data Summit reaffirms their accuracy.

*Finally*, Zeta's decision to revise the description of its dataset in its 2024 10-K to "refine[] [its] terminology to better reflect the evolving nature of data permissions" does not support Plaintiffs' allegations of fraud. Ex. 9, 3/10/25 Statement. Falsity cannot be inferred from this terminology change as a matter of law because "if the law viewed a company's editing or removal

of language from an SEC filing as a tacit admission that the language was false when made, no public company would ever remove disclosures from its filings." *Welgus v. TriNet Grp., Inc.*, 2017 WL 6466264, at *8 (N.D. Cal. Dec. 18, 2017), *aff'd*, 765 F. App'x 239 (9th Cir. 2019); *Krouner v. Am. Heritage Fund*, 899 F. Supp. 142, 147 & n.2 (S.D.N.Y. 1995) (refusing to consider revisions in a prospectus when evaluating whether earlier SEC filings were misleading). Even so, Plaintiffs do not, and cannot, allege that this textual revision constituted a change in the quality of Zeta's underlying data or the uses to which it could put that data. Indeed, the Company simultaneously reaffirmed that "the Zeta data set includes 245 million US individuals that provided permission to online tracking by agreeing to publisher terms of service." Ex. 9, 3/10/25 Statement. There is no discernible difference between this description and the prior disclosure that what Zeta previously described as opted-in data had been collected "directly from the consumers when they register or interact with our platform . . . or with partners' services." Ex. 5, 2023 10-K at 15. These revisions did not alter the truth of the opt-in statements at the time they were made, and "without *contemporaneous* falsity, there can be no fraud." *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014).

#### 4. Statements Denying Zeta's Use of "Consent Farm" Were Not False

Twelve challenged statements are denials that Zeta "operate[s] consent farms" (alleged as websites that use deceptive means to collect data, ¶ 9), and affirmances that users who opt-in to Zeta's dataset receive a value exchange. ¶¶ 196-205, 207-19 (¶ 218 addresses both opted-in data and consent farms); Ex. 2, Statement Chart. Plaintiffs again fail to allege particularized facts showing these statements were false or misleading, for the simple reason that they were not.

Zeta has always denied using consent farms, so Plaintiffs rely instead on the Culper Report and vaguely described confidential sources to plead falsity. *E.g.*, ¶ 197. None withstands scrutiny. The authors of the Culper Report—which begins, "We are short Zeta" and is preceded by a long

disclaimer disavowing any responsibility for the research, Ex. 6 at 1-2—"ha[d] an obvious motive to exaggerate the infirmities of the securities in which they speculate." *Long Miao*, 442 F. Supp. 3d at 801. "[T]o the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic interest in driving down the company's stock price—these allegations must be considered with caution." *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023); *Smith v. PureCycle Techs., Inc.*, 2024 WL 5186586, at *12 (S.D.N.Y. Dec. 20, 2024) ("speculative," uncorroborated short-seller reports "are fairly discounted or put aside altogether").

The Culper Report does not survive the critical analysis required when a financially motivated short seller supplies securities fraud allegations. *See DraftKings*, 650 F. Supp. 3d at 154. In fact, much of the report is not about Zeta at all; it focuses on an FTC investigation of consent farms operated by a different company, Fluent. Ex. 6 at 15-17, 18-19, 26. But neither the Culper Report nor the Complaint alleges that *Zeta* is, or has ever been, the subject of an FTC investigation into its data collection practices (it has not). The Culper Report also relies on anonymous former employees, particularly for the contention that Arcamax and Apptness were significant revenue drivers to Zeta. *Id.* at 18. But reliance on such anonymous sources—questionable at best—is particularly suspect in the hands of a financially interested short seller:

> Relevant here, the case law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on "confidential" or anonymous sources, without corroboration. In that circumstance, the risk of motivated reporting by the author of the short-seller report is twinned with the reliability concerns presented by anonymous sourcing recognized in *Novak*.

*Long Miao*, 442 F. Supp. 3d at 801.

The anonymous former employees in the Culper Report would not survive dismissal if pled in a complaint; they are devoid of any detail such as titles, responsibilities, or the time periods in

which they worked at Zeta. Ex. 6 at 18. The allegations are even less reliable when siphoned through the hearsay of a short seller. *DraftKings*, 650 F. Supp. 3d at 154 ("there is still greater need for care" when relying on anonymous witnesses in a short-seller reports because the author "is not an attorney with professional obligations to the Court"). Notably, the allegations about Arcamax and Apptness are inconsistent with Zeta's public statements—which Plaintiffs do not otherwise challenge—that indicate those sites represent a tiny fraction of Zeta's data sources. *See, e.g.*, Ex. 4, 11/20/24 Slides at 10; Ex. 7, 11/13/24 Press Release at 1. The Culper Report's speculative assertions bear all the hallmarks of unreliability, and allegations based upon it should be "put[] aside." *DraftKings*, 650 F. Supp. 3d at 164.

The Complaint also attempts to undermine Defendants' denials that Zeta operated "consent farms" by relying on Plaintiffs' anonymous "expert," who purports to opine that certain websites were "'consent farm[s]' under the FTC standard"; that "user information is being transmitted to Zeta through deceptive means"; and that certain websites used "leaky forms behavior." ¶¶ 137-39, 152, 159. Again, this purported analysis is unreliable, conclusory, and should be disregarded. For example, the "expert" opines that certain websites (their affiliation with Zeta is unalleged or vaguely pled) used "leaky forms" whereby information was collected from users before they consented. ¶¶ 148-52. But these allegations are uncorroborated and wholly conclusory; at no point does the "expert" explain *why* he believed the forms were "leaky" or what facts supported that opinion. ¶¶ 148-53. There is no basis to credit his opinion.

**5. Plaintiffs' Confidential Witnesses Should Be Disregarded**

The alleged statements of six anonymous former employees ("FEs"), ¶¶ 34-39, cannot salvage Plaintiffs' claims. To rely on anonymous FEs, "those individuals must provide an adequate basis for believing that the defendants' statements were false." *Lululemon*, 14 F. Supp. 3d at 579. Courts consider (1) whether the FE is described with specificity such that he was in a

position to know the facts attributed to him; (2) the timing of the FE's account; (3) whether the FE's factual allegations are pled with sufficient particularity; and (4) whether the facts attributed to the FE are corroborated. *DraftKings*, 650 F. Supp. 3d at 154.

Here, the FEs' "positions and job responsibilities are not described at a sufficient level of particularity to indicate a high likelihood that they actually knew facts underlying their allegations." *Long Miao*, 442 F. Supp. 3d at 803; *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500, at *17 (S.D.N.Y. Sept. 22, 2021) (disregarding FEs where "threadbare descriptions of titles and functions do not indicate access to knowledge on the issues"). The FEs' titles and positions are vague, but critically, *none* is alleged to have worked on data collection, the subject of the challenged statements. Instead, all appear to have worked in roles involving the use of that data by Zeta's clients: FE-1 in and FE-2 in developing or maintaining client projects or programs; FE-3 and FE-5 in marketing and sales; and FE-4 and FE-6 in account management. ¶¶ 34-39. Indeed, FE-5 "described Zeta as 'very siloed' and not sharing internally on how the data collection side works," affirmatively demonstrating that these client-facing employees would *not* be in a position to know "how the data collection side works." ¶ 174. That alone is fatal.

This critical disconnect is reflected in the allegations attributed to the FEs, nearly all of which are irrelevant to Plaintiffs' theory. For instance, several FEs claim Zeta *used* non-opt-in data improperly. *See* ¶¶ 179-81. These allegations are wholly unconnected to the challenged statements, which are about how Zeta *collected* its data. Further, all but one FE (FE-6) left Zeta before the Class Period—and FEs 3, 4, and 5 left *at least six months* before the first challenged statement—further undermining their allegations. *See* ¶¶ 34-39. Courts view with particular skepticism "allegations where the confidential witnesses left the company before the class period," *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020), because "without

*contemporaneous* falsity, there can be no fraud," *Lululemon*, 14 F. Supp. 3d at 571.

Nor are the FEs' factual allegations "pled with sufficient particularity." *DraftKings*, 650 F. Supp. 3d at 154. The FEs recount vague rumors—not facts—about what they heard, or did not hear, about Zeta's dataset. *E.g.*, ¶¶ 287-88. For instance, FE-5 fielded "lots of questions" and was told to "dance around the subject" of how Zeta's dataset was sourced, ¶¶ 173-74; FE-3 allegedly "detailed how Zeta was internally 'quiet' about how it gathered consumer data," ¶ 178; and FE-1 claims the source of Zeta's data was "nebulous" and "cloudy," ¶ 177. These "general and second-hand" accounts do not meet the particularity bar. *Francisco*, 481 F. Supp. 3d at 208.

**B. Plaintiffs Fail to Plead a Strong Inference of Scienter**

The Complaint also does not plead a "strong inference" of scienter (*i.e.*, an "intent to deceive, manipulate, or defraud") for any Defendant. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); 15 U.S.C. § 78u-4(b)(2). The "strong" inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. Scienter requires particularized facts showing (1) "motive and opportunity to commit fraud"; or (2) "strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The Complaint alleges neither.

**1. Plaintiffs Have Not Pled Motive and Opportunity**

To establish motive and opportunity, Plaintiffs must plead a "concrete and personal benefit" by *each* Defendant from any purported fraud. *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). Plaintiffs do not allege that Greiner, Gore, or Hayes sold any stock during the Class Period, a failure that "fatally undermines" Plaintiffs' scienter allegations. *Russo v. Bruce*, 777 F. Supp. 2d 505, 518 (S.D.N.Y. 2011); *Acito v. IMCERA Group, Inc.*, 47 F. 3d 47, 54 (2d Cir. 1995) (absence of sales "undermines" inference of scienter); *In re Gildan Activewear, Inc.*, 636 F. Supp.

2d 261, 271-72 (S.D.N.Y. 2009) (similar). In fact, Plaintiffs do not plead that those Defendants had a motive to commit fraud or benefited in any concrete way from the alleged fraud *at all*.

Plaintiffs concede that Steinberg, too, did not sell any stock in open-market transactions during the Class Period. ¶ 223. Instead, the crux of Plaintiffs' motive allegations is that Steinberg allegedly gifted stock to a variety of independent trusts (the "Independent Trusts"), some of which subsequently filed Forms 144 indicating an intent to sell. ¶¶ 228, 235-39. These purported sales do not support an inference of scienter because Plaintiffs have not alleged that Steinberg exercised control over any of the Independent Trusts' sales or that any sales were unusual or suspicious in timing or amount. *City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, 565 F. Supp. 3d 478, 488-89 (S.D.N.Y. 2021). Indeed, Plaintiffs' allegations demonstrate the opposite.

*First*, the Complaint lacks any particularized facts that Steinberg, who Plaintiffs allege was the trusts' settlor, ¶ 230, retained control over the Independent Trusts' investment decisions or influenced those decisions in any way. To the contrary, the Forms 4 filed by Steinberg clearly disclose that the Independent Trusts were "managed by an independent trustee." ¶ 228; Ex. 12. Accordingly, the Independent Trusts' sales are not the type of "insider trading" sufficient to support an inference of scienter. *Cf. U.S. v. Anderson*, 2006 WL 1580023, at *2 (D. Minn. June 5, 2006) (acquitting defendant of securities fraud based on insider trading where a "trustee independently sold the stock"); *see In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 349 (S.D.N.Y. 2011) (noting that "insider trading" can suffice to plead motive). Despite Plaintiffs' attempt to connect Steinberg to the independent trustees, Plaintiffs do not—and cannot—allege that Steinberg directed the trustees to sell or provided them with material non-public information about Zeta. That is fatal to Plaintiffs' tortured theory regarding the Independent Trusts' sales.

Moreover, Plaintiffs concede that many of "the proposed sales were being made in reliance

on Rule 10b5-1 trading plans." ¶ 237. While Plaintiffs claim the 10b5-1 plans evince that Steinberg controlled the Independent Trusts, ¶ 237, the mere existence of 10b5-1 plans does not support scienter in the absence of particularized facts to suggest that the trusts traded on material non-public information. In fact, the opposite is true—"[i]t is well established that trades under 10b5-1 plans do not raise a strong inference of scienter" precisely because they are non-discretionary. *Bazzelle v. Novocure Ltd.*, 2025 WL 843668, at *22 (S.D.N.Y. Mar. 18, 2025). Plaintiffs' failure to allege that Steinberg exercised discretion over *any* of the Independent Trusts' sales dooms their claims. *Gildan*, 636 F. Supp. 2d at 272.

*Second*, none of Plaintiffs' remaining allegations cast suspicion on the timing or the amount of the purported sales. Indeed, Plaintiffs do not allege when a single share was sold. *Farfetch*, 565 F. Supp. 3d. at 487; *Chapman v. Mueller Water Products*, 466 F. Supp. 3d 382, 411 (S.D.N.Y. 2020). And the dates the trusts filed Forms 144 also are not suspicious because there is no alleged connection between those dates and the alleged misstatements. *See Farfetch*, 565 F. Supp.3d at 488; *Gildan*, 636 F. Supp. 2d at 271 (sales "weeks before the principal allegation of material misstatement and many months before the release of any negative information" are insufficient). Plaintiffs' allegations that the Independent Trusts collectively sold more shares during the Class Period than in the preceding 378-day period, ¶ 227, do not plead scienter because Plaintiffs "have not explained why" the first day of the Class Period "holds any significance as the opening date"—Zeta had long described its dataset as opted-in prior to February 27, 2024. *North Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, 2016 WL 5794774, at *18 (S.D.N.Y. Sept. 30, 2016) (no scienter where "the totals are based on a time period with no apparent connection to the alleged fraud," *i.e.*, the Class Period); *e.g.*, Ex. 10, 2021 10-K at 1-2.

Nor have Plaintiffs alleged the purported sales were unusual in amount. Steinberg's

Forms 4 reporting gifts to the Independent Trusts reveal that the gifted shares "will also be used to satisfy any tax withholding obligations arising from the vesting of certain restricted stock awards." ¶ 236; Ex. 12, Forms 4. Plaintiffs have failed to allege any particularized facts to contradict this disclosure, and "the disposition of shares to pay taxes do[es] not demonstrate a [] motive to defraud." *MDC Partners*, 2016 WL 5794774, at *20. And while Plaintiffs try to downplay Steinberg's personal purchase of over 50,000 shares during the Class Period, ¶ 321, this show of faith *undermines*, rather than *supports*, an inference of scienter. *Wachovia*, 753 F. Supp. 2d at 349.

### 2. Plaintiffs Fail to Plead Conscious Misbehavior or Recklessness

Because Plaintiffs fail to allege a cognizable motive, they face the difficult task of establishing a strong inference that Defendants, without any reason to do so, recklessly engaged in fraud. *Kalnit*, 264 F.3d at 142 (without motive, allegations of scienter must be "correspondingly greater"). "Recklessness," in this context, is "not merely a heightened form of negligence," but must be "conscious . . . *i.e.*, a state of mind approximating actual intent." *Novak*, 216 F.3d at 312. Plaintiffs assert a scattershot of theories, none of which supports a strong inference of scienter.

Plaintiffs cannot establish scienter based on their FE allegations. ¶¶ 309-12. As explained, above, five FEs left Zeta before the Class Period; their allegations are just as "unmoored in time" with respect to scienter as they are as to falsity. *DraftKings*, 650 F. Supp. 3d at 160. And because none worked on data collection, the Complaint "does not plead facts indicating that [any FE] was in a position to know the important facts attributed to them" regarding the scienter of executives who were privy to that side of Zeta's operations. *Hebron*, 2021 WL 4341500, at *17.

Further, *none* of the FEs is alleged to have had any "personal contact" with *any* Individual Defendant during the Class Period and thus cannot speak to their states of mind. *Wachovia*, 753 F. Supp. 2d at 352. Plaintiffs only plead that FE-6 and Steinberg both attended *company-wide* "all-hands meetings," ¶ 271, but not that they interacted at those meetings or elsewhere—

underscoring the FEs' "lack of [direct] access" to Defendants. *Lucescu v. Zafirovski*, 2018 WL 1773134, at *12 (S.D.N.Y. Apr. 11, 2018); *Marquez v. Bright Health Grp., Inc.*, 755 F. Supp. 3d 266 (E.D.N.Y. 2024) (merely attending all-hands meetings insufficient to support scienter). Nor does any FE specifically identify any information the Individual Defendants supposedly had that contradicted their public statements. *See Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 n.1 (S.D.N.Y. Sept. 11, 2014) ("[C]onfidential source allegations must show that individual defendants actually possessed the knowledge highlighting the falsity of public statements.").

Plaintiffs' remaining sundry allegations also fail to plead a cogent inference of scienter. *First*, Plaintiffs point to Zeta's monitoring of its data collection practices. ¶¶ 259-62. But a company "diligently track[ing]" its data collection policies, ¶ 260, does not evidence scienter; rather, it supports the non-fraudulent inference that Zeta knew its dataset well and therefore did not lie about its size. *City Pension Fund for Firefighters & Police Officers in the City of Tampa v. Generac Holdings, Inc.*, 765 F. Supp. 3d 775 (E.D. Wis. Feb. 7, 2025) (no inference of scienter from allegations that defendant "closely monitored [its] business"). Plaintiffs assert no facts that any of the information tracked by Zeta contradicted the statements at issue (because it did not).

*Second*, Plaintiffs point to statements by "C-Suite and high-level executives" that Zeta validated opt-in consent user data and "was heavily invested in oversight of its data collection practices and integrity." ¶¶ 263-69. But Plaintiffs do not plead particularized facts to suggest that anyone in the reported opted-in population had *not* been validated, returning instead to their false and conclusory premise that the 240 million figure was inaccurate. Nor do Plaintiffs explain why statements about a company's "integrity" support a fraudulent intent (they do not). *E.g.*, ¶¶ 263, 321; *Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368, (E.D.N.Y. 2024) ("general allegations" are "insufficient to demonstrate" individual defendant's scienter).

*Third*, Plaintiffs' allegations that Defendants "would have" had access to certain information or discovered the "truth" based on their positions, ¶¶ 271, 308, are too speculative to give rise to strong inference of scienter. *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011). Plaintiffs "must do more than allege that the individual defendants or other [company] officers had or should have had knowledge of certain facts contrary to their public statements simply by virtue of their high-level positions, their general responsibility for monitoring [the company's] activities, and their access to insider information." *Johnson v. Siemens AG*, 2011 WL 1304267, at *15 (E.D.N.Y. Mar. 31, 2011); *see also Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) ("occup[ying] high-ranking positions . . . is insufficient to establish scienter").

*Fourth*, Zeta's response to the Culper Report's false accusations does not support scienter. ¶¶ 280-90. Plaintiffs selectively highlight specific statements, attempting to present them as "admissions," but fail to provide any facts showing a fraudulent intent. *E.g.*, ¶¶ 287, 290. The statement "Zeta is going to do a better job at being more transparent," for example, does not imply prior non-transparency unless accompanied by a "particularized showing" that the company knowingly or recklessly misled investors or omitted material information. *ECA*, 553 F.3d at 198. Nor does "refin[ing] [Zeta's] terminology to better reflect the evolving nature of data permissions" concede a prior lack of transparency. ¶ 290. Of course, a company can and should strive to improve transparency, especially when faced with a short attack; if anything, this increased commitment to transparency undermines an inference of fraud. *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 577-78 (S.D.N.Y. 2012) (internal investigation begun shortly after a short-seller report was issued undermined allegations of scienter).

*Fifth*, the SOX certifications by Steinberg and Greiner do not support scienter. ¶¶ 313-15. The certifications relate to Zeta's "financial condition," not the challenged statements, and Zeta's

reported financials are not alleged to have been false or misleading. ¶ 313; 18 U.S.C. § 1350(b); *see* Ex. 2, Statement Chart. Regardless, "SOX certifications will not support an inference of scienter where, as here, a plaintiff does not allege that the defendants had contemporaneous awareness of falsity." *Saraf v. Ebix, Inc.*, 632 F. Supp. 3d 389, 399 (S.D.N.Y. 2022).

*Finally*, Plaintiffs turn to the core-operations theory, which is of dubious validity, *see In re Supercom Inc. Sec. Litig.*, 2018 WL4926442, at *31 (S.D.N.Y. Oct. 10, 2018), and can never "independently establish scienter," *In re Adient plc Sec. Litig*, 2020 WL 1644018, at *29 (S.D.N.Y. Apr. 2, 2020). Plaintiffs' barebone allegations that the opted-in data was important to the Company are insufficient because Plaintiffs do not allege that any of the speakers "did not believe the truth of those statements" at the time they were made. *Lululemon*, 14 F. Supp. 3d at 582. Plaintiffs also argue that "it would be absurd to suggest that Defendants were unaware of" how Zeta obtained its data, ¶ 291; analysts frequently asked about Zeta's dataset, ¶¶ 298-308; and Gore's and Hayes's positions "required them to monitor" Zeta's data collection, ¶ 272. But Plaintiffs cannot establish scienter even when defendants "had access to . . . information and a duty to monitor" without alleging "specific instances" where Defendants received "contrary" information. *Pitman v. Immunovant Inc.*, 2024 WL 964258, at *20 (E.D.N.Y. Feb. 25, 2024). Without particularized allegations of how Defendants "must have known" the data was not, in fact, opted-in, the "core operations" theory fails. *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 (S.D.N.Y. 2006); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 176 (S.D.N.Y. 2015) ("broad allegations that Defendants 'knew'" statements were false "lack[ ] the specificity required").

### 3. The Non-Fraudulent Inference Is More Compelling

The more cogent and compelling inference here is non-fraudulent. Plaintiffs focus on the 2024 10-K's updated language describing Zeta's dataset. ¶¶ 120-21, 290. Rather than supporting an inference of fraud, however, Zeta's decision to change the way it described its dataset shows

that Zeta was laser-focused on transparency. The more compelling inference is simply what Zeta explained—the composition of Zeta's dataset was always described accurately, but the changing vocabulary of a rapidly evolving industry required Zeta to "refine[]" its choice of words to keep pace. Ex. 9, 3/10/25 Statement. Doing so "was a prudent course of action that weakens rather than strengthens an inference of scienter." *In re Hain Celestial Grp. Inc. Sec. Litig.*, 2022 WL 18859055, at *30 (E.D.N.Y. Nov. 4, 2022). Moreover, the more compelling inference from Zeta's emphatic insistence that it did not operate consent farms is that Zeta, in the wake of a predatory short-seller attack, needed to set the record straight; that Zeta never wavered supports that those denials were, and remain, true. *See In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1155 (C.D. Cal. 2007) (failure to plead any admissions by defendants militated against scienter).

### C. Plaintiffs Fail to Adequately Plead Loss Causation

Fatally, Plaintiffs have also not advanced a viable loss causation theory with respect to the "consent-farm" allegations or the March 10, 2025 purported corrective disclosures.

#### 1. No Allegations Show That "Consent Farm" Statements Caused Losses

The Culper Report is the only purported corrective disclosure addressing Zeta's alleged use of "consent farms," but it was published *before* any of the "consent-farm" denials Plaintiffs challenge. ¶ 335; Ex. 2, Statement Chart. The Culper Report (and the stock drop that followed) cannot possibly be a "a foreseeable *consequence*" of statements made *after* its publication, as loss causation requires. *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005).

The other three purportedly corrective disclosures—made on December 9, 2024, February 26, 2025, and March 10, 2025—did not corroborate *anything* about the Culper Report's false allegation that Zeta operates "consent farms." ¶¶ 339, 342, 345. To the contrary, Plaintiffs allege that during the December 9 Data Summit, "Defendants *doubled-down* on the claim that Zeta did *not* operate 'consent farms'" and, according to Plaintiffs, "continued to mislead the market."

¶¶ 339, 340. That is the opposite of a corrective disclosure. *See Boluka Garment Co., Ltd. v. Canaan Inc.*, 547 F. Supp. 3d 439, 445 (S.D.N.Y. 2021) ("[A] corrective disclosure . . . reveal[s] an alleged misstatement's falsity . . . ."). And the most Plaintiffs can muster with respect to the February 26, 2025 and March 10, 2025 disclosures is a conclusory assertion that they "partially corrected prior statements" and that "the market reacted negatively" to them. ¶¶ 340, 342-343, 345. Yet the only "disclosures" to which Plaintiffs point is that Zeta revised the phrase "Opted-In Data Set" to "Zeta's Data Set"—with no reference to consent farms at all. *Id.* That is "far too tenuous" a connection to support loss causation. *See Plumbers, Pipefitters & MES Loc. Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012) (no loss causation where "no logical connection" between alleged fraud and corrective disclosures).

**2. The March 10th Disclosures Do Not Support Loss Causation**

Plaintiffs also rely on two disclosures on March 10, but nothing new was revealed that day.

*First*, Plaintiffs claim a March 10, 2025 X (Twitter) post by *The Capitol Forum* somehow caused their losses. ¶ 345. But all the one-sentence post (which has only 1,525 views) contained was a link to an article published *three days prior*. Ex. 11, X Post. Plaintiffs do not allege the market reacted to anything in the article when it was published; nor do they explain why the market would react *only* to the "promot[ion]" of an article several days after publication. ¶ 345. Nor could they, as such a claim would be inconsistent with their allegation that "Zeta's common stock traded in an efficient market." ¶ 350; *Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017).

*Second*, in addition to the X post, Plaintiffs assert that Zeta's March 10 "Global Statement on Terminology Updates" corrected the challenged statements, but neither the "Global Statement" nor the X post—nor the March 7 article for that matter—"even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010); *In re Mylan N.V. Sec. Litig.*,

666 F. Supp. 3d 266, 325 (S.D.N.Y. 2023) (a corrective disclosure must contain "*new* fraud-related information."). "[A] negative characterization of already-public information" does not a corrective disclosure make. *Omnicom*, 597 F.3d at 512; *see Dalberth v. Xerox Corp.*, 766 F.3d 172, 188 (2d Cir. 2014). Both the March 7 and March 10 statements only discuss the changes in Zeta's 2024 10-K—information released weeks prior and in Zeta's own SEC filings—which a reasonable investor would obviously have reviewed. Exs. 9, 11; ¶ 15; *see* Ex. 8, 2024 10-K. Nor do Plaintiffs allege otherwise, conceding the *Capitol Forum* article merely "drew attention to" Zeta's 10-K and that the "Global Statement" statement "acknowledg[ed]" the language in the 10-K. ¶ 345. Neither of these statements were corrective, and Plaintiffs have not pled loss causation. *Id.*; *Fila v. Pingtan Marine Enter. Ltd.*, 195 F. Supp. 3d 489, 496-97 (S.D.N.Y. 2016) (article that merely "summariz[ed] and interpret[ed] the [defendant's] SEC filings" insufficient for loss causation).

## II. PLAINTIFFS FAIL TO PLEAD A SCHEME LIABILITY CLAIM

Plaintiffs cannot save their deficient fraud claims by repackaging them as a "scheme." To state a claim for scheme liability, Plaintiffs must plead with particularity all elements of a Section 10(b) and Rule 10b-5 claim, *and* "what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). "[M]isstatements and omissions cannot form the 'sole basis' for liability under the scheme subsections," and a complaint must allege "something extra." *SEC v. Rio Tinto plc*, 41 F.4th 47, 53 (2d Cir. 2022). Plaintiffs fail to clear this hurdle.

*First*, Plaintiffs identify no deceptive or manipulative act that would serve as "something extra." The scheme liability claim is based on the same alleged misstatements and omissions that form the basis of the 10(b) claim. *E.g.*, ¶¶ 382-83 (describing a "scheme" of Zeta's touting its 240+ million opt-in users and denying consent farms).

*Second*, Plaintiffs' allegations regarding the Independent Trusts' stock sales are "premised on a scheme the existence of which is not supported by allegations of fact but only surmise" and thus are insufficient. *Kraft v. Third Coast Midstream*, 2021 WL 860987, at *19 (S.D.N.Y. Mar. 8, 2021). As explained above, Plaintiffs have not adequately pled that Steinberg exercises control over the Independent Trusts. Plaintiffs admit Steinberg disclosed his gifts to the Independent Trusts via Forms 4, ¶¶ 228, 236, and all of the intended stock sales to which Plaintiffs point were publicly reported via Forms 144, such that the fact of the intended sales was fully public. *See Glaser*, 772 F. Supp. 2d at 584 (disclosure of sales on Forms 144 did not support scienter). Thus, the notion that Steinberg "secretly divested massive quantities of Zeta common stock" is contradicted by the Complaint.

*Third*, Plaintiffs allege Zeta "was complicit in Steinberg's scheme," ¶ 331, but that makes little sense. Far from particularized allegations suggesting that the Company worked in concert with Steinberg, as this allegation would suggest, Plaintiffs allege that Steinberg's trading activity *violated* Zeta policies. *Accord Gissin v. Endres*, 739 F. Supp. 2d 488, 514 (S.D.N.Y. 2010) (dismissal warranted where "scienter claim is implausible").

*Finally*, Plaintiffs fail to plead loss causation for their "scheme liability" claim. They assert that "Steinberg's scheme" of gifting shares to Independent Trusts "artificially inflated the value of Zeta's stock," ¶ 316, but the Complaint lacks allegations that the price of Zeta securities dropped once the purported "scheme" was discovered. *See Boluka*, 547 F. Supp. 3d at 446.

## III. PLAINTIFFS FAIL TO PLEAD A SECTION 20(A) CLAIM

Finally, a Section 20(a) claim requires a primary violation, which Plaintiffs have failed to allege. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016).

## CONCLUSION

The Complaint should be dismissed with prejudice.

Dated: July 11, 2025

Respectfully submitted,

*/s/ Colleen C. Smith*

Colleen C. Smith (admitted *pro hac vice*)
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
Email: colleen.smith@lw.com

Megan A. Behrman
Thomas J. Giblin
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email: megan.behrman@lw.com
thomas.giblin@lw.com

*Attorneys for Defendants*

**CERTIFICATE OF COMPLIANCE**

I, Colleen C. Smith, an attorney duly admitted *pro hac vice* to practice before this Court, hereby certify pursuant to Local Rule 7.1(c) of the United States District Courts for the Southern and Eastern Districts of New York and Rule 4(c) of Judge Dale E. Ho's Individual Rules and Practices in Civil Cases, that the foregoing Memorandum of Law was prepared using Microsoft Word, contains 8,500 words, and does not exceed 25 pages. In making this calculation, I have relied on the word and page counts of the word-processing program used to prepare the document.

Dated: July 11, 2025

*/s/ Colleen C. Smith*
Colleen C. Smith