**KAHN SWICK & FOTI, LLC**
Kim E. Miller
J. Ryan Lopatka
250 Park Ave., 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Fax: (504) 455-1498
kim.miller@ksfcounsel.com
j.lopatka@ksfcounsel.com


*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
David Saldamando
Alexandra E. Forgione
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Fax: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com


*Counsel for Lead Plaintiffs and*
*Lead Counsel for the Class*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE ZETA GLOBAL HOLDINGS CORPORATION SECURITIES LITIGATION | Case No. 1:24-cv-8961-DEH<br><br>**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |

## <u>TABLE OF CONTENTS</u>

**Page:**

Glossary of Certain Defined Terms ................................................................................... vi

I.     PRELIMINARY STATEMENT AND SUMMARY OF THE FACTS ............................ 1

II.    LAW AND ARGUMENT ......................................................................................... 2

    A.    The AC Adequately Alleges Material Misstatements and Omissions ................... 2

        1.    Defendants' "Puzzle Pleading" Challenge Is Baseless .............................. 3

        2.    Defendants Do Not Challenge Plaintiffs' Expert's Factual Findings ......... 4

        3.    The AC Provides Sufficient Particularity to Support the Credibility of Plaintiffs' Data Science Expert ............................................................ 4

        4.    The AC Alleges the Material Falsity of Opt-In Statements ....................... 5

        5.    The AC Alleges the Material Falsity of Statements Regarding Consent Farms and Whether Users Received a "Value Exchange" ........... 9

    B.    The AC Adequately Alleges Defendants' Scienter ............................................. 11

        1.    The AC Adequately Alleges Conscious Misbehavior and Recklessness .............................................................................................. 11

        2.    The AC Adequately Alleges Motive and Opportunity ............................ 17

        3.    The Most Compelling Inference Is Defendants' Fraudulent Intent .......... 19

    C.    The AC Adequately Alleges Loss Causation ...................................................... 20

        1.    The AC Alleges a Causal Link to Dataset Misrepresentations ................ 20

        2.    The AC Alleges a Causal Link to Consent Farm Misrepresentations ...................................................................................... 22

    D.    The AC Adequately Alleges Scheme Liability .................................................... 24

    E.    The AC Establishes Control Person Liability ...................................................... 25

III.   CONCLUSION ....................................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases**

*Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LF*,
    532 F. Supp. 3d 189 (E.D. Pa. 2021) ...................................................................................... 21

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    19 F.4th 145 (2d Cir. 2021) ............................................................................................ 4

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*,
    2023 WL 4249356 (S.D.N.Y. June 29, 2023) ................................................................ 4

*Anderson News, L.L.C. v. Am. Media, Inc.*,
    680 F.3d 162 (2d Cir. 2012) .................................................................................. 3, 17

*Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ............................................................................................ 6

*Ashley v. Deutsche Bank Aktiengesellschaft*,
    144 F.4th 420 (2d Cir. 2025) ........................................................................................ 7

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ...................................................................................................... 7

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
    423 F. Supp. 2d 348 (S.D.N.Y. 2006) .......................................................................... 11

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*,
    477 F. Supp. 3d 123 (S.D.N.Y. 2020) .......................................................................... 3

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
    433 F. Supp. 3d 515 (S.D.N.Y. 2020) .......................................................................... 3

*Cox v. Blackberry Ltd.*,
    660 F. App'x 23 (2d Cir. 2016) .................................................................................. 13

*E. Ohman J v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ........................................................................................ 4

*Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015) ........................................................................ 2, 11, 16, 19

*Freedman v. Value Health, Inc.*,
    958 F. Supp. 745 (D. Conn. 1997) .............................................................................. 14

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*,
    268 F. Supp. 3d 526 (S.D.N.Y. 2017) .......................................................................... 15

*Freudenberg v. E\*Trade Fin. Corp.*,
    712 F. Supp. 2d 171 (S.D.N.Y. 2010) ...................................................................... 6, 23

*George v. China Auto. Sys.*,
    2012 WL 3205062 (S.D.N.Y. Aug. 8, 2012) .............................................................. 19

*Glaser v. The9, Ltd.*,
  772 F. Supp. 2d 573 (S.D.N.Y. 2011) .................................................................. 12

*Gruber v. Gilbertson*,
  2018 WL 1418188 (S.D.N.Y. Mar. 20, 2018) ....................................................... 24

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
  324 F. Supp. 2d 474 (S.D.N.Y. 2004) .................................................................... 6

*In re Avon Sec. Litig.*,
  2019 WL 6115349 (S.D.N.Y. Nov. 18, 2019) ....................................................... 14

*In re Axsome Therapeutics, Inc. Sec. Litig.*,
  2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) ......................................................... 15

*In re Cassava Scis. Inc. Sec. Litig.*,
  2024 WL 4916373 (W.D. Tex. June 12, 2024) ...................................................... 22

*In re Chi. Bridge & Iron N.V., Sec. Litig.*,
  2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ........................................................ 22

*In re DraftKings Inc. Sec. Litig.*,
  650 F. Supp. 3d 120 (S.D.N.Y. 2023) .................................................................. 16

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) .................................................................. 17

*In re Estee Lauder Co., Inc. Sec. Litig.*,
  2025 WL 965686 (S.D.N.Y. Mar. 31, 2025) ................................................... 12, 16

*In re EZCorp, Inc. Sec. Litig.*,
  181 F. Supp. 3d 197 (S.D.N.Y. 2016) .................................................................. 15

*In re Hebron Tech. Co., Ltd. Sec. Litig.*,
  2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) ...................................................... 16

*In re Lottery.com, Inc. Sec. Litig.*,
  765 F. Supp. 3d 303 (S.D.N.Y. 2025) .................................................................. 14

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018) ....................................................... 13

*In re ProNetLink Sec. Litig.*,
  403 F. Supp. 2d 330 (S.D.N.Y. 2005) .................................................................. 25

*In re RenovaCare, Inc. Sec. Litig.*,
  2024 WL 2815034 (D.N.J. June 3, 2024) ............................................................. 25

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341 (S.D.N.Y. Apr. 22, 2016) ....................................................... 13

*In re Vivendi, S.A., Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016) ................................................................................. 3

*Johnson v. Siemens AG*,
  2011 WL 1304267 (E.D.N.Y. Mar. 31, 2011) ...................................................... 12

*Kusnier v. Virgin Galactic Holdings, Inc.*,
   639 F. Supp. 3d 350 (E.D.N.Y. 2022) ................................................................. 3

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005) ............................................................................ 23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ...................................................................... 20, 25

*Lozada v. TaskUs, Inc.*,
   710 F. Supp. 3d 283 (S.D.N.Y. 2024) .............................................................. 9

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
   601 U.S. 257 (2024) ...................................................................................... 8

*Meyer v. Organogenesis Holdings Inc.*,
   727 F. Supp. 3d 368 (E.D.N.Y. 2024) ............................................................ 12

*Miao v. Fanhua, Inc.*,
   442 F. Supp. 3d 774 (S.D.N.Y. 2020) ............................................................ 10

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ........................................................................ 17

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) .......................................................................... 15

*Oklahoma Firefighters Pension & Ret. Sys. v. Musk*,
   2025 WL 951231 (S.D.N.Y. Mar. 28, 2025) ............................................ 11, 24

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDX*,
   2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) ................................................. 4

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*,
   89 F. Supp. 3d 602 (S.D.N.Y. 2015) .............................................................. 16

*Plumbers, Pipefitters & MES Local Union 392 v. Fairfax Fin. Holdings, Ltd.*,
   886 2d 328 (S.D.N.Y. 2012) ..................................................................... 23, 24

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ........................................................................... 2

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
   732 F. Supp. 3d 300 (S.D.N.Y. 2024) ............................................................ 25

*Setzer v. Omega Healthcare Inv'rs, Inc.*,
   968 F.3d 204 (2d Cir. 2020) .......................................................................... 11

*Sills v. United Nat. Foods, Inc.*,
   2024 WL 4188324 (S.D.N.Y. Sept. 13, 2024) ................................................ 12

*Stadium Cap. LLC v. Co-Diagnostics, Inc.*,
   2024 WL 456745 (S.D.N.Y. Feb. 5, 2024) ..................................................... 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................... 11

*Welgus v. TriNet Grp., Inc.*,
   2017 WL 6466264 (N.D. Cal. Dec. 18, 2017) ........................................................... 5

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) ........................................................... 16

*Zornberg v. NAPCO Sec. Techs., Inc.*,
   778 F. Supp. 3d 516 (E.D.N.Y. 2025) ...................................................................... 19

**Statutes**

15 U.S.C. § 78u-4(b) ...................................................................................................... 2

**Other Authorities**

John C. Coffee, Jr., *Activist Short Selling Today: The Two Sides of the Coin*,
   CLS Blue Sky Blog (July 7, 2020) ........................................................................... 10

## GLOSSARY OF CERTAIN DEFINED TERMS

| | |
|---|---|
| 2024 10-K | Zeta's Annual Report filed with the SEC on February 26, 2025, for the year ending December 31, 2024. |
| AC, Complaint, or ¶ | The Amended Class Action Complaint for Violations of the Federal Securities Laws. ECF No. 92. |
| Apptness | A digital job board publisher purchased by Zeta in 2021. ¶¶46, 68-69. |
| ArcaMax | A web and email syndication news publisher purchased by Zeta in 2022. ¶¶46, 70. |
| Defs.' Br. | Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Amended Complaint. ECF No. 104. |
| CCPA | California Consumer Privacy Act. ¶55. |
| Class Period | The period from February 27, 2024 through March 10, 2025, inclusive. ¶353. |
| Company or Zeta | Defendant Zeta Global Holdings Corp. ¶27. |
| Culper Research | Research investment firm that issued the Culper Report on Zeta's data collection practices. ¶86. |
| Culper Report | The report released by Culper Research on November 13, 2024. ¶¶86-88. |
| Defendants | Zeta and the Individual Defendants. ¶¶27-33. |
| Disqus | A comment hosting platform embedded in third-party websites. *See* ¶¶46-49. |
| FEs | Zeta's former employees referred to in the AC and defined in ¶¶34-39. |
| FE-1 | FE-1 was employed by Zeta from May 2022 until February 2024, as a Data Scientist, in Zeta's Prague, Czech Republic location. Allegations attributable to FE-1: ¶¶34, 74, 176-77, 181, 289, 311. |
| FE-2 | FE-2 was employed by Zeta from before the Class Period until January 2024, as a Marketing Campaign Manager (May 2021 to Sept. 2022), Senior Campaign Manager (Oct. 2022 to March 2023), and Mobile Operations (SMS/MMS) Manager (March 2023 to Jan. 2024). Allegations attributable to FE-2: ¶¶35, 180, 310. |
| FE-3 | FE-3 was employed by Zeta from August 2019 to June 2023, as a Vice President of Client Services. Allegations attributable to FE-3: ¶¶36, 178-79, 272, 289, 312. |
| FE-4 | FE-4 was formerly employed by Zeta as Associate Account Director from April 2021 to January 2023. Allegations attributable to FE-4: ¶37, 182. |
| FE-5 | FE-5 was formerly employed by Zeta as Vice President of Business Development from December 2021 to August 2023. Allegations attributable to FE-5: ¶¶38, 172-75, 271, 287-88. |
| FE-6 | FE-6 was employed with Zeta as a Senior Account Manager from June 2024 to November 2024. Allegations attributable to FE-6: ¶¶39, 182, 271. |
| Gore | Defendant Neej Gore, Zeta's Chief Data Officer at all relevant times. ¶30. |
| Greiner | Defendant Christopher Greiner, Zeta's Chief Financial Officer at all relevant times. ¶29. |
| Hayes | Defendant Benjamin Hayes, Zeta's Senior Vice President, Privacy and Chief Privacy Officer at all relevant times. ¶31. |

| Individual Defendants | Defendants Steinberg, Greiner, Gore, and Hayes. ¶¶28-32. |
|---|---|
| ITP | Zeta's Insider Trading Compliance Policy. ¶¶225, 240, 244-45. |
| Plaintiffs | Lead Plaintiffs Amir Konigsberg and Allegheny County Employees' Retirement System. ¶¶25-26. |
| Rule 10b5-1 Trading Plan | A securities trading plan adopted by insiders transacting in a company's securities. ¶¶ 237, 240; 17 C.F.R. § 240.10b5-1(c)(1)(ii)(B)(1). |
| Steinberg | Defendant David A. Steinberg, Zeta's co-founder who served as Zeta's Board Chairman and Chief Executive Officer at all relevant times. ¶28. |
| Steinberg Affiliates | Entities Plaintiffs allege are controlled by Defendant Steinberg. ¶227. |
| Zeta Data Summit or Data Summit | In-person and virtual conference hosted by Zeta on December 9, 2024. ¶¶108-14. |

## I.    PRELIMINARY STATEMENT AND SUMMARY OF THE FACTS

This is a straight-forward case of securities fraud. Zeta and its CEO, Defendant Steinberg, told investors on earnings calls, in Zeta's annual report, and in media interviews that Zeta's business was built on a simple but powerful asset that differentiated Zeta from competitors in an increasingly regulated industry: opt-in consent from 240 million Americans to use their data.[1] There was just one problem: as Defendants later admitted, this wasn't true.

Defendants' backpedaling began in response to a report issued by Culper Research on November 13, 2024, which revealed that Zeta's "opted-in" data was procured through a network of "consent farms"—sham websites that collect data under false pretenses. ¶86-88. Zeta immediately denounced the Culper Report. On November 27, 2024, Steinberg unequivocally declared "[w]e never do consent farms." ¶¶99-107, 198, 212. Zeta then staged an investor Data Summit on December 9, 2024, to "clarify the truth," with Gore revealing the U.S. dataset contained only 110 million "opted-in" individuals—less than half the figure Defendants previously touted— and that Zeta collected less consumer information from those who opted-in. ¶¶109-14. On February 26, 2025, Zeta scrubbed all "opted-in" language from its 2024 10-K. ¶¶120-23. Finally, on March 10, 2025, Zeta admitted the removal of this language was necessary to "provide shareholders with clear and accurate disclosures" and "prevent misinterpretations." ¶126. The market reacted and the artificial inflation was removed from Zeta's stock price, which declined from a Class Period high of $36.74 to just $14.03 after the truth was fully revealed. ¶¶332-49.

Plaintiffs' investigation, aided by a data science expert, confirmed what the market suspected and Culper Research reported: Zeta operated consent farms throughout the Class Period (rendering their promise of 240 million opted-in users blatantly false). ¶¶130-62. The expert

---

[1] Unless otherwise noted, emphasis is added, internal citations and quotations are omitted, and all capitalized and defined terms have the meaning ascribed in the AC or the Glossary, *supra*.

validated 15 of 18 still-active websites as consent farms under the FTC's definition, discovered Zeta used "leaky forms" that collect data before users can consent, and found Zeta operated fake job sites misappropriating corporate logos. ¶¶138, 148, 157-60. Incredibly, as Defendants misled investors, Steinberg orchestrated a scheme to dump *over $270 million* in Zeta stock through a web of falsely "independent" trusts he controlled, circumventing SEC cooling-off periods, blackout windows, and short-swing profit rules. ¶¶222-58.

Defendants now ask this Court to ignore these detailed allegations, arguing semantics about what "opt-in" means while their own spokesperson admitted the Company's use of the term caused "misinterpretations." They claim innocence despite admitting they lacked transparency with investors. They insist their denials about consent farms were true even as Plaintiffs' expert forensically proved their existence. The pattern is clear: Defendants made unequivocal false and misleading statements, issued fierce denials, followed by partial admissions, and ultimately a complete reversal, all while Steinberg pocketed hundreds of millions of dollars. This is not good faith error—it is securities fraud. Defendants' Motion should be denied.

## II.    LAW AND ARGUMENT

In deciding Defendants' Motion, the Court must "accept all factual claims in the complaint as true and draw all reasonable inferences in the plaintiff's favor." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015).

### A.    The AC Adequately Alleges Material Misstatements and Omissions

A plaintiff meets the particularity requirement of the PSLRA by "specify[ing] each statement alleged to have been misleading and the reason or reasons why the statement is misleading." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004) (citing 15 U.S.C. § 78u-4(b)).

Defendants seek to undermine Plaintiffs' well-pled allegations by improperly presenting an alternative factual narrative. *See, e.g.*, Defs.' Br. at 8 (denying falsity of opt-in statements by

advancing factual argument that the market knew Zeta's definition of "opt-in" differed materially from the definition publicly embraced by, for example, Apple or the FCC); Defs.' Br. at 11 (denying Zeta's use of consent farms by advancing factual argument that Apptness and ArcaMax "represent a tiny fraction of Zeta's data sources"). These premature attempts to supplant Plaintiffs' factual allegations in favor of their own, preferred version of events, must be rejected as "fact-specific questions cannot be resolved on the pleadings." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012); *see, e.g.*, *City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 130 (S.D.N.Y. 2020) (refusing to resolve factual dispute as to alleged statement's meaning in favor of defendants at the pleading stage).

### 1. Defendants' "Puzzle Pleading" Challenge Is Baseless

Courts routinely reject "puzzle pleading" challenges when the "plaintiffs have identified specific statements (and added emphasis where challenged assertions are embedded in longer passages) and followed each by a list of reasons why those statements are allegedly misleading." *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 369 (E.D.N.Y. 2022); *see also Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 530 (S.D.N.Y. 2020) (rejecting "puzzle pleading" challenge). The AC here does ***exactly*** that. *See* ¶¶183-219. Simply put, using block quotes for context is not "puzzle pleading," it's a requirement under controlling law. *See In re Vivendi, S.A., Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) ("'The test for whether a statement is materially misleading under Section 10(b)" is not whether the statement is misleading in and of itself, but 'whether the defendants' representations, taken together and in context, would have mislead a reasonable investor.'"). Notably, Defendants had no difficulty identifying the alleged misstatements by paragraph number, grouping the statements into categories, and transposing the misstatements into a chart. *See* ECF No. 103-2.

### 2.      Defendants Do Not Challenge Plaintiffs' Expert's Factual Findings

To validate and substantiate the findings in the Culper Report and explore the nature of Zeta's "consent farm" practices, Plaintiffs engaged a data science expert. ¶130. Plaintiffs often retain experts when pleadings involve technical knowledge beyond the ken of the average layperson. *See Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150-51 (2d Cir. 2021) (crediting expert's opinion to assess falsity allegations); *E. Ohman J v. NVIDIA Corp.*, 81 F.4th 918, 941 (9th Cir. 2023) (crediting allegations citing analysis by an expert that corroborated an analyst report analysis). Defendants do not claim that experts cannot be cited at the pleadings stage; in fact, their primary authority, *Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.*, states that "[p]laintiffs may rely on unnamed experts at the pleading stage." 2024 WL 5399664, at *17 (N.D. Cal. Sept. 18, 2024). *CareDx* held plaintiffs must allege with particularity that an unnamed expert "was in a position to know the relevant fact claimed" by providing information about qualifications, "how the analysis was performed, or the data upon which the consultant relied." *Id*. Plaintiffs do so here.[2]

### 3.      The AC Provides Sufficient Particularity to Support the Credibility of Plaintiffs' Data Science Expert

The AC alleges the expert has a Ph.D in Information Management and Systems; has 25+ years of experience as a research scientist and technologist; worked with Fortune 100 firms to develop privacy and security solutions; gave testimony on his research to Congress and the FTC; and served as a testifying expert for the California DOJ. ¶131. While Defendants lament the lack of a declaration or CV (*see* Defs.' Br. at 8), none of the cases they cite require this at the pleading stage. After arguing Plaintiffs do not provide sufficient details to assess the expert's qualifications,

---

[2] Defendants' reliance on the *Altimeo* district court's later opinion concerning a different expert is inapposite because unlike here, that complaint "lacked any factual basis or identifying details that would tend to support the expert's reliability." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 2023 WL 4249356, at *9 (S.D.N.Y. June 29, 2023).

in the next breath Defendants argue that, due to the detailed explanation of the expert's process (*e.g.*, ¶¶133, 134, 149, 154), any person with sufficient technical know-how and access to the named tools could perform this analysis. Defs.' Br. at 8. Defendants' contradictory arguments fail: this particularity about process is exactly what Defendants' cases require.

### 4.    The AC Alleges the Material Falsity of Opt-In Statements

Throughout the Class Period, Defendants represented that Zeta's dataset had 240 (later 245) million opted-in U.S. users. *See* ¶¶184, 186, 189, 190, 194, 206, 218; *see also* ¶192 ("[W]e have…***one of the largest proprietary opted-in data clouds***."). This was not true. After the Culper Report revealed Zeta's use of consent farms, Defendants disclosed that only 110 million users in their dataset had explicitly opted in, and the rest merely "Provid[ed] Permission to Online Tracking by Agreeing to Publisher Terms of Service." ¶109; ECF No. 103-3 at 29. Then, in Zeta's 2024 10-K, Defendants removed all references to "opt-in" data. ¶120. Zeta later admitted this change was necessary "to provide shareholders with clear and accurate disclosures" and the correction would "prevent misinterpretations." ¶345.

Relying entirely on *Welgus v. TriNet Grp., Inc.*, Defendants argue "[f]alsity cannot be inferred from this terminology change as a matter of law because 'if the law viewed a company's editing or removal of language from an SEC filing as a tacit admission that the language was false when made, no public company would ever remove disclosures from its filings.'" 2017 WL 6466264, at *8 (N.D. Cal. Dec. 18, 2017). But here, unlike *Welgus*, there was nothing "tacit" about Defendants' correction. Zeta issued a press release to specifically address the conspicuous absence of "opt-in" language in its 2024 10-K, explaining it was to "prevent misinterpretations," because Zeta's prior language was inaccurate (*see* ¶345)—not, as Defendants now prematurely (and baselessly) claim, because the industry was "rapidly evolving." Defs.' Br. at 10, 22. Defendants' suggestion that a correction does not support a finding of falsity "as a matter of law" would unwind

decades of authority holding that "the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004); *see also Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 192 (S.D.N.Y. 2010) (subsequent admissions can establish falsity).

Pinned down by Zeta's own "clarif[ications]" (*i.e.*, admissions), Defendants spill much ink wrestling with the definition of "opt-in." At one point, they argue "[t]here is no discernible difference" between their earlier statements that data was collected from people who "opt-in" versus their later admission that data was collected from people who merely "provided permission to online tracking." Defs.' Br. at 11. This argument directly refutes Zeta's own statements that the Company's use of the term "opt-in" was subject to "misinterpretation." ¶345. Their other argument that "[n]othing in Zeta's statements to investors indicated that its opt-in data collection always required users to 'check a box' or take any action beyond what Zeta disclosed," Defs.' Br. at 8-9, ignores Zeta's own privacy policy, which stated "permission [to collect a user's data] is generally provided at a website or landing page where an individual provides an email address and ***checks a box authorizing their data to be used*** for marketing purposes, transferred to third parties, and augmented with other data obtained from other sources." ¶60.[3] Thus, unlike *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, where defendant "made clear at all times" that it would not define what it meant by the words "strong expression," the AC relies on Zeta's own documents for determining the meaning of the term "opt in." 28 F.4th 343, 353-54 (2d Cir. 2022).

Defendants' argument that the Company's definition of "opt-in" was known to the market

---

[3] Plaintiffs never claim that checking a box is the only way to obtain "opt-in" consent, but an opt-in framework always requires a choice to participate (*i.e.*, affirmative consent). ¶54.

because "Zeta expressly disclosed that it collected 'individual opted-in data…directly from the consumers when they register or interact with our platform" (Defs.' Br. at 8) backfires, as this disclosure does not *define* opt-in, it simply asserts "*when*" Zeta collected purportedly opted-in data. Furthermore, Zeta later corrected this statement to remove the word "opt-in." *See* ¶¶121-23. In the end, Plaintiffs plausibly plead that the investing market understood opt-in to require an affirmative action from the user. *See* ¶97 (quoting Canaccord, who, after speaking with "management on numerous occasions," understood Zeta's data to be "opt-in, which means that consumers check a box that consents to their information being collected.") ¶97.[4] Defendants have no answer for this.

Finally, Defendants provide no support for their passing argument that statements concerning Zeta's dataset of 240 million U.S. opt-in users, despite the later revision ***cutting that number in half***, were true when made. *See* Defs.' Br. at 11. In fact, the AC contains numerous allegations that support falsity when made. ***First***, Defendants ***admitted*** during the Data Summit that only 110 million users were explicit opt-ins. ¶109. Defendants' insistence that they were merely distinguishing between two different kinds of opt-ins is not supported by their own language, Defs.' Br. at 10,[5] and is not how it was viewed by the market. *See* ¶¶109, 111 ("Calling your data set the largest "opted-in" data set and then admitting that less than half the people in that data set actually opted in is a ***straight up lie….***") (quoting law professor Ari Waldman). In any event, the fact that Defendants repeatedly characterized the 240 million users as the same, despite their different makeup, was materially misleading. *See, e.g.*, *Macquarie Infrastructure Corp. v.*

---

[4] Defendants take issue with the fact that the AC cites articles and blogs for additional support as to the meaning of "opt in." Defs.' Br. at 8. But Plaintiffs may rely on public sources as part of the "total mix of information" available. *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *see also Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420, 438 (2d Cir. 2025) (allegations based on "public sources" appropriate at the pleading stage).

[5] Defendants' slide (ECF No. 103-3 at 29) supports Plaintiffs' allegations as it differentiates between users providing "explicit opt-in" and merely agreeing to a publisher's terms of service.

*Moab Partners, L.P.*, 601 U.S. 257, 263 (2024) (defining actionable half-truths as "representations that state the truth only so far as it goes, while omitting critical qualifying information").

**Second**, the AC adequately alleges that Zeta's data collection practices included user data that could not be defined as "opt-in" under any definition, such as Disqus' policy which requires users to sign up and then take action to exclude themselves ("opt-out") of data collection. *See* ¶¶167-68. Not only does Plaintiffs' data science expert conclude that data collected from Disqus was not collected under an "opt-in" framework (¶167), but Plaintiffs also cite multiple additional sources for this conclusion. *See, e.g.*, ¶111 (Prof. Waldman: "no definition of 'opt in' where the latter group ["users who just clicked agree to a third party's terms of service without another option"] are considered opted in for the purposes of laws like the CCPA."); ¶170 (Prof. Acquisti: "[T]hat's not an opt-in (where a user joins a service and then can opt into their data being used in various ways); that's a 'take it or leave it;'"—*i.e.*, an opt-out). Defendants don't argue Disqus' data collection framework was *not* "opt-out"—instead, they claim the framework was "exactly as Zeta disclosed." Defs.' Br. at 9. However, when asked by an analyst exactly what happens when a user registers for Disqus, Steinberg replied "it's just their name, their email address ***and an opt-in***." ¶166. This statement is plainly untrue, which is perhaps why Defendants ignore it.

Defendants then try to argue the expert's conclusions about the websites in the Culper Report (*see* ¶¶134-42) are unrelated to Defendants' statements regarding the number of opted-in users in Zeta's dataset. But whether these websites collected users' data via an opt-in framework, and whether there was a value exchange for users' data (which was provided to Zeta, *see* ¶139), go to the heart of whether Zeta had 240+ million U.S. opt-in users. Defendants also claim Plaintiffs do not allege the data collected by these websites contributed to the opted-in figure (*see* Defs.' Br. at 10). However, Plaintiffs allege the sites were operated by Zeta-owned platforms (Apptness and

ArcaMax) and Zeta itself states "Zeta obtains data through a variety of sources, including owned platforms it acquired such as Disqus, Apptness, and ArcaMax." Defs.' Br. at 3; *see also* ¶190.

### 5.    The AC Alleges the Material Falsity of Statements Regarding Consent Farms and Whether Users Received a "Value Exchange"

On November 13, 2024, Culper Research published a report detailing Zeta's use of consent farms, uncovering at least 40 websites run by Zeta-owned companies Apptness and ArcaMax that collected user's data without offering anything of value in return. ¶¶86-87. In its wake, Defendants made numerous statements that: (1) Zeta did not operate consent farms; and (2) users were always ("in one hundred percent of the cases," ¶100) given a value exchange for their data. *See* ¶¶196, 198, 200, 202, 203, 205, 208, 210, 212, 214, 216, and 218; *see also* ¶90 ("ArcaMax…is one of the largest publishers of opted-in newsletters.").[6] However, Plaintiffs' data science expert was able to determine that 15 of 18 websites named in the Culper Report and that were still operational as of the filing of the AC *are* consent farms based on the FTC definition of that term. ¶138. The expert also determined that, for five of these websites, there was no value exchange for user data. ¶139. In fact, several of the websites examined used "leaky forms," meaning data was collected as soon as it was entered, without any kind of form submission or chance to give consent—certainly not "opt in." ¶148. This research demonstrates Zeta's statements about not running consent farms and always providing users with a value exchange were false.

Defendants first try to challenge Plaintiffs' well-pled allegations by discrediting the author of the Culper Report. Defs.' Br. at 11-12. In recent years, however, experts have recognized short sellers like Culper Research serve a vital role in maintaining the efficiency of public markets. *See,*

---

[6] This statement does not fit neatly into Defendants' categories, but its falsity derives from the fact that ArcaMax operated consent farms. Defendants' failure to challenge the falsity of this statement means that they have waived any such arguments. *See, e.g.*, *Lozada v. TaskUs, Inc.*, 710 F. Supp. 3d 283, 307 (S.D.N.Y. 2024).

*e.g.*, John C. Coffee, Jr., *Activist Short Selling Today: The Two Sides of the Coin*, CLS Blue Sky Blog (July 7, 2020) ("If you want to detect fraud, forget the accountants and contact your local short sellers; they are the real detectives today…."); *Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) ("Courts have critically analyzed [short-seller] attributions, dismissing some but generally sustaining others where independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers' reports.") (collecting cases). Here, not only were the allegations in the Culper Report independently corroborated (and expanded on) by Plaintiffs' expert, but they were also confirmed when Zeta revealed it had only obtained opted-in consent for 110 million individuals, and removed "opted-in" language from its 2024 10-K.

Importantly, while Defendants tersely dismiss Plaintiffs' allegations regarding Zeta's use of "leaky forms" as "conclusory," Defs.' Br. at 13, Defendants have no response to the detailed allegations that Zeta operates websites that bait people into submitting data by offering sham jobs. ¶¶149-52. The allegations on this score firmly support claims that Defendants' statements denying use of consent farms and provision of a value exchange are materially misleading.

Indeed, that Defendants work so hard to distance themselves from the data collection practices of Apptness and ArcaMax, insisting that that they "represent a tiny fraction of Zeta's data sources," speaks volumes about the lack of user consent obtained via those entities. Defs.' Br. at 11. Contrary to Defendants' assertion, Plaintiffs' data scientist found "that from March 2024 to November 2024 (*i.e.*, during the Class Period), the 40 websites identified by Culper Research received 161.3 million visits and 82.9 million unique users—indicating the massive scale of collection of data from individuals." ¶133. Even if only a small fraction of Zeta's dataset was collected via consent farm, this still renders categorically false Defendants' statements that Zeta does not operate consent farms, including: "we do not operate ***any*** sites that trick or mislead

consumers into giving us their data" (¶210), "[w]e ***never*** do consent farms" (¶212), and that Zeta provides a value exchange in "***a hundred percent of the cases*** where we collect a consumer's data" (¶198). The AC has adequately pled the falsity of consent farm and value exchange statements.

## B.    The AC Adequately Alleges Defendants' Scienter

Plaintiffs can satisfy the scienter requirement by either "alleging facts (1) showing that defendants had both motive and opportunity to commit the fraud ***or*** (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 212 (2d Cir. 2020). "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences," but need only be "at least as compelling" as any opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The court's job is not to scrutinize each allegation in isolation" but to assess whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id.* at 313, 322-23. "At the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Oklahoma Firefighters Pension & Ret. Sys. v. Musk*, 2025 WL 951231, at *15 (S.D.N.Y. Mar. 28, 2025).

### 1.    The AC Adequately Alleges Conscious Misbehavior and Recklessness

Recklessness is alleged when Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Blanford*, 794 F.3d at 306. Evidence of "'[a]n egregious refusal to see the obvious, or to investigate the doubtful" may also give rise to an inference of recklessness. *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006). Moreover, Defendants do not dispute that "the scienter of 'management level' employees can be attributed to the corporation," establishing Zeta's scienter. *In re Estee Lauder Co., Inc. Sec. Litig.*, 2025 WL 965686, at *10 (S.D.N.Y. Mar. 31, 2025). Defendants' attempt to minimize the AC's scienter allegations (Defs.' Br. at 19-21) ignores

the wealth of particularized facts demonstrating that Defendants knew or recklessly disregarded that their unequivocal and affirmative representations about Zeta's "opted-in" dataset and consent farms were false. ¶¶259-314.

**First**, Defendants repeatedly boasted they could track and "validate every opt-in that we have," "produce a time and date stamp, a screenshot of the registration path, and the privacy policy" for each opt-in, and "take a screen grab of [each opt-in] to document that this person has opted in." ¶¶260, 263-69. Defendant Hayes affirmatively assured investors that Zeta did not associate with consent farms and "do[es] not operate any sites that trick or mislead consumers into giving us their data" ¶¶259-62. These are not general statements about data "integrity" (Defs.' Br. at 19), but specific representations about Zeta's data tracking capabilities and Defendants' own detailed monitoring and access to this information.[7] *See Sills v. United Nat. Foods, Inc.*, 2024 WL 4188324, at *13 (S.D.N.Y. Sept. 13, 2024) (scienter adequately alleged where defendants had access to "granular information" through "regular reports"). If Defendants maintained such records—***as they assured investors they did***—Defendants knew, or were reckless in not knowing, that less than half of the 240 million U.S. users had provided opt-in consent, and that Zeta used consent farms to deceptively acquire user data.[8] This isn't speculation; it's the logical import of Defendants' stated capabilities. *See, e.g.*, *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. Apr. 22, 2016) (scienter alleged where defendants "maintained internal reports" of

---

[7] Defendants' assertion that its "diligent[] track[ing]" of user data somehow shows Zeta "did not lie about its size" (Defs.' Br. at 19) presents a factual argument unsuitable at this stage.

[8] These specific allegations of Defendants' access to detailed records differentiates this matter from cases they cite. *See, e.g., Meyer v. Organogenesis Holdings Inc.*, 727 F. Supp. 3d 368 (E.D.N.Y. 2024); *Johnson v. Siemens AG*, 2011 WL 1304267, at *17 (E.D.N.Y. Mar. 31, 2011); *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011) (noting that "actual identification of reports or other documents indicating defendants' recklessness" would have supported an inference of scienter and collecting cases).

inventory levels).

**Second**, Defendants cannot credibly claim ignorance about their "opt-in" data collection practices, which Zeta claims as its core business differentiator. ¶¶270-79. Contrary to Defendants' assertions (Defs.' Br. at 20), the AC alleges specific facts connecting Defendants' roles to knowledge of the fraudulent practices. Steinberg—architect of Zeta's data collection practices for over 15 years (¶¶271, 274)—acquired platforms generating data (¶46); described how Disqus users provide "their name, their email address and an opt-in" (¶275); and, according to FE-6, personally led recorded monthly all-hands meetings. Gore was responsible for "Zeta's global data and analytics strategy" and "developing Zeta's identity graph"; oversaw a 10-person data team that knew how Zeta obtained consumer data (¶272); and presented at conferences demonstrating intimate knowledge about the Company's opt-in data practices. ¶¶109, 205-06, 208, 277. Hayes oversaw and spoke about Zeta's privacy compliance program, including opt-in/opt-out practices. ¶¶31, 210, 216, 267, 272. Greiner also spoke with knowledge of the opt-in data collection practices. ¶276. Given these allegations, it "requires no stretch of the imagination to infer that [Defendants] knew facts or had access to information suggesting that their public statements'…'were not accurate.'" *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *12 (S.D.N.Y. Mar. 28, 2018).[9]

**Third**, Defendants' evolving responses to the Culper Report strongly imply consciousness of wrongdoing when they made a series of revealing admissions that demonstrate prior knowledge of the falsity. ¶¶280-90. After Defendants issued initial categorical denials (*see* ¶¶102-04, 196-213), Defendants were compelled to issue multiple admissions: (a) on November 20, 2024,

---

[9] Defendants' own statements that Zeta validated and maintained records of every opt-in contradicts Defendants' position that Plaintiffs allege no more than that Defendants should have known certain facts by virtue of their positions (Defs.' Br. at 20), and provides the "facts suggesting that defendants actually possessed information contradicting their public statements" that the Court found missing in *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016).

Steinberg admitted "we made a mistake in not doing the same thing [transparency] with Wall Street" (¶282); (b) on December 9, 2024, Gore conceded Zeta "was not as transparent with the investment community" as it purportedly was with its customers (¶¶285-86), despite the fact that FE-5 stated Defendants were *not* transparent with Zeta's customers about the opt-in dataset (¶172-75); and (c) on March 10, 2025, Zeta acknowledged the removal of "opted-in" language was to "provide shareholders with clear and accurate disclosures" and "prevent misinterpretations." ¶290. These aren't aspirational statements about improving transparency—they're admissions that prior disclosures were neither "clear" nor "accurate" and subject to "misinterpretations," all supportive of Defendants' scienter. *See In re Lottery.com, Inc. Sec. Litig.*, 765 F. Supp. 3d 303, 350 (S.D.N.Y. 2025); *Freedman v. Value Health, Inc.*, 958 F. Supp. 745, 757 (D. Conn. 1997) (executive's admissions of "shortcomings" in diligence gave rise to "strong inference" of scienter).[10]

**Fourth**, Defendants' scienter is supported by repeated analyst and industry inquiries into Zeta's opt-in consent framework and whether Zeta was operating consent farms. Given the frequency and import of these questions, Defendants were prepared to—and did—answer these questions, which supports a strong inference of scienter. ¶¶273-79, 298-308. Given that Defendants repeatedly spoke on the same topics as the alleged fraud, and these were key issues of public focus, "this Court can reasonably conclude either that Defendants [had] access to information regarding [the subject of the Misstatements], or…were recklessly indifferent to the truth or falsity of their [] statements and never bothered to investigate [them]." *In re Avon Sec. Litig.*, 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019); *see Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 553 (S.D.N.Y. 2017) (defendants' assurances on "'a

---

[10] Defendants' citation to *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561 (S.D.N.Y. 2012) (Defs.' Br. at 20), is irrelevant as *Longtop* involved a post-disclosure investigation by an auditor-defendant, and not an admission of prior misrepresentations.

subject about which investors and analysts often inquired' reinforces the inference of scienter").

*Fifth*, former employees corroborate Defendants' knowledge of or reckless disregard for the falsity of their representations. Their accounts demonstrate Company-wide knowledge of the data issues: (a) FE-5 reported customers had "lots of questions" about opt-in status and was directed by "real veterans" with 10+ years at Zeta to "dance around the subject" (¶¶173-175, 287-88);[11] (b) FE-1 explained it was "nebulous" and "cloudy" internally whether users had opted-in (¶177); and (c) FE-2 reported Zeta "was aware internally that it was sharing the data of opt-out consumers." ¶180. These aren't rumors, but rather firsthand accounts of deliberate obfuscation directed by senior management. The FEs also detailed Defendants' hands-on involvement in the Company and access to information through, among other things, Snowflake, Zeta's internal customer data management platform. ¶¶181, 271-72, 311. These allegations support scienter. *See In re Axsome Therapeutics, Inc. Sec. Litig.*, 2025 WL 965265, at *9 (S.D.N.Y. Mar. 31, 2025) (scienter adequately alleged where FE described how defendants had "access to information contradicting his public statements").

Defendants' position that the FEs' descriptions lack specificity (Defs.' Br. at 14) is incorrect, especially in light of authority that plaintiffs need only describe FEs "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). The AC's particularized allegations overcome this hurdle by alleging each FEs' role or position at the Company, their responsibilities, and the time period for which they occupied that role. *See* ¶¶34-

---

[11] While Defendants argue that these allegations are irrelevant (Defs.' Br. at 14), they illustrate a "collective picture" of "a culture of unscrupulous [] practices and lax oversight that was so widespread as to be 'a matter of course.'" *See In re EZCorp, Inc. Sec. Litig.*, 181 F. Supp. 3d 197, 209 (S.D.N.Y. 2016).

39;[12] *see Estee Lauder*, 2025 WL 965686, at *5 (crediting former employee accounts). Defendants'

other challenges to the FE allegations also fail. First, while FEs left Zeta before the Class Period

(Defs.' Br. at 14), the Second Circuit "has held that allegations concerning activity in one period

can support an inference of similar circumstances in a subsequent period." *Blanford*, 794 F.3d at

307. Courts have found that pre-class period accounts of fraud from FEs can confirm what a

defendant "should have known during the class period." *In re Scholastic Corp. Sec. Litig.*, 252

F.3d 63, 72 (2d Cir. 2001). Second, contrary to Defendants' implication (Defs.' Br. at 18), there is

"no baseline requirement" of contact with individual defendants to adequately allege FE accounts.

*Plumbers & Pipefitters Nat. Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 615

(S.D.N.Y. 2015).

      **Sixth**, Defendants' scienter is further supported by the core operations doctrine, which

"supports the inference that the defendant knew or should have known the statements were false

when made" where the alleged misstatements "concern[] the core operations of the company."

*Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *5 (S.D.N.Y. June 21, 2021). Here, Defendants

emphasized that Zeta's "opted-in" dataset was the "central feature" of its business that

differentiated it from its competitors. ¶291. The importance of Zeta's data to its business model

supports "the commonsense assumption that executives are likely to know more about things

central to their business." *Stadium Cap. LLC v. Co-Diagnostics, Inc.*, 2024 WL 456745, at *5

(S.D.N.Y. Feb. 5, 2024).[13]

---

[12] Defendants' citations to *In re Hebron Tech. Co., Ltd. Sec. Litig.*, 2021 WL 4341500 (S.D.N.Y. Sept. 22, 2021) and *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120 (S.D.N.Y. 2023), where plaintiffs only offered vague descriptions of confidential witnesses, is distinguishable from the case at hand, where Plaintiffs provide each FE's title, tenure, and responsibilities. *See* ¶¶34-39.

[13] Steinberg and Greiner's SOX certifications further support an inference of scienter. ¶¶313-15. *See In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 468 (S.D.N.Y. 2017).

When viewed holistically, the most cogent and compelling inference is that of fraud.

### 2.    The AC Adequately Alleges Motive and Opportunity

Plaintiffs cogently allege how SEC filings and other public documents evince Steinberg's common control over entities that sold over 13 million shares of Zeta common stock, many during "blackout" and "cooling off" periods, for over **$270 million** in profits.[14] Defendants simply respond that Steinberg "did not control any of the trusts," Defs.' Br. at 2, characterizing Plaintiffs' detailed allegations as "conspiratorial" and "tortured." Defs.' Br. at 2, 16. But Steinberg's control over the Steinberg Affiliates is a question of fact. *See Anderson News*, 680 F.3d at 185 ("Fact-specific questions cannot be resolved on the pleadings.").

Defendants then argue that "the Complaint lacks any particularized facts that Steinberg, who Plaintiffs allege was the trusts' settlor, retained control over the Independent Trusts' investment decisions or influenced those decisions in any way." Defs.' Br. at 16.[15] To the contrary, the AC alleges numerous facts substantiating the connections between Steinberg, the Steinberg Affiliates, and various personal entities controlled by Steinberg, all of which buttress Plaintiffs' allegation "that throughout the Class Period Defendant Steinberg controlled the Steinberg Affiliate trusts." ¶237. Tellingly, Defendants do not dispute the well-pleaded allegations that the operations of the Steinberg Affiliates and Steinberg's personal entities were principally effectuated by a single Florida attorney, Joel Zychick, or that nine of the twelve Steinberg Affiliates shared the same mailbox address as Steinberg's personal foundation and family office. ¶¶231-34.

---

[14] Contrary to Defendants' claim, the fact that the AC does not allege that Defendants Greiner, Gore, or Hayes sold stock does not "fatally undermine[]" Plaintiffs' scienter allegations. Defs.' Br. at 15. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) ("Scienter can be established even if the officers who made the misleading statements did not sell stock during the class period….In other words, the lack of stock sales by a defendant is not dispositive as to scienter.").

[15] In so arguing, Defendants appear to tacitly admit Steinberg was the settlor of and controlled, for at least some period of time, the Steinberg Affiliates.

Similarly, Defendants' assertion that "Plaintiffs have pled nothing that raises suspicion about the timing or amount of the purported sales" is belied by even a cursory review of the AC. Defs.' Br. at 2. Plaintiffs allege the Steinberg Affiliates' sales were suspiciously timed to circumvent Section 16's mandatory 90-day "cooling off" period, the "blackout periods" imposed by Zeta's Insider Trading Policy, and Section 16(b)'s "short-swing" rule. ¶224. As detailed in the AC, throughout the Class Period, the Steinberg Affiliates enjoyed over ***$270M in profits*** by selling Zeta shares in circumvention of these prohibitions. ¶255. These allegations are further supported by the express language of Zeta's own ITP, which explains insider trading is restricted within blackout periods "[t]o avoid the appearance of impropriety" because those periods "during which the Company prepares quarterly financials is a sensitive time for insider trading purposes, as Company personnel may be more likely to possess, or be presumed to possess, material nonpublic information." Zeta ITP at § IV.A.

To the extent Defendants argue the timing of these sales was not suspicious because "there is no alleged connection between those [sale] dates and the alleged misstatements" (Defs.' Br. at 17), they ignore the nexus alleged: Steinberg, via the Steinberg Affiliates, sold significantly more shares of Zeta common stock during the Class Period because Defendants made false and misleading statements regarding Zeta's "opt-in" dataset, which inflated and/or maintained Zeta's share price, *during the Class Period*. ¶79. "By obscuring his stock sales and making numerous, materially false and misleading statements about Zeta's data collection practices, including the level of "opted-in" consent for data, Steinberg was able to maintain investor confidence in the Company…." ¶222. The timing of the Steinberg Affiliates' Class Period sales is also suspicious because those sales greatly exceed the Steinberg Affiliates' sales before and after the Class Period. ¶227; *see, e.g.*, *Zornberg v. NAPCO Sec. Techs., Inc.*, 778 F. Supp. 3d 516, 526-27 (E.D.N.Y.

2025) (motive sufficiently alleged where defendants' class period sales significantly outnumbered sales before and after class period, raising "compelling inference that the officers sold their shares to capitalize on the overinflated financial reports"). Moreover, the total amount of Steinberg's Class Period sales via the Steinberg Affiliates—some 13,371,398 shares for total profits of **$270,660,177.43**—is suspicious in and of itself. ¶227; *see, e.g.*, *Blanford*, 794 F.3d at 308-09 (sales of $49 million were suspicious).

Finally, Defendants misconstrue Plaintiffs' allegations regarding the Steinberg Affiliates' sales made pursuant to 10b5-1 plans, arguing that "the mere existence of 10b5-1 plans does not support scienter in the absence of particularized facts to suggest that the trusts traded on material non-public information." Defs.' Br. at 17. But Plaintiffs do not allege the trading plans independently support an inference of scienter. Rather, the AC pleads that the Steinberg Affiliates' Class Period trading pursuant to 10b5-1 plans demonstrates they were controlled by a Zeta insider (*i.e.*, Steinberg). ¶237.[16]

### 3.    The Most Compelling Inference Is Defendants' Fraudulent Intent

The totality of the evidence compels the inference that Defendants knowingly, or at least recklessly, misled investors about Zeta's data practices. No innocent explanation accounts for the pattern of conduct alleged: Defendants claimed for years that 240 million U.S. users had "opted-in" to their data cloud while simultaneously claiming they could "validate every opt-in" (¶¶260, 267), yet when exposed by the Culper Report, they first vehemently denied any issues, then admitted that only 110 million users opted-in (¶109), and then finally scrubbed all "opted-in"

---

[16] Nevertheless, "10b5-1 trading plans [that] are entered into during the class period" "'are not a cognizable defense to scienter allegations on a motion to dismiss.'" *George v. China Auto. Sys.*, 2012 WL 3205062, at *9 (S.D.N.Y. Aug. 8, 2012). Here, Plaintiffs allege 17 of Steinberg Affiliates' 32 Class Period Form 144s and Form 144/A sales were made pursuant to 10b5-1 plans. ¶237. All but two were adopted during the Class Period. ¶¶243, 255 n.80.

language from their SEC filings while conceding this was necessary to "provide shareholders with clear and accurate disclosures." (¶126). This progression—from absolute statements to fierce denials to partial admissions to complete reversal—is inconsistent with good faith error.

The innocent inference strains credulity: accepting that Defendants *didn't* know the true consent status of data they claimed was the "philosophical foundation" of the company requires accepting that executives tasked with data oversight were ignorant about their core business asset while simultaneously assuring investors they tracked every detail.

### C.    The AC Adequately Alleges Loss Causation

Although Defendants describe their arguments as "fatal," Defendants do not challenge (and thus concede) loss causation for nearly all of the corrective disclosures related to the alleged dataset misrepresentations. Defs.' Br. at 22. As for the arguments Defendants do put forward, these fare no better, as Plaintiffs easily satisfy their burden by giving "some indication of the actual loss suffered and…a plausible causal link between the loss and the alleged misrepresentations." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015).

### 1.    The AC Alleges a Causal Link to Dataset Misrepresentations

Defendants' brief only argues that Plaintiffs have "not advanced a viable loss causation theory with respect to the 'consent-farm' allegations or the March 10, 2025 purported corrective disclosures." Defs.' Br. at 22. Thus, Defendants **concede** that Plaintiffs adequately allege loss causation with respect to the dataset misrepresentations for the corrective disclosures on November 13, 2024, December 9, 2024, and February 26, 2025. ¶¶335-36, 339-41, 342-44. Their sole argument, that the March 10, 2025 corrective disclosure revealed nothing new to the market, fails legally and factually.

Plaintiffs allege that on March 10, 2025, *The Capitol Forum* publicly published an article informing the market that Zeta's 2024 10-K had removed references to "opt-ins" from its dataset

figures and including a quote from Zeta explaining that it changed its language "to provide shareholders with clear and accurate disclosures" and "prevent misinterpretations." ¶345. This revealed that Zeta removed the opt-in language from its 2024 10-K because it was misleading.

***First***, Defendants argue that the article was "published" three days (one business day) before March 10, and that Plaintiffs do not "explain why the market would react only to the 'promot[ion]' of" the article on March 10. But as made clear in the AC—and ignored by Defendants—"[t]he article is dated [Friday] March 7, 2025, when it was *not publicly available*, but rather *only privately available* to Capitol Forum subscribers." ¶124, n.55. ***Second***, Defendants' argument that *The Capitol Forum* article and Zeta press release published on March 10, 2025, contained "nothing new" is incorrect. Defendants' "newness" argument that investors already knew the corrective information is essentially a 'truth-on-the-market' affirmative defense, "which requires that defendants 'demonstrate that any such corrective information had been conveyed to the public with a degree of intensity and credibility to counter-balance effectively any misleading information created by the alleged misstatements.'" *Allegheny Cty. Employees' Ret. Sys. v. Energy Transfer LF*, 532 F. Supp. 3d 189, 241 (E.D. Pa. 2021). "This defense 'is intensively fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint." *Id.*

Here, the disclosures on March 10, 2025, provided important new information that Zeta did not disclose when it—without explanation—deleted all opt-in language from its 2024 10-K: the reason *why* it did so (*i.e.*, to "to provide shareholders with clear and accurate disclosures" and "prevent misinterpretations"). ¶345. In very similar circumstances, the court in *In re Chi. Bridge & Iron. N.V., Sec. Litig.*, found information contained in a short seller report was "new to the market" even though the report was based on already-filed financial reports. 2019 WL 5287980, at *26-28 (S.D.N.Y. Oct. 18, 2019). Like here, the report "disclosed conversations that the

21

Report's author had with [] management," that provided insight into how and why the company reported what it did, and the court held that "[t]he recounting of these conversations with firm management alone is 'new' information to the market." *Id*. Moreover, "[i]f the report only 'parroted' the same old information 'it is hard to understand the sharp drop in the price of [the company's] stock," following the *The Capitol Forum* disclosure. *In re Cassava Scis. Inc. Sec. Litig.*, 2024 WL 4916373, at *4 (W.D. Tex. June 12, 2024).

### 2.    The AC Alleges a Causal Link to Consent Farm Misrepresentations

Defendants advance a convoluted argument that the November 13, 2024 Culper Report cannot reveal the falsity of Defendants' ***subsequent*** statements denying the Culper Report's revelations. Defs.' Br. at 22. But Plaintiffs allege no such thing. Plaintiffs only allege the Culper Report corrected the dataset misrepresentations, which Defendants do not dispute. ¶87 ("The Culper Report raised significant issues concerning the composition, the value proposition, and potential liability of Zeta's claimed "opted-in" data set."); *see also* ¶¶88-95, 335-38.

Next, while Defendants argue there is "no logical connection" between the consent farm misrepresentations and the revised opt-in dataset figures revealed on December 9, 2024 (Defs.' Br. at 23), Defendants' own brief ties them together. Defendants describe the Culper Report as having "negatively characterized Zeta's data collection practices, particularly Zeta's methods of obtaining opt-in data" (*id*. at 4), after which, "Zeta swiftly denied the allegations and provided additional context and clarity about its data collection practices" (*id*. at 2), including explaining, "the important distinction between the larger umbrella of digital permission and the smaller subset of email permission." *Id*. at 4-5. That Defendants needed to provide "clarity" (*i.e.*, previously undisclosed information) regarding their so-called opt-in data as a result of the Culper Report's consent farm revelations, establishes a rock-solid "logical connection" between the two.

Defendants also argue that the December 9, 2024 Data Summit cannot operate as a partial

corrective disclosure of the consent farm misrepresentations if, on that same day, they continued to misrepresent that they did not operate consent farms. Defs.' Br. at 22-23. But courts have long held that a partial corrective disclosure can also mislead investors. *See, e.g.*, *Freudenberg*, 712 F. Supp. 2d at 178 (finding loss causation where defendants "blunted" a partial disclosure with misrepresentations).[17]

Courts in this Circuit have routinely cited this policy rationale in rejecting Defendants' sole causation argument against the February 26 and March 10, 2025 disclosures. For those disclosures, Defendants argue that the AC cannot plead causation for consent farm misrepresentations when the disclosures have "no reference to consent farms at all." Defs.' Br. at 23. "Because corporate wrongdoers rarely admit that they committed fraud, 'it cannot ordinarily be said that a drop in value of a security is 'caused' by the misstatements or omissions made about it, as opposed to the underlying circumstance that is concealed or misstated.'" *Freudenberg*, 712 F. Supp. 2d at 202 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). For that reason, "neither the Supreme Court in *Dura*, nor any court addressing the loss causation pleading standard require a corrective disclosure be a 'mirror image' tantamount to a confession of fraud." *Id*. The court in Defendants' own case, *Plumbers, Pipefitters & MES Local Union 392 v. Fairfax Fin. Holdings, Ltd.*, agrees, making clear that "loss causation certainly need not be demonstrated explicitly." 886 2d 328, 337 (S.D.N.Y. 2012) (citations omitted). All that is required is "*a sufficient nexus* with a prior misstatement such that it reveals at least part of the falsity of that misstatement." *Id*. at 338. Here, the AC plainly alleges the nexus between Zeta's data collection practices and

---

[17] Consider a hypothetical: A report accuses a manufacturer of operating sweatshops. The manufacturer denies this, but, at the same time, discloses it manufactures in countries with poorly enforced child labor laws. Later, the manufacturer again denies that it operates sweatshops but reveals numerous workplace safety and wage violations. Such revelations could cause the market to question the credibility of the company's denials, eroding artificial inflation from its stock price.

corrections regarding opt-in data. *See, e.g.*, ¶¶120-23, 124-27.

### D.    The AC Adequately Alleges Scheme Liability

Throughout the Class Period, Steinberg engaged in a fraudulent scheme to secretly sell over $270M worth of Zeta shares via a complex web of trusts and LLCs, thereby surreptitiously divesting shares while simultaneously misleading investors about the nature of Zeta's business and dataset. *See* ¶¶316-31, 379-88. While scheme liability requires a deceptive act "beyond misstatements and omissions, such as dissemination," courts regularly find deceptive acts arising from secret financial stock transactions like those alleged here. *See e.g.*, *Musk*, 779 F. Supp. 3d at 421 (concluding that "the facts surrounding the trading strategy evince a deceptive act in furtherance of a scheme to defraud"); *see also Gruber v. Gilbertson*, 2018 WL 1418188, at *14 (S.D.N.Y. Mar. 20, 2018) (awarding family members shares for financial gain is "a telltale sign of deceptive conduct" sufficient to allege a deceptive act in furtherance of a scheme to defraud).

Defendants lodge three unsuccessful attacks on the adequacy of the AC's scheme liability claim, each of which fails. ***First***, contrary to Defendants' claim that "Plaintiffs identify no deceptive or manipulative act," Defs.' Br. at 24, the AC clearly alleges a pattern of deceptive insider sales corresponding with the dissemination of misstatements, which provides "something extra." ***Second***, Defendants claim Zeta's complicity in Steinberg's scheme "makes little sense" because Steinberg violated company policies. *Id.* But the AC alleges Zeta and its Board granted Steinberg massive stock awards while failing to monitor or prevent his systematic violations of both SEC rules and its ITP company policies (¶331). Zeta's failure to enforce its ITP—which states violations may result in "dismissal" and "serious criminal and civil charges" (¶251)—while the CEO openly flouted these rules, demonstrates institutional complicity. ***Third***, Defendants argue the AC does not allege causation with respect to the scheme claims because the revelation of Steinberg's insider sales did not cause a share price decline. Defs.' Br. at 25. However, the AC

alleges Steinberg's purportedly bullish stance on Zeta's stock (while concealing massive sales through his affiliates) contributed to the artificial inflation of the stock during the Class Period (*see, e.g.*, ¶¶323, 327, 329), which inflation was removed through the same series of corrective disclosures that revealed the falsity of Defendants' misstatements. *See* ¶332 (incorporating by reference the scheme allegations). Moreover, courts addressing scheme claims based on insider trading have not required revelation of said trading to plead loss causation. In *In re ProNetLink Sec. Litig.*, the sustained complaint alleged defendants engaged in a pump and dump scheme, trading through "secret alter-ego[] or 'nominee' accounts," which was constructively revealed through a petition for bankruptcy. 403 F. Supp. 2d 330, 332-33 (S.D.N.Y. 2005); *see also In re RenovaCare, Inc. Sec. Litig.*, 2024 WL 2815034, at *67-73 (D.N.J. June 3, 2024) (causation linked to pump-and-dump scheme sustained).

### E.    The AC Establishes Control Person Liability

As Defendants concede, because Plaintiffs allege a violation of §10(b), the Court should sustain the §20(a) claims. *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 325 (S.D.N.Y. 2024).

## III.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in full. If this Court grants Defendants' Motion, Plaintiffs respectfully request leave to amend pursuant to Fed. R. Civ. P. 15(a)(2). *See Loreley*, 797 F.3d at 190.


DATED: September 9, 2025                          Respectfully submitted,


                                                 *Kim E. Miller*
                                                 _____
                                                 **KAHN SWICK & FOTI, LLC**
                                                 Kim E. Miller (KM-6996)
                                                 J. Ryan Lopatka
                                                 250 Park Ave., 7th Floor
                                                 New York, NY 10177

Telephone: (212) 696-3730
Facsimile: (504) 455-1498
kim.miller@ksfcounsel.com

-and-

Craig J. Geraci. Jr.
Matthew Woodard *(pro hac vice)*
Alexandra Pratt (*pro hac vice*)
1100 Poydras St., Suite 960
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
craig.geraci@ksfcounsel.com
matthew.woodard@ksfcounsel.com
alexandra.pratt@ksfcounsel.com

*Counsel for Lead Plaintiff Amir Konigsberg
and Lead Counsel for the Proposed Class*

**LABATON KELLER SUCHAROW LLP**
Lauren A. Ormsbee
David Saldamando
Alexandra E. Forgione
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
lormsbee@labaton.com
dsaldamando@labaton.com
aforgione@labaton.com

*Counsel for Lead Plaintiff Allegheny County
Employees' Retirement System and Lead
Counsel for the Proposed Class*

26

## <u>CERTIFICATE OF SERVICE</u>

On September 9, 2025, the foregoing document was filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kim E. Miller*
Kim E. Miller

## <u>WORD COUNT CERTIFICATION</u>

I, Kim E. Miller, certify that the foregoing memorandum of law complies with the word-count limitations set forth in Local Civil Rule 7.1(c). According to the word count of the word-processing program used to prepare the memorandum, and exclusive of the portions of it that are excluded by the rule, there are 8,280 words in the document.

*/s/ Kim E. Miller*
Kim E. Miller
