UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: ZETA GLOBAL HOLDINGS
CORPORATION SECURITIES LITIGATION

24 Civ. 8961 (DEH)

**OPINION
AND ORDER**

DALE E. HO, United States District Judge:

Court-appointed Lead Plaintiffs Allegheny County Employees' Retirement System ("Allegheny") and Amir Konigsberg ("Konigsberg") (collectively, "Lead Plaintiffs" or "Plaintiffs") bring this suit against Zeta Global Holdings Corp. ("Zeta" or the "Company"); Zeta's Chief Executive Officer, David A. Steinberg ("Steinberg"); Zeta's Chief Financial Officer, Christopher Greiner ("Greiner"); Zeta's Chief Data Officer ("CDO"), Neej Gore ("Gore"); and Zeta's Senior Vice President ("SVP") of Privacy and Chief Privacy Officer ("CPO"), Benjamin Hayes ("Hayes") (collectively, "Defendants," and without Zeta, "Individual Defendants"), under the Securities Exchange Act of 1934 (the "Exchange Act"). On May 12, 2025, Plaintiffs filed an Amended Complaint ("Compl."), the operative pleading. *See* ECF No. 92. Defendants have moved to dismiss. ECF No. 102. For the reasons discussed below, Defendants' Motion to Dismiss is **DENIED**.

## BACKGROUND

The following facts are taken from the Amended Complaint and are assumed to be true solely for the purposes of adjudicating Defendants' motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023).[1]

---

[1] All references to Rules are to the Federal Rules of Civil Procedure. In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

1

### A. Zeta's History

Zeta is a marketing technology company founded in 2007 by Defendant Steinberg and former Apple CEO John Sculley, *see* Compl. ¶ 27, and went public on June 10, 2021, now trading as a Delaware corporation on the NYSE under the ticker symbol "ZETA." *Id.* At all relevant times, Defendant Steinberg served as Zeta's CEO, *id.* ¶ 28; Defendant Greiner served as Zeta's CFO, *id.* ¶ 29; Defendant Gore served as Zeta's CDO, *id.* ¶ 30; and Defendant Hayes served as Zeta's SVP, *id.* ¶ 31. Plaintiffs are individuals who purchased or otherwise acquired the publicly traded common stock of Zeta during the period from February 27, 2024 through March 10, 2025 (the "Class Period"). *Id.* at 1.

According to its SEC filings, Zeta's "flagship product" is its Zeta Marketing Platform ("ZMP"), a platform that analyzes billions of data points "to predict individual consumers' intent by leveraging machine learning algorithms and the 'industry's largest opted-in data set.'" *Id.* ¶¶ 27, 41. Zeta "collect[s] consumer data—contact information (names, email addresses, etc.), shopping preferences, browsing history, etc.—then organizes and sells that data to companies who use it primarily for marketing purposes." *Id.* ¶ 41. Zeta obtained much of its consumer data through the acquisition of "a series of networks," according to Steinberg's statements in a March 4, 2024 Morgan Stanley conference. *Id.* ¶ 46. Prior to the Class Period, the Company made several "significant acquisitions," which Zeta explained were not for "[the companies'] core business strategies," but rather, for "the data generation and . . . [the ability to] combine them." *Id.* ¶ 46-47. These acquisitions included Disqus—"the web's largest conversation platform"—in 2017 for $90 million; Apptness—a job board publisher—in 2021 for nearly $48 million; and ArcaMax—a newsletter publisher—in 2022 for around $27 million. *Id.* ¶¶ 46-48, 68-70, 71. Roughly 65%, or $31.7 million, of the Apptness purchase price, and roughly 69%, or $18.6 million, of the ArcaMax

2

purchase price were attributed to "goodwill"—an accounting term referring to the premium paid above the fair value of the assets—based on the value of the user data acquired and added to the ZMP. *Id.* ¶¶ 69, 70. In reference to the Apptness and ArcaMax acquisitions, Steinberg stated that Zeta was "driving millions of opted-in consumers through those platforms." *Id.* ¶ 71.

## B. Zeta's Pre-Class Period Statements Regarding its Opted-In Data Set

In 2020, the year prior to Zeta's IPO, Apple announced that its forthcoming software system would mandate that all apps acquire affirmative "opt-in" user consent to tracking via individual Identifier for Advertisers (IDFA) information, a decision some data advertising analysts attributed to "the ongoing global regulatory scrutiny applied to the . . . industry." *Id.* ¶¶ 52, 58. This "opt-in" requirement, fully implemented in April 2021, exceeded the requirements of the California Consumer Privacy Act ("CCPA") at the time, which only mandated an "opt-out" framework that allowed a company to "assume[ ] the user's consent by virtue of using the service," unless the user took affirmative action to request removal from tracking. *Id.* ¶ 55. A November 2021 analyst report characterized the shift as "a game changer for the industry," and documented a drop from 75-80% to around 20% in the number of Apple users opting in to share their IDFA information. *Id.* ¶¶ 57, 58. During Zeta's Q2 2021 earnings call, Steinberg stated that Apple's change was "not going to affect [Zeta]," *id.* ¶ 59, and in its 2021 IPO registration statement, Zeta stated it had "implemented a framework to record and apply consumer consents that meet or exceed legal requirements in the U.S. and the E.U. We capture much of our opted-in data through our publisher network, which includes our commenting platform, Disqus." *Id.* ¶ 49.

Soon after, during an interview with *Yahoo Finance* on the day of its IPO, in response to a question about how Zeta intends to operate "when there's so much backlash around companies . . . collecting personal data that can be used for digital advertisers," Defendant Greiner said

3

> In the setting of privacy and personalization, what's unique about Zeta is—even if you zoom out and look at the evolving regulatory landscape from [the EU's General Data Protection Regulation] all the way through CCPA and even [Apple's announcement it would introduce even more features to help users control data use]—what's unique about our model is that we're philosophically, and the foundation of our data, is all built on permissioned data; data that's been opted-in.

*Id.* ¶ 63.

At the time, and during the Class Period, Zeta's online privacy policy stated that personal data "is collected when an individual consents to have their data used for marketing purposes," going on to explain that such consent "is generally provided at a website or landing page where an individual provides an email address and checks a box authorizing their data to be used for marketing [and related] purposes." *Id.* ¶ 60. The policy also stated that Zeta complied with the Self-Regulatory Principles for Online Behavioral Advertising as put forth by the Digital Advertising Alliance ("DAA"), which defines consent as "an individual's action in response to a clear, meaningful and prominent notice regarding the collection and use of data for [advertising] purposes." *Id.*

Following Zeta's IPO, Bank of America's analyst coverage highlighted the Company's opted-in data set as a "key differentiator" that gave it an advantage over "competitive data sets that are more reliant on third-party cookies." *Id.* ¶ 65. Another analyst report published by Roth Capital Partners issued a "Buy," reasoning that the shifting regulatory landscape "should favor opt-in data collection systems like the one Zeta has built and operated for many years." *Id.* ¶ 66.

**C. Zeta's Class Period Statements Regarding its Opted-In Data Set**

During Zeta's February 27, 2024 Q4 2023 earnings conference call, Steinberg referenced the Company's data set of "240 million-plus opted-in individuals" as an asset that would "unique[ly] position" Zeta to transition into the mobile advertising space. *Id.* ¶ 79. The next day, Zeta published its Form 10-K for the 2023 fiscal year, including a statement that "[its] data set

4

contains more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally." *Id.* Also on February 28, 2024, Needham & Company issued a "Buy" rating with a price target of $13 per share, while Zeta's stock was trading at around $10.67, noting in its accompanying analyst report that the ZMP "analyzes billions of structured and unstructured data points to predict consumer intent by leveraging . . . the industry's opted-in data set." *Id.* ¶ 80.

During a Morgan Stanley Technology, Media & Telecom Conference on March 4, 2024, Steinberg again made references to the Company's data set, stating that "[w]e have 240 million opted-in Americans in our data cloud that we're seeing across 5.2 million publisher platforms on a first-party basis," and that "[t]he 240 million Americans in our data cloud have opted-in to be there." *Id.* ¶ 81. He later reiterated this sentiment during a July 31, 2024 Q2 2024 earnings conference call, stating that Zeta had "assembl[ed] one of the largest proprietary opted-in data clouds" over the previous 15 years. *Id.*

In the months following these statements, numerous analyst reports issued "Buy" ratings at least in part premised upon Zeta's opted-in data set. *Id.* ¶¶ 82-83. On July 15, 2024, Truist Securities published a report noting Zeta's possession of "the largest opted-in consumer data sets in the world . . . [with] over 240 million opted-in individuals in the US and over 525 million opted-in individuals worldwide." *Id.* ¶ 82. The report also predicted a greater scrutiny of industry standards regarding data collection and privacy, but still issued a "Buy" rating with a price target of $23 per share, while Zeta was trading at around $17.66 per share at the time. *Id.* On July 31, 2024, following Steinberg's statements in the Q2 2024 call, Truist Securities issued another report, increasing the price target to $30 per share, meant to reflect its assessment that "Zeta [was] well outgrowing its market" as a result of its "differentiated proprietary opted-in data cloud." *Id.* ¶ 83. Finally, on October 21, 2024, KeyBanc stated that Zeta's "secret sauce" was its "240+M opted in

consumers with a Zeta ID that, unlike cookies or IDFA or bulk email rules, are completely in the hand of Zeta." *Id.* ¶ 84. Several days later, on October 25, Steinberg appeared on Fox Business television and stated that "over 240 million Americans have opted-in to our data cloud." *Id.* ¶ 85.

### D. The Culper Report and Zeta's Response

On November 13, 2024, Culper Research, a research investment firm, issued a report (the "Culper Report" or the "Report") alleging that Zeta used "deceptive" practices to gather its purportedly "opted-in data," citing "conversations with former employees, a September 2023 class action lawsuit," "[their] own experiences," and "numerous online complaints" as corroborating this claim. *Id.* ¶ 9. According to the Report, Zeta operated "consent farms," which are "sham websites" that obtain data from individuals "under false pretenses" by promising "job applications, stimulus money, or other rewards that *simply do not exist*." *Id.* (emphasis in original). Following publication of the Report, Zeta's stock price fell 37%. *Id.* ¶ 10.

Zeta immediately published a press release, "Zeta Response to Short-Seller Report," in which it stated, "We do not operate so-called 'consent farms.'" *Id.* ¶ 196. The Company also attached this press release to its Form 8-K filed the following day. *Id.* ¶ 200. On November 13, citing Zeta's reassurances in the press release, RBC Capital Markets concluded that "the stock reaction [was] significantly overdone" and issued a price target of $43.00, *id.* ¶ 92, and on the morning of November 14, 2024, Zeta's stock price had risen to $19.12, 7.66% higher than the previous day's close. *Id.* ¶ 90.

Other analysts published similar reports, attributing the stock decline to the publication of the Culper Report but nevertheless issuing higher "Buy" ratings based on the Company's response. *Id.* ¶¶ 92-97. Like RBC, Needham & Company set a price target of $43 based on "the[ ] points of clarification in [Zeta's] response." *Id.* ¶ 93. D.A. Davidson set a price target of $42, specifically

6

citing its conversation with management as confirmation that "Z[eta] has compliant processes in place to collect exclusive opt-in information." *Id.* ¶ 95.

Others, including Morgan Stanley and Canaccord Genuity, published more skeptical reports. Morgan Stanley noted that the Company had not addressed all of the issues raised in the Report and concluded that it was "not yet comfortable with . . . the nature of the data aggregation tactics, and . . . the quality of the data assets." *Id.* ¶ 96. Canaccord also acknowledged the uncertainty of "taking management at their word," but later issued a follow-up note, stating that it had confirmed the following through conversations with management: (1) Zeta's data collection practices "are opt-in, which means that consumers check a box that consents to their information being collected"; and (2) "there is a transfer of value to that consumer in exchange for their consent." *Id.* ¶¶ 94, 97.

After the press release, Zeta's public response to the Report continued with Defendants Steinberg and Greiner's participation in a webinar on November 14, 2024 called "Zeta: Update on Company in Response to Recent Price Movements," during which Steinberg stated that "[i]n a hundred percent of the cases where we collect a consumer's data, there's a value exchange." *Id.* ¶ 198. Further, on November 20, the Company published a presentation on its website, and held an investor conference call with William Blair, in which Defendants Steinberg, Greiner, Gore, and Hayes participated. *Id.* ¶¶ 202-03, 205-06. The presentation, titled "Setting the Record Straight – Zeta Provides the Facts on its Robust Accounting Processes and Controls Data Collection Policies, and Privacy Oversight," stated on Slide 4 that "Zeta does not operate 'consent farms,'" and on Slide 5 that "[Apptness and ArcaMax] are not 'consent farms.'" *Id.* ¶¶ 202-03.

During the William Blair conference call, Gore also made a number of verbal statements. In response to a question about how "investors can evaluate the quality of Zeta data assets," Gore responded

> And as part of that check, you should ask the question, is the data asset collecting data in the path of the consumer? And when I say that, what I mean is, do you actually have code on page where consumer is interacting with a website and agreeing to a terms of service or actually applying a consent flag as part of an opt-in so that you're doing it in a way that is exposed to them and they have controls of the way their data is used. That data needs to be used to enhance their experience. That's the basic value exchange that takes place.

*Id.* ¶ 205.  Later in the call, Gore participated in the following exchange

> Q: And if we now take this, the data collection mechanism and think about some of the claims made in [the Culper] report, what is Zeta doing actively? And maybe, Ben [Hayes], you can jump in here, but what processes, what controls do you have in place to ensure that the data you're collecting is opted in, it's consented, that it complies with consumer data protection laws, that it complies with regulations, and that you're not running afoul of any of those?
>
> Gore: The one thing I want to make really clear is that we have 240 million people in our graph that are opted-in for tracking and monitoring for digital marketing, display ads, CTV ads, calculation of intent.

*Id.* ¶ 206.  Gore also made statements about Apptness, characterizing it as "a performance marketing publisher, where there's an explicit exchange between a consumer . . . willing to opt-in to a service and provide their data." *Id.* ¶ 208.  Hayes echoed these sentiments, explaining that "in the clearest terms, [Zeta] [does] not operate any sites that trick or mislead consumers into giving . . . their data." *Id.* ¶ 106.

On November 21, Morgan Stanely issued another report, stating that "not all data points are created equal," and concluding that Zeta had not sufficiently dispelled the Report's comparisons to the fraudulent data collection practices of Zeta's competitor Fluent, which had recently faced a Federal Trade Commission ("FTC") enforcement action regarding its "massive 'consent farm' enterprise,":

8

> [T]he [Culper] short report specifically features screen shots of Zeta's alleged data collection practices, which appear quite similar to those of Fluent, a company which faced regulatory action. The rebuttal does acknowledge these screen shots, referring to them as "false", though stops short of providing incremental context, which could have potentially increased investor (and our) confidence in how the seller engineered these images. While Zeta does opine on differences between their practices and those of Fluent, we have unanswered questions. We look forward to gaining further insight into these outstanding questions at the company's announced Data Summit on December 9th.

*Id.* ¶ 103-04

A week later, on November 27, Steinberg appeared on CNBC, and in response to a question about whether the Company was operating consent farms, stated

> No. We never do consent farms . . . We have spent hundreds of millions of dollars over the years in acquiring companies that create first party, opted-in data, where we partner with the consumer.  The consumers are always getting a value exchange . . . A consent farm is when somebody is running misleading ads to get somebody to sign up for something that they have no intention of giving them. We never do that and we have never done that.

*Id.* ¶ 107.

### E.  Zeta's Subsequent Statements and Changes to Form 10-K Language

On December 9, 2024, the Company hosted the "Zeta Data Summit," an in-person and virtual conference, which included a presentation describing the Company as in a state of "[c]risis" since publication of the Report, and outlining the steps Zeta has been taken in response.  *Id.* ¶ 108. Defendant Gore also made statements drawing a distinction between two subsets of individuals included in the total 240 million opted-in data set:

> Now, one thing I'm going to call out before we continue is that digital and email permission are different.  The 245 million people that we see across the US, we have digital permission on . . . There is a subset of the population, about 110 million that we actually have opt-in email permission for.  These are people that we would send acquisition email to, but it's a subset of the 245 million that we have in the overall graph.  And again, across both of these vectors, we comply with federal, state and self-regulatory programs.

*Id.* ¶ 109.  Explaining the difference between the three types of data Zeta collected from users—identity, signal, and identifier, Gore stated that "[t]o be a really good data cloud, you need to have all three things happening persistently and being refreshed persistently," but also disclosed that Zeta "received only identity data from opted-in individuals, and not the valuable signal or identifier data." *Id.* ¶ 112-14.  Following the Summit, Zeta's share price declined from an open of $26.10 on December 9 to a close of $22.97 on the same day—a 12% decline.  *Id.* ¶ 116.

On December 12, 2024, "widely subscribed and viewed investor podcaster" and Youtuber Anthony Pompliano interviewed Defendant Steinberg, who again stated that Zeta has 245 million people opted-in individuals in its data cloud, all of whom are getting a value exchange.  *Id.* ¶ 118. Soon after, William Blair published a report highlighting "the breadth of [Zeta's] opted-in data sources as a moat that would make it difficult for a competitor to replicate its offering," and attributing its ability to attract "large customers in highly regulated industries" to its approach to data privacy.  *Id.* ¶ 119.

On February 26, 2025, Zeta filed its 2024 Form 10-K, which altered certain language as compared with past filings.  *Id.* ¶ 121.  The Company's 2023 Form 10-K had listed four pillars upon which ZMP was built, including Zeta's "Opted-in Data Set" of "more than 240 million opted-in individuals in the U.S. and more than 535 million opted-in individuals globally."  *Id.*  The 2024 10-K, however, removed the "opted-in language," stating only that "Zeta's Data Set" included "more than 245 million individuals in the U.S. and more than 535 million individuals globally." *Id.*  The Company made similar changes to the risk disclosure section of the form.  *Id.* ¶ 122.  Its 2023 10-K had stated that "the principal way [Zeta] collect[s] individual opted-in data is directly from consumers when they register or interact with our platform . . . or with partners' services";

10

the risk disclosure section of the 2024 10-K removed the word "opted-in." *Id.* That day, Zeta's share price declined on unusually high trading from $20.48 to $17.77 per share. *Id.* ¶ 123.

Finally, on March 10, 2025, *The Capital Forum* promoted an article, "Zeta Global: Company Removes References to 'Opted-In' Data in 10-K Filings Experts Question Data Collection Claims," on the social media platform X (formerly known as Twitter). *Id.* ¶ 124. The article quoted several data privacy experts opining on Zeta's removal of the opt-in language from its 2024 10-K. *Id.* One professor described the removal as "concerning," and another highlighted the legal "difference between data that is subject to an actual affirmative express consent indication process versus data that's not," which is "very relevant to companies that are considering whether they can use [Zeta]." *Id.* Some experts also claimed that in light of Zeta's clarification that its 245 million user data set represents customers who have provided "Permission to Online Tracking by Agreeing to Publisher Terms of Service," rather than opt-in consent, the Company may be in violation of state laws mandating affirmative express consent to gather sensitive data. *Id.* ¶ 125.

The article also quoted a Zeta spokesperson, who stated that the removal of the opt-in language was intended "to provide shareholders with clear and accurate disclosures, and that "[the] update ensure[d] [their] terminology aligns with the nature of permissions across our data assets to prevent misinterpretation." *Id.* ¶ 126. A March 10 press release, titled "Zeta Global Statement on Data Terminology Updates" and published on Zeta's website, included identical explanations of the decision to remove the opt-in language. *Id.* ¶ 127. Zeta's stock declined from its March 9 closing price of $15.82 to $14.03 at close on March 10, with an "unusually high trading volume" of nearly 10 million shares. *Id.* ¶ 128.

**LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106 (2d Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In assessing the complaint, [a court] must construe it liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiffs' favor." *Id.* at 106-07. However, the court must disregard any "conclusory allegations, such as 'formulaic recitations of the elements of a cause of action.'" *Id.* at 107 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Rule 9(b) requires that "a party . . . state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). The PSLRA "expanded on the Rule 9(b) standard." *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012). The PSLRA requires that a plaintiff "(1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter—the required state of mind." *Set Cap. LLC*, 996 F.3d at 75.

**DISCUSSION**

**I. Liability under Section 10(b)**

Count I of the Amended Complaint alleges a violation of Section 10(b) of the Exchange Act, which prohibits the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of the rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the

protection of investors." *See In re Omega Healthcare Invs., Inc. Sec. Litig.*, 375 F. Supp. 3d 496, 506 (S.D.N.Y. 2019) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)); *see also* 15 U.S.C. § 78u-4(b)(1).

> SEC Rule 10b–5(b) implements § 10(b) by declaring it unlawful:

> "(a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

*Omega Healthcare*, 375 F. Supp. 3d at 506 (quoting *Tellabs*, 551 U.S. at 318); *see also* 17 CFR § 240.10b–5.

To sustain a claim under § 10(b) and Rule 10b–5, a private plaintiff "must show (i) a material misrepresentation or omission; (ii) scienter; (iii) a connection with the purchase or sale of a security;[2] (iv) reliance by the plaintiffs; (v) economic loss; and (vi) loss causation." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).

### A. False or Misleading Statement

As explained below, the Court concludes that, at this stage of the litigation, Plaintiffs have adequately alleged that the statements about Zeta's "opted-in" user data set and about its alleged operation of consent farms were materially misleading.

### 1. Standard for a Material Misrepresentation

To adequately allege a material misrepresentation, a plaintiff must allege particularized facts showing that the statement "was false at the time it was made." *In re Bristol-Myers Squibb*

---

[2] This is a standing requirement and is satisfied by virtue of the fact that all Plaintiffs in the putative class bought or sold during the Class Period.

*Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 230 (S.D.N.Y. 2023) (citation omitted).  The challenged misstatement must be both (1) false or misleading and (2) material.

Rule 10b-5 prohibits "two things": (1) "any untrue statement of a material fact—*i.e.*, false statements or lies," and (2) "omitting a material fact necessary to make the statements made . . . not misleading."  *Macquarie Infrastructure Corp. v. Moab Partners, L. P.*, 601 U.S. 257, 263 (2024).  With respect to the second category, "Rule 10b–5(b) does not proscribe pure omissions," *id.* at 264—that is, "when a speaker says nothing, in circumstances that do not give any particular meaning to that silence," *id.* at 263.  Rather, the Rule only "prohibits omitting material facts necessary to make the statements made . . .  not misleading.  Put differently, it requires disclosure of information necessary to ensure that statements already made are clear and complete . . . "  *Id.* at 264; *see also Shapiro v. TG Therapeutics, Inc.*, 652 F. Supp. 3d 416, 421 (S.D.N.Y. 2023) ("[A]lthough Rule 10b-5 imposes no duty to disclose all material, nonpublic information, once a party chooses to speak, it has a duty to be both accurate and complete.").

"A statement or omission is material [for purposes of securities fraud] if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to act."  *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383, 389 (2d Cir. 2015).  "In general there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact."  *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014).  But "when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate."  *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).  "On a motion to dismiss, a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could

14

not differ on the question of their importance." *IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 389 (internal citations omitted).

### 2. Application

#### a. Statements about Zeta's "Opted-In" User Data Set

Plaintiffs have adequately pled that Defendants' statements about Zeta's "opted-in" data set were inaccurate. Plaintiffs allege that, following the release of the Culper report, Zeta began in December 2024 to scale down its statements about the size of its opted-in data set from 240+ million to 110 million individuals in the United States. Compl. ¶¶ 108-09. Plaintiffs also allege that, beginning in 2025, Zeta removed certain references to "opted-in" individuals from its Form 10-K report, in contrast to its report from the prior year. *Id.* ¶¶ 120-23. Plaintiffs contend that these statements and revisions reveal that Zeta's earlier statements about its purported 240+ million-person "opted-in" data set were misrepresentations, and that these statements are material because they characterized the data set as a uniquely superior asset within the industry that purportedly complied with regulatory requirements. *Id.* ¶¶ 79-81. The statements involve characterizations of the nature and value of Zeta's data set that would form an important consideration for a reasonable shareholder in evaluating the company; indeed, third party analysts published positive coverage of Zeta's business model, specifically referencing the size of Zeta's opted in data set, with Truist Securities issuing multiple "Buy" ratings for Zeta shares during the class period. *Id.* ¶¶ 82-84, 119. These allegations satisfy the threshold of materiality. *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 389-90 ("[F]or the misstatement to be material, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.").

15

Defendants' counter-arguments are unavailing.  First, they contend that Zeta in fact had 245 million users in its opted-in data set, even if only a subset of 110 million of those users actually consented to receive emails.  *See* Defs.' Reply in Supp. of Mot. to Dismiss ("Reply") at 3, ECF No. 106.  But on December 9, Gore specifically acknowledged that, of Zeta's 240+ million-person users, there are only "about 110 million *that we actually have opt-in* email permission for."  Compl. ¶ 109 (emphasis added).  And Plaintiffs, in part by relying on the independent analysis of their expert, have alleged that there is no accepted definition of "opted-in" that would match the larger 240+ million group, who essentially click a box agreeing to a party's terms of service without having another option.  *See, e.g.*, Compl. ¶¶ 111, 167-68, 170.  The Court concludes that, at this stage of the litigation, this is sufficient to allege that Defendants' statements were misleading.

Next, Defendants argue that the deletion of the "opted-in" language in the 2024 Form 10-K, and the clarifying statement explaining this change issued on March 10, 2025, do not suggest that their prior statements were false.  *See* Reply at 3-4.  But even crediting their argument that these were not corrections per se, and instead represented more of a *clarification* of how Zeta defines "opted-in," the lack of definitional clarity in Defendants' previous statements about the nature of the data illustrates that the statements were neither accurate nor complete.  At a minimum, they omitted critical information about the nature of the purported 240+ million-person data set, which renders the statements materially misleading.  *See Macquarie*, 601 U.S. at 263 (holding that, while "pure omissions" cannot form the basis of 10(b) liability, "representations that state the truth only so far as it goes, while omitting critical qualifying information"—or "half-truths"—remain actionable).[3]

---

[3] Defendants contend that denying the motion to dismiss on an omissions theory would amount to allowing an improper amendment of the Complaint.  *See* Reply at 3 n.1.  But the

Finally, Defendants argue that Plaintiffs have provided insufficient information about their anonymous expert for any allegations regarding the expert's conclusions to be considered in adjudicating the Motion to Dismiss. *See* Defs.' Mem. Supp. Mot. Dismiss ("Defs.' Mem.") at 6-7, ECF No. 104. However, at the pleading stage, Plaintiffs need only provide "information as to the identity, qualifications, *or* methodology of the expert that would tend to support his or her reliability." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 663 F. Supp. 3d 334, 372 (S.D.N.Y. 2023) (emphasis added). Here, the facts alleged about the anonymous expert's education, experience, and prior testimony to Congress, the FTC, and California Department of Justice provide sufficient information to support his reliability. Pls.' Mem. Opp'n Defs. Mot. Dismiss ("Pls.' Mem.") at 4, ECF No. 105.

In sum, Plaintiffs have adequately alleged materially misleading statements regarding Zeta's "opted-in" data set.

### b. Statements about the Operation of Consent Farm

Plaintiffs have also adequately pled that Zeta's statements disavowing the use of consent farms amounted to material misstatements. Plaintiffs have proffered information from the Culper Report, as well as findings from their own expert, to substantiate their allegations that Zeta does in fact operate consent farms. *Cf. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009) ("Where a complaint relies on both confidential witnesses and other factual information, such as documentary evidence, the plaintiffs need not name their sources so long as the latter facts provide an adequate basis for believing that the defendants' statements were false."). Defendants' misstatements about consent farms are material, because the inclusion of data derived from the

---

operative Complaint expressly refers to Defendants' "false and misleading statements *and omissions* concerning Zeta's oft-touted 'opted-in' data set." Compl. ¶ 183 (emphasis added).

operation of consent farms in Zeta's data set is a factor that a reasonable shareholder would consider in evaluating the company. *See IBEW Loc. Union No. 58 Pension Tr. Fund & Annuity Fund*, 783 F.3d at 390 ("a complaint may not be properly dismissed unless the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.") (internal citations and quotation marks omitted). Further, the use of consent farms is material to regulatory risk incurred by Zeta's business model in light of FTC enforcement action driven by the use of consent farms by competitors in the same industry. Compl. ¶¶ 103-04. *Cf. In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 315 (S.D.N.Y. 2013) (denying motion to dismiss where defendants' "disclosures did not specifically reveal the particular risks allegedly known to [them]").

Defendants' principal response is that, "[t]o the extent that open-market securities fraud complaints use as the source for adverse factual allegations about a public issuer a report by a short seller—an entity with an economic interest in driving down the company's stock price—these allegations must be considered with caution." Defs.' Mem at 12; *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 154 (S.D.N.Y. 2023); *see also Smith v. PureCycle Techs, Inc.*, 2024 WL 5186586, at *12 (S.D.N.Y. Dec. 20, 2024). Such "caution," however, does not require completely disregarding a short-seller's report, and courts have "generally sustain[ed] [short-seller attributions] where independent factual allegations corroborated the factual allegation in the complaint drawn from short-sellers' reports," as is the case here where Plaintiffs also rely on their own expert's independent corroboration of the Report's findings. *See Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020). While Defendants contest the expert's findings, the Court

18

concludes, for the reasons stated above, that they are sufficient to support Plaintiffs' allegations at this stage of the litigation.[4]

### B. Scienter

#### 1. Standard

The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). The requisite state of mind for a § 10(b) claim is "an intent to deceive, manipulate or defraud." *Setzer v. Omega Healthcare Invs., Inc.*, 968 F.3d 204, 212 (2d Cir. 2020) (internal quotation marks and citation omitted). Courts in this Circuit have held that a plaintiff can satisfy this requirement by "alleging facts (1) showing that defendants had both motive and opportunity to commit the fraud *or* (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* (emphasis added) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007); *see also In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 269 (2d Cir. 1993) (holding that motive and opportunity, and conscious misbehavior or recklessness, are two "distinct ways in which a plaintiff may plead scienter"); *see also Tellabs.*, 551 U.S. at 310 (holding that "[t]he absence of a motive allegation . . . is not fatal for allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety.").

A plaintiff may properly plead recklessness by alleging that the defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Emps.' Ret.*

---

[4] Because the Court concludes that the "plaintiffs have identified specific statements" that "are allegedly misleading," it rejects Defendants' "puzzle pleading" argument. *Kusnier v. Virgin Galactic Holdings, Inc.*, 639 F. Supp. 3d 350, 369 (E.D.N.Y. 2022).

*Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).  "At the motion to dismiss stage, a tie on scienter goes to the plaintiff."  *Okla. Firefighters Pension & Ret. Sys. v. Musk*, 779 F. Supp. 3d 396, 422 (S.D.N.Y. Mar. 28, 2025) (collecting cases).

### 2. Application

Here, Plaintiffs have alleged that

C-Suite and high-level executives at Zeta claimed that Zeta would "validate," record, and monitor every opt-in consent from each individual user's data acquired by the Company. Moreover, Zeta and the Individual Defendants also emphasized repeatedly that Zeta was heavily invested in oversight of its data collection practices and integrity.

Compl. ¶ 263.  In other words, Defendants "knew facts or had access to information" as to the true nature of Zeta's opted-in data set, "suggesting that their public statements were not accurate." *Emps.' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 306.  Defendants respond that it is unremarkable that a company like Zeta tracked its data in this way.  *See* Reply at 6.  But as Plaintiffs point out, "[t]hese are not general statements about data 'integrity,' . . . but specific representations about Zeta's data tracking capabilities and Defendants' own detailed monitoring and access to this information," Pls.' Mem. at 12—information that was central to Defendants' representations about the superiority of Zeta's business model vis-à-vis its competitors.

And while responding to a short-seller by disclosing more precise information does not necessarily amount to an admission of fraud, Plaintiffs allege that Defendants' *changing* responses to the Culper Report—first denying the Report altogether, but then clarifying the nature of Zeta's "opted-in" data set—support an inference that Defendants knew that their initial denials about the Culper Report's conclusions and representations about their data set were inaccurate.  Pls.' Mem. at 13-14; *cf. In re Nielsen Holdings PLC Securities Litig.*, 510 F. Supp. 3d 217, 237 (S.D.N.Y. 2021) ("Defendants' repeated assurances about [a privacy regulation]'s *de minimis* impact on [a company] throughout the first half of 2018 and the magnitude of the event support an inference

20

that Defendants knew facts or had access to information suggesting that these statements were materially misleading."). Notably, Defendants do not claim that, after initially denying the Culper Report's results, their subsequent statements clarifying the nature of their "opted-in" data collection arose from any new information. *See* Compl. ¶¶ 282, 285-86, 290. At this stage of the litigation, where a "tie on scienter goes to the plaintiff," Plaintiffs' allegations are sufficient to establish Defendants' conscious recklessness. *See Musk*, 779 F. Supp. 3d at 422.[5]

## C. Causation

In order to establish § 10(b) liability, a plaintiff "must prove both transaction and loss causation." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005) (collecting cases). The Court considers both forms of causation in turn.

### 1. Transaction Causation

"Transaction causation is akin to reliance, and requires only an allegation that 'but-for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction.'" *Id.* (quoting *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003)). Although "direct proof . . . that a plaintiff was aware of a company's statement and engaged in a relevant transaction" is sufficient, courts have recognized that "requiring such direct proof of reliance 'would place an unnecessary unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market.'" *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 245 (1988)).

---

[5] Because scienter has been adequately pled under a theory of conscious misbehavior and recklessness, the Court does not address Plaintiffs' alternate theory, argued under motive and opportunity.

Alternatively, under a fraud-on-the-market theory, which assumes that "most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations . . . may be presumed for the purposes of a Rule 10b-5 action." *See Basic Inc.*, 485 U.S. at 247; *see also Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74, 85 (2d Cir. 2023) ("*Basic* rests on what is referred to as the 'fraud-on-the-market' theory—that a stock trading on theoretically efficient markets like the New York Stock Exchange or Nasdaq, incorporates all public, material information, including material misrepresentations, into its share price."). To establish reliance under this theory, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co.*, 573 U.S. at 268.

At this stage of the litigation, Plaintiffs have adequately pled these elements. They allege that Defendants' misstatements were broad and publicly facing and therefore publicly known. Compl. ¶ 350. As discussed, *supra*, Plaintiffs have adequately alleged that the misstatements or omissions were material. The stock was traded in an efficient market because it was listed on the New York Stock Exchange. Compl. ¶ 350. And Plaintiffs allege that they traded the stock during the relevant class period. *Id.*

### 2. Loss Causation

Loss causation is the "causal connection between the material misrepresentation and the loss." *See Dura*, 544 U.S. at 342. To adequately state a claim under § 10(b), a plaintiff must "demonstrate that 'the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (quoting

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016)).  To satisfy this requirement, a plaintiff may either allege "(a) the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud; or (b) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 232-33 (2d Cir. 2014) (citing *In re Omnicon Grp., Inc. Sec. Litig.*, 597 F.3d at 511, 513); *see also In re Omnicon Grp., Inc. Sec. Litig.* 597 F.3d at 511 ("Establishing either theory as applicable would suffice to show loss causation."). Ultimately, a plaintiff's burden in alleging loss causation "is not a heavy one." *Lorely Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 187 (2d Cir. 2015) (citing *Dura*, 544 U.S. at 347).  "The complaint must simply give Defendants 'some indication' of the actual loss suffered and of a plausible causal link between that loss and the alleged misrepresentations." *Id.*

Plaintiffs have adequately pled loss causation.  They identify declines in the value of Zeta securities that coincide in time with the disclosures of the alleged misstatements or omissions. Compl. ¶¶ 335, 337, 340, 343, 346.  And they allege facts that suggest the declines were plausibly caused by these disclosures, rather than independent fluctuations in the market.  *Id.* ¶¶ 336, 341, 344, 347.  At this stage of the litigation, these allegations are sufficient.  *See Lorely Fin. (Jersey) No. 3 Ltd.*, 797 F.3d at 187.

## II. Control Person Liability Under Section 20(a)

Count II alleges a claim of "control person liability" under Section 20(a) of the Exchange Act against all of the Individual Defendants.  Section 20(a) states:

> Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person whom such controlled person is liable . . . , unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  "To establish a prima facie case of control person liability, a plaintiff must show (1) a primary violation by the controlled person [here, Zeta], (2) control of the primary violator by the defendant [here, the Individual Defendants], and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *See In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 25 (S.D.N.Y. 2016).  If the plaintiff clears this threshold, "the burden shifts to the defendant to show that he acted in good faith, and that he 'did not directly or indirectly induce the acts or acts constituting the violation.'"  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473 (2d Cir. 1996) (quoting 15 U.S.C. § 78t(a)).

### A.  Primary Violation

Whether a "primary violation" has been established "rises and falls with the [§ 10(b)] analysis."  *See San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 326 (S.D.N.Y. May 1, 2024).  The Individual Defendants argue that the § 20(a) claim must be dismissed because Plaintiffs have failed to allege a primary violation, but as discussed above, *see supra* Section A, Plaintiffs have sufficiently pled violations of § 10(b) by Zeta—the controlled "person."

### B.  Control of the Primary Violator

Turning to the second element, "in order to allege 'control person' status, [a] plaintiff must allege that the defendant had *actual* control over the primary violator."  *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y. 2005) (emphasis added) (citing *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997) ("Actual control is essential to control person liability.").  Actual control requires a showing that the defendant had "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  *SEC v. First Jersey Sec.*, 101 F.3d at 1472-73.

However, the "exercise of influence, without power to direct or cause the direction of management and policies . . . in [a] direct way" is insufficient to establish actual control. *In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (citing *In re Flag Telecom*, 352 F. Supp. 2d at 458) ("Control in this context is not the mere ability to persuade, but almost always means the practical ability to *direct* the actions of people who issue or sell securities.").

Determining whether control has been established "necessarily involves an individualized, fact-sensitive analysis." *See In re Alstom SA*, 406 F. Supp. 2d at 487. Generally, officer or director status alone is insufficient to establish control for the purposes of § 20(a) liability, *see id.*, but "where it is alleged that an officer or director signed an allegedly fraudulent SEC filing, courts have concluded that 'control' was adequately pled." *In re Flag Telecom*, 352 F. Supp. 2d at 468 (collecting cases).

### 1. Steinberg and Greiner

Plaintiffs have adequately pled control for Steinberg. In addition to his role as co-founder and CEO, Plaintiffs allege that Steinberg made statements and answered questions at Zeta's earnings conference calls. Compl. ¶ 28. They also allege that he signed quarterly and annual financial reports and Sarbanes-Oxley Act certifications, and gave interviews to analysts and the media. *Id.*; *cf. In re Flag Telecom*, 352 F. Supp. 2d at 468.

Likewise, Plaintiffs have adequately pled control for Greiner. In addition to his role as Chief Financial Officer, Plaintiffs allege that Greiner gave prepared remarks and answered questions at Zeta's earnings conference calls and signed quarterly and annual financial reports and Sarbanes-Oxley Act certifications. Compl. ¶ 29.

### 2. Gore and Hayes

Unlike the other individual defendants, Gore and Hayes did not sign SEC filings, and Plaintiffs do not allege that either owns a large number of voting securities. *Cf. In re Flag Telecom*, 352 F. Supp. 2d at 468. However, Plaintiffs have alleged that both hold high positions at Zeta, with Gore "responsible for the Zeta global data and analytics strategy" and Hayes overseeing "the Company's privacy compliance program, which entails ensuring that the Company's data collection practices comply with the relevant regulatory requirements." *See* Compl. ¶ 272. Plaintiffs have alleged that Gore and Hayes directly made statements alleged to be material misrepresentations about Zeta's opted-in data set and its use of consent farms. Compl. ¶¶ 105-06, 210, 216, 260-61. That Gore and Hayes were given authority to be spokespeople on behalf of Zeta on these topics, combined with their respective job descriptions, suggests a sufficient level of control for purposes of this stage of the litigation. *See In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 351 (S.D.N.Y. 2004) (allowing control person claims to proceed despite "a close call on the issue of control" in light of the "presumption of control that follow[ed] from . . . defendants' extremely high ranks within the company").

### C. Culpable Participation

Turning to the third element, "culpable participation clearly requires 'something more than negligence,'" and although courts in this Circuit have expressed uncertainty about what exactly is required, recklessness appears to be "the minimum standard of culpability that plaintiffs must plead under Section 20(a)." *In re Alstom SA*, 406 F. Supp. 2d at 490. In the securities fraud context, recklessness may be established when plaintiffs "(1) specifically allege defendants' awareness of facts or access to information contradicting their public statements and thus that they knew or should have known they were misrepresenting material facts related to the corporation;

26

or (2) allege facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud. *See id.* at 491 (citing *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000)). Courts have enumerated behavior that is insufficient—"fraud by hindsight; negative public statements consistent with reasonably available data; failure to adequately monitor the behavior of others; and accounting violations"—absent a showing of "highly unreasonable or extreme misconduct." *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 422 (S.D.N.Y. 2001) (citing *Novak*, 216 F.3d at 309).

Here, Plaintiffs have adequately alleged culpable participation for all Individual Defendants. As discussed, *supra*, Plaintiffs have alleged that each Individual Defendant made public material misstatements, later contradicted by clarifying statements that appear to indicate they knew or should have known of information contradicting the initial statements. *Cf. In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d at 422.

## III.    Scheme Liability

Plaintiffs allege that, in violation of Rule 10b-5(a) and (c), Steinberg engaged in a fraudulent scheme to sell more than $270 million worth of Zeta shares "via a complex web of trusts and LLCs" in order to divest shares "while simultaneously misleading investors about the nature of Zeta's business and dataset." Pls.' Mem. at 24. To bring a scheme liability claim, a Plaintiff must allege "(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter,[6] and (4) reliance.[7]" *Plumber &*

---

[6] As discussed, *supra*, the Court has already determined that Plaintiffs have sufficiently alleged scienter for Defendants, including Steinberg, whose corrective statements following the Culper Report support an inference that he acted with conscious recklessness.

[7] Defendants do not challenge Plaintiffs' allegations of reliance in connection with their scheme liability claim.

*Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021). The Second Circuit has held that "misstatements and omissions can form *part* of a scheme liability claim, but an actionable scheme liability claim also requires something *beyond* misstatements and omissions." *Musk*, 779 F. Supp. 3d at 418; *see, e.g.*, *Gruber v. Gilbertson*, 2018 WL 1418188, at *14 (S.D.N.Y. Mar. 20, 2018) (holding that awarding family members shares for financial gain is "a telltale sign of deceptive conduct" sufficient to allege a deceptive act in furtherance of a scheme to defraud).

Here, Plaintiffs have alleged that in addition to the misstatements and omissions, discussed *supra*, Steinberg gifted stock to purportedly independent affiliates under his control, thereby enabling him to direct the sale of large quantities of shares while avoiding reporting requirements. Compl. ¶ 318. Plaintiffs allege that in doing so, Steinberg justified an artificially bullish projection of the shares' value. *Id.* ¶¶ 321-24. This alleged act to pump the price of Zeta's stock is sufficient for purposes of pleading the first two elements of a scheme liability claim. *Cf. SEC v. Stubos*, 634 F. Supp. 3d 174, 201 (S.D.N.Y. 2022) (holding that stock transactions while allegedly misleading investors are sufficient to establish scheme liability).

## CONCLUSION

For the reasons discussed herein, Defendants' Motion to Dismiss is **DENIED**. The parties are directed to file a joint status letter within fourteen (14) days of the date of this Order proposing next steps in this litigation. The letter shall address (1) an amended proposed case management plan, which shall be attached as an exhibit to the letter; (2) whether the parties seek a referral to the District's Mediation Program or a settlement conference; and (3) any other matters that the parties wish to address.

The Clerk of Court is respectfully requested to terminate ECF 102.

SO ORDERED.

Dated: July 8, 2026

New York, New York

DALE E. HO
United States District Judge